# EXHIBIT A

Case 1:23-cv-00066-FPG  Document 1-1  Filed 01/23/23  Page 2 of 208

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ERIE
---------------------------------------------------------------X
THE CITY OF BUFFALO,

               Plaintiff,

– against–

SMITH & WESSON BRANDS, INC.; BERETTA
U.S.A. CORP.; BUSHMASTER FIREARMS
INDUSTRIES, INC.; COLT'S MANUFACTURING
COMPANY, LLC; GLOCK, INC.; HI-POINT
FIREARMS, A/K/A STRASSEL'S MACHINE, INC.;
JA INDUSTRIES, LLC, F/K/A JENNINGS
FIREARMS, F/K/A BRYCO ARMS, F/K/A JIMENEZ
ARMS; KEL-TEC CNC INDUSTRIES, INC.; O.F.
MOSSBERG & SONS, INCORPORATED;
REMARMS, LLC, A/K/A REMINGTON FIREARMS;
SAVAGE ARMS, INC.; SIG SAUER, INC.;
SPRINGFIELD ARMORY, INC.; STURM, RUGER &
CO., INC.; SCCY INDUSTRIES, LLC; TAURUS
HOLDINGS, INC., A/K/A TAURUS
INTERNATIONAL MANUFACTURING, INC.; ARM
OR ALLY, LLC; BROWNELLS, INC., A/K/A
BROWNELLS OR BOB BROWNELL'S; GS
PERFORMANCE, LLC, A/K/A GLOCKSTORE,
A/K/A GSPC A/K/A DOUBLE DIAMOND; INDIE
GUNS, LLC; JSD SUPPLY; KM TACTICAL;
POLYMER80, INC.; PRIMARY ARMS, LLC;
RANIER ARMS, LLC; SALVO TECHNOLOGIES,
INC., A/K/A 80P BUILDER OR 80P FREEDOM CO.;
ROCK SLIDE USA, LLC; BANGERS, L.P. N/K/A
IRON VALLEY™ SUPPLY CO.; GUN CENTER
INC., A/K/A GC WHOLESALE; RSR GROUP, INC.;
VINTAGE FIREARMS, LLC; AND WOLCOTT
GUNS INC.,

               Defendants.
---------------------------------------------------------------X

**Index No.:**

**SUMMONS**

**TO:**   **THE ABOVE NAMED DEFENDANTS:**

     **YOU ARE HEREBY SUMMONED** to answer the Verified Complaint in this action
and to serve a copy of your Answer, or, if the Verified Complaint is not served with this
Summons, to serve a notice of appearance, on the plaintiff's attorney within 20 days after service
of this Summons, exclusive of the day of service, where service is made by delivery upon you

personally within the state, or within 30 days after completion of service where service is made in any other manner.  In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Verified Complaint. The basis of the venue is the Plaintiff's places of business and the location in which this cause of action arose.

Dated:   Melville, New York
         December 20, 2022                      NAPOLI SHKOLNIK PLLC

                                                By: /s/ Salvatore C. Badala
                                                     Salvatore C. Badala
                                                     Shayna E. Sacks
                                                400 Broadhollow Road, Ste 305
                                                Melville, New York 11747
                                                Tele.: (212) 397-1000
                                                Email: SBadala@Napolilaw.com
                                                       SSacks@Napolilaw.com
                                                -and-
                                                NAPOLI SHKOLNIK
                                                NS PR LAW SERVICES, LLC
                                                /s/ Paul Napoli
                                                /s/ Hunter J. Shkolnik
                                                1302 Avenida Ponce de León
                                                Santurce, Puerto Rico 00907
                                                Tele: (833) 271-4502
                                                Email: PNapoli@NSPRLaw.com
                                                       Hunter@NSPRLaw.com

                                                *Attorneys for Plaintiffs*

**DEFENDANTS:**

SMITH & WESSON BRANDS, INC.
Registered Agent: Solutions, Inc. 44 School Street, Suite 505, Boston, MA 02108

BERETTA U.S.A. CORP.
Address: 17601 Beretta Drive, Accokeek, MD 20607
Registered Agent: Steven Biondi, 17601 Beretta Drive, Accokeek, MD 20607

BUSHMASTER FIREARMS INDUSTRIES, INC.
Address: 3505 Arrowhead Drive, Carson City, NV 89706
Registered Agent: Sun Naegele, 3505 Arrowhead Drive, Carson City, NV 8970

COLT'S MANUFACTURING COMPANY, LLC
Address: 545 New Park Avenue, West Hartford, CT 06110
Registered Agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808

GLOCK, INC.
Address: 6000 Highlands Parkway SE, Smyrna, GA 30082-7204
Registered Agent: Carlos Guevara, 6000 Highlands Pkwy, Attn: Legal Dept., Smyrna, GA, 30082

HI-POINT FIREARMS, A/K/A STRASSEL'S MACHINE, INC.
Address: 1015 Springmill Rd., Mansfield, OH 44906
Registered Agent: Joseph M. Strassell, 1015 Springmill Street, Mansfield, OH 44906

JA INDUSTRIES, LLC, F/K/A JENNINGS FIREARMS, F/K/A BRYCO ARMS,
F/K/A JIMENEZ ARMS
Address: 249 Elliott Road Unit 1, Henderson, Nevada 89011
Registered Agent: The Amin Law Group NV, Ltd., 3753 Howard Hughes Pkwy, Suite 200, Las
Vegas, NV 89169

KEL-TEC CNC INDUSTRIES, INC.
Address: 1475 Cox Road, Cocoa, Florida
Registered Agent:  Ganon J. Studenberg, Esq., 1119 Palmetto Avenue, Melbourne, FL 32901

O.F. MOSSBERG & SONS, INCORPORATED
Address: 7 Grasso Avenue, North Haven, CT 06473
Registered Agent: Corporation Service Company, Goodwin Square 225 Asylum Street, 20th Floor,
Hartford, CT 06103

REMARMS, LLC, A/K/A REMINGTON FIREARMS
c/o Registered Agent: Corporation Service Company, 251 Little Falls Dr., Wilmington, DE 19808

SAVAGE ARMS, INC.
Address: 100 Springdale Rd, Westfield, MA 01085
Registered Agent: Thomas W. Humphrey, 100 Springdale Road, Westfield, MA 01085

SIG SAUER, INC.
Address: 72 Pease Boulevard, Newington, NH 03801
Registered Agent: Cogency Global, Inc., 850 New Burton Road, Suite 201, Dover, DE 19904

SPRINGFIELD ARMORY, INC.
Address: 420 West Main Street, Geneseo, IL 61254
Registered Agent: James S. Zmuda,  1515 5th Avenue, Suite 700, Moline, IL 61265

STURM, RUGER & CO., INC.
Addresss: 1 Lacey Place, Southport, CT 06890
Registered Agent: The Corporation Trust Company,  Corporation Trust Center, 1209 Orange
Street, Wilmington, DE 19801

SCCY INDUSTRIES, LLC
Address: 1800 Concept Court, Daytona Beach, FL 32114
Registered Agent:  Palmetto Charter Services, Inc.,  149 S. Ridgewood Avenue, Suite 700, Daytona,
Beach, FL 32114

TAURUS HOLDINGS, INC., A/K/A TAURUS INTERNATIONAL MANUFACTURING,
INC.
Address: 100 Taurus Way, Bainbridge, GA 39817
Registered Agent: Thomas Conger, 100 Taurus Way, Bainbridge, GA 39817

ARM OR ALLY, LLC
Address: 1021-C Technology Drive, Indian Trail, NC 28079.
Registered Agent: James F. Tobin at 6416 Providence Farm Lane, Apt. 1319, Charlotte, NC 28277

BROWNELLS, INC., A/K/A BROWNELLS OR BOB BROWNELL'S
Address: 3006 Brownells Pkwy, Grinnell, IA 50112
Registered Agent: Corporation Service Company, 505 5th Avenue, Suite 729, Des Moines, IA
50309

GS PERFORMANCE, LLC, A/K/A GLOCKSTORE, AKA GSPC AKA DOUBLE
DIAMOND
Address: 1930 Air Lane Drive, Nashville, TN 37210
Registered Agent: Leonard L. Magill, 1930 Air Lane Dr., Nashville, TN 37210-3810

INDIE GUNS, LLC
Address: 3208 E. Colonial Drive, #262, Orlando, FL 32803
Registered Agent: Lawrence Destefano,  3000 Huntington Street, Orlando, FL 32803

JSD SUPPLY
Address: 1052 New Castle Road, Prospect, PA 16052.
c/o JSD's Officer,  Jordon J. Vinroe, 106 Poplar Lane, Portersville, PA 16051

KM TACTICAL
Address: 6 SW Industrial Drive, Lee's Summit MO, 64081
Registered Agent: Kyle Wayne Murphy, 19009 E 31st Terr. Ct. S., Independence, MO 64057

POLYMER80, INC.
Address: 134 Lakes Blvd, Dayton, NV 89403
Registered Agent: Mark H. Gunderson, Gunderson Law Firm, 3895 Warren Way, Reno, NV 89509
PRIMARY ARMS, LLC
Address: 3219 S Sam Houston Pkwy E #100, Houston, TX 77047
Registered Agent:  Marshall Lerner, 3219 S. Sam Houston Parkway, Houston, TX 77047

Case 1:23-cv-00066-FPG  Document 1-1  Filed 01/23/23  Page 6 of 208

RANIER ARMS, LLC
Address: 2504 Auburn Way N, Auburn, WA 98002
Registered Agent:  John Hwang, 2504 Auburn Way N, Auburn, WA 98002-2420

ROCK SLIDE USA, LLC
Address: 303 N Main Street, Broadway, NC 27505
Registered Agent: Ian O. Frampton, 303 N. Main St., Broadway, NC 27505

SALVO TECHNOLOGIES, INC., AKA 80P BUILDER, AKA 80P FREEDOM CO.
Address: 8060 Bryan Dairy Rd, Largo, FL 33777
Registered Agent: Heather Dunn, 8192 Hopwell Court, Seminole, FL 33777.

BANGERS, L.P. N/K/A IRON VALLEY™ SUPPLY CO.
Address: 101 London Pkwy, Birmingham, AL 35211
Registered Agent: Rick Bestwick, #10 South 14th Street, Birmingham, AL 35233

GUN CENTER INC., A/K/A GC WHOLESALE
Address: 3385 Harlem Rd, Cheektowaga, NY 14225

RSR GROUP, INC.
Address: 4405 Metric Drive, Winter Park, FL, 32792-6904
Registered Agent: Incorporated Services, Ltd., 3500 S Dupont Hwy, Dover, DE 19901

VINTAGE FIREARMS, LLC
Address: 120 Nanticoke Ave, Endicott, NY 13760

WOLCOTT GUNS INC.
Address: 3052 Walden Ave, Depew, NY 14043

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ERIE

-------------------------------------------------------------------X

| | |
|---|---|
| THE CITY OF BUFFALO, | Index No.: |
| *Plaintiff,* | |
| -*against*- | |
| | |
| SMITH & WESSON BRANDS, INC.; BERETTA U.S.A. CORP.; BUSHMASTER FIREARMS INDUSTRIES, INC.; COLT'S MANUFACTURING COMPANY, LLC; GLOCK, INC.; HI-POINT FIREARMS, A/K/A STRASSEL'S MACHINE, INC.; JA INDUSTRIES, LLC, F/K/A JENNINGS FIREARMS, F/K/A BRYCO ARMS, F/K/A JIMENEZ ARMS; KEL-TEC CNC INDUSTRIES, INC.; O.F. MOSSBERG & SONS, INCORPORATED; REMARMS, LLC, A/K/A REMINGTON FIREARMS; SAVAGE ARMS, INC.; SIG SAUER, INC.; SPRINGFIELD ARMORY, INC.; STURM, RUGER & CO., INC.; SCCY INDUSTRIES, LLC; TAURUS HOLDINGS, INC., A/K/A TAURUS INTERNATIONAL MANUFACTURING, INC.; ARM OR ALLY, LLC; BROWNELLS, INC., A/K/A BROWNELLS OR BOB BROWNELL'S; GS PERFORMANCE, LLC, A/K/A GLOCKSTORE, A/K/A GSPC A/K/A DOUBLE DIAMOND; INDIE GUNS, LLC; JSD SUPPLY; KM TACTICAL; POLYMER80, INC.; PRIMARY ARMS, LLC; RANIER ARMS, LLC; SALVO TECHNOLOGIES, INC., A/K/A 80P BUILDER OR 80P FREEDOM CO.; ROCK SLIDE USA, LLC; BANGERS, L.P. N/K/A IRON VALLEY™ SUPPLY CO.; GUN CENTER INC., A/K/A GC WHOLESALE; RSR GROUP, INC.; VINTAGE FIREARMS, LLC; AND WOLCOTT GUNS INC., | |
| *Defendants.* | |

-------------------------------------------------------------------X

================================================================

## SUMMONS

================================================================

**NAPOLI SHKOLNIK PLLC**

400 Broadhollow Road, Ste. 305.Melville, New York 11747, Tel: (212) 397-1000
*Attorneys for Plaintiff*

================================================================

The undersigned attorney hereby certifies, pursuant to 22 NYCRR 130-1.1a that he has read the within papers and that same are not frivolous as that term is defined in 22 NYCRR 130-1.1(c).

/s/ Salvatore C. Badala
Salvatore C. Badala

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 8 of 208

=================================================================
Service of a copy of the within                              is hereby admitted.
Dated,
        _____
        Attorney(s) for
=================================================================
PLEASE TAKE NOTICE:

☐  NOTICE OF ENTRY
   that the within is a (certified) true copy of an              duly entered in the office of the
   clerk of the within named court on _____200__.

☐  NOTICE OF SETTLEMENT
   that an order                          of which the within is a true copy
   will be presented for settlement to the HON.              one of the judges of the
   within named Court, at                    on                   200___
   at_____ O'clock ____.M.

Dated, _____

                              Yours, etc.

                        **NAPOLI SHKOLNIK PLLC**

# EXHIBIT B

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF ERIE**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE CITY OF BUFFALO,

                    Plaintiff,

             – against–

SMITH & WESSON BRANDS, INC.; BERETTA U.S.A. CORP.;
BUSHMASTER FIREARMS INDUSTRIES, INC.; COLT'S
MANUFACTURING COMPANY, LLC; GLOCK, INC.; HI-
POINT FIREARMS, A/K/A STRASSEL'S MACHINE, INC.; JA
INDUSTRIES, LLC, F/K/A JENNINGS FIREARMS, F/K/A
BRYCO ARMS, F/K/A JIMENEZ ARMS; KEL-TEC CNC
INDUSTRIES, INC.; O.F. MOSSBERG & SONS,
INCORPORATED; REMARMS, LLC, A/K/A REMINGTON
FIREARMS; SAVAGE ARMS, INC.; SIG SAUER, INC.;
SPRINGFIELD ARMORY, INC.; STURM, RUGER & CO., INC.;
SCCY INDUSTRIES, LLC; TAURUS HOLDINGS, INC., A/K/A
TAURUS INTERNATIONAL MANUFACTURING, INC.; ARM
OR ALLY, LLC; BROWNELLS, INC., A/K/A BROWNELLS OR
BOB BROWNELL'S; GS PERFORMANCE, LLC, A/K/A
GLOCKSTORE, A/K/A GSPC A/K/A DOUBLE DIAMOND;
INDIE GUNS, LLC; JSD SUPPLY; KM TACTICAL;
POLYMER80, INC.; PRIMARY ARMS, LLC; RANIER ARMS,
LLC; SALVO TECHNOLOGIES, INC., A/K/A 80P BUILDER
OR 80P FREEDOM CO.; ROCK SLIDE USA, LLC; BANGERS,
L.P. N/K/A IRON VALLEY™ SUPPLY CO.; GUN CENTER
INC., A/K/A GC WHOLESALE; RSR GROUP, INC.; VINTAGE
FIREARMS, LLC; AND WOLCOTT GUNS INC.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No.:

**VERIFIED**
**COMPLAINT**

**PLAINTIFF**
**DEMANDS A**
**TRIAL BY JURY**

INTRODUCTION .................................................................................................................... 1

JURISDICTION AND VENUE ............................................................................................ 17

PARTIES ................................................................................................................................ 18

   I.   Plaintiff ......................................................................................................................... 18

   II.   Defendants. ................................................................................................................ 18
      A.   Manufacturers/Makers .......................................................................................... 18

      B.   Ghost Gun Defendants .......................................................................................... 26

      C.   Distributors ............................................................................................................. 28

FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION ................. 33

   I.   Firearm Violence in the United States, State of New York, and City of Buffalo .................. 33

   II.   The Primary and Secondary Market for Guns ....................................................... 45

   III.   Diversion to the Illegal Market .............................................................................. 46
      A.   Illegal Sales at Gun Shows .................................................................................... 47

      B.   Private Sellers and Other Non-Storefront Sales .................................................. 47

      C.   Straw Purchases ....................................................................................................... 48

      D.   Multiple Sales .......................................................................................................... 49

      E.   Corrupt FFLs .......................................................................................................... 49

      F.   Other Means of Diversion ..................................................................................... 49

   IV.   The Trace Database ................................................................................................... 76

   V.   Indications that Defendants Have Knowledge of the Diversion of Handguns to the Illegal Market .............................................................................................................. 78

   VI.   Merchandising Practices that Could Reduce Illegal Diversion .............................. 81

   VII.   2022 U.S. House of Representatives Committee on Oversight and Reform's Investigation into Gun Industry Practices and Profits ....................................................... 83

   IX.   Ghost Gun Defendants .......................................................................................... 109
      A.   Ghost Gun Defendants' Firearm Products Are Manufactured to Be Easily Converted in to Working, Untraceable Firearms, and Are Sold Without Background Checks or Other Public Safety Concerns .......................................................................................... 109

      B.   Ghost Gun Defendants Violate and Circumvent, and Assist Their Customers in Violating and Evading, State and Federal Gun Laws Designed to Protect Public Safety ......................... 119

        i.   The Federal Gun Control Act. ........................................................................ 119

        ii.   New York State Law ....................................................................................... 122

      C.   Ghost Guns Endanger the Public and Undermine Law Enforcement .............................. 122

      D.   Ghost Gun Defendants' Online Marketing and Sales of Ghost Guns .............................. 125

i

i.      Arm or Ally ................................................................................... 127

ii.     Rainier Arms ................................................................................. 131

iii.    80P Builder .................................................................................... 133

iv.     Rock Slide USA ............................................................................. 136

v.      Indie Guns ..................................................................................... 138

vi.     Brownells ....................................................................................... 141

vii.    Glockstore/GS Performance .......................................................... 146

viii.   KM Tactical ................................................................................... 148

ix.     Primary Arms ................................................................................ 150

x.      Polymer 80 ..................................................................................... 150

xi.     JSD Supply ..................................................................................... 155

E.   Ghost Gun Defendants' Guns Have Harmed the City of Buffalo and Will Continue to
Do So If Unabated. ...................................................................................... 158

i.      The Rise of Ghost Guns and the Damage Done ............................ 159

ii.     Ghost Gun Defendants' Firearm Products Are Manufactured to Be Easily Converted
Into Working Untraceable Firearms and Are Sold Without Background Checks or Other
Public Safety Concerns. ........................................................................ 161

X.   Defendants' Conduct Is Dangerous and Directly Harms the City of Buffalo ..................... 162

XI.    This Avoidable Crisis Needs to Be Fixed ................................................. 176

FIRST CAUSE OF ACTION ................................................................................ 179

SECOND CAUSE OF ACTION ............................................................................ 183

THIRD CAUSE OF ACTION ............................................................................... 186

FOURTH CAUSE OF ACTION ............................................................................ 188

REQUEST FOR RELIEF .................................................................................... 190

Plaintiff, City of Buffalo, New York ("Plaintiff," "City," or "Buffalo"), by and through its attorneys, Cavette A. Chambers, Corporation Counsel of the City of Buffalo, and Napoli Shkolnik PLLC, allege upon personal knowledge as to itself, and upon information and belief as to all other matters, as follows:

## **INTRODUCTION**

1.      Defendants' conduct in the design, manufacturing, importing, selling, marketing and distribution of their firearms has created, contributed to, and maintained the public nuisance of unlawful possession, transportation and disposition of firearms and the utilization of guns in the commission of an offense by a) marketing that emphasizes firearm characteristics such as their high capacity and ease of concealment, which appeals to prospective purchasers with criminal intent, including but not limited to through advertisement, product placement in movies and social media; b) purposely supplying more firearms than the legitimate market can bear in order to induce sales in the secondary market; c) not training dealers to avoid straw sales and other illegal transactions; and d) refusing to terminate contracts with distributors who sell to dealers with disproportionately high volumes of guns traced to crime scenes.

2.      These actions have created, maintained, or contributed to a condition in the City of Buffalo that endangers the safety and health of the public.

3.      All of the Defendants manufacture, import, sell, market, and/or distribute firearms that have been possessed and/or used illegally in the City of Buffalo. Defendants are identified below as Firearm Manufacturer Defendants, Firearm Distributor Defendants, and Ghost Gun Defendants.

4.      Defendants' actions have created, maintained, or contributed to a condition in Buffalo that impacts the health and well being of us all.[1]  In 2020, gun deaths reached the highest number ever recorded. "According to data released by Centers for Disease Control and Prevention (CDC), more than

---

[1]  *See* The Johns Hopkins Center for Gun Violence Solutions, *A Year in Review: 2020 Gun Deaths in the U.S.* (Apr. 28, 2022). Available at: https://publichealth.jhu.edu/sites/default/files/2022-05/2020-gun-deaths-in-the-us-4-28-2022-b.pdf.

1

45,000 people died by gun violence in the U.S. As we struggled against the COVID-19 pandemic, a concurrent public health crisis intensified. Gun homicides rose dramatically across the country, increasing by 35% in just one year. Nearly 5,000 more lives were lost to gun homicide in 2020 than in 2019. Gun suicides remained at historically high levels. *Guns were the leading cause of death among children and teens in 2020, accounting for more deaths than COVID-19, car crashes, or cancers.*"[2]

5.     "Coincident with the rise in gun-related deaths, 2020 was also a year of record gun sales. Millions of people, including many first-time purchasers, bought guns. Tens of thousands of these new guns turned up at crime scenes across the country — almost twice as many as in 2019."[3]

6.     "Gun violence was a leading cause of death in 2020. On average, 124 individuals died from gun violence every day in 2020, an additional 15 more gun deaths per day than in 2019. The overall gun death rate increased by 15% from 2019 reaching the highest level ever recorded. This increase was driven by a dramatic rise in gun homicides — nearly 5,000 more gun homicides than in 2019 — and persistently high numbers of gun suicides."[4]

7.     "Firearm homicides increased by nearly 5,000 deaths, or 35%, from 2019 to 2020. The firearm homicide spike was experienced in communities across the country — both rural and urban. The overall gun death rate among children and teens under age 19 increased by 30% — this increase was driven by a dramatic (40%) increase in the gun homicide rate and 11% increase in the gun suicide rate. There was a 47% increase in the firearm homicide rate among Black women from 2019 to 2020.

---

[2] *Id.* at 4 (emphasis in original) (citing National Center for Health Statistics, *Provisional death counts for Coronavirus disease 2019 (COVID-19)* (2022)). Available at: https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#SexAndAge).

[3] *Id.* (citing C. Barton, "New data suggests a connection between pandemic gun sales and increased violence," *The Trace* (2021)). Available at: https://www.thetrace.org/2021/12/atf-time-to-crime-gun-data-shooting-pandemic).

[4] *Id.* at 5.

The rate of gun suicides was the second highest in three decades, and 2020 was only the second time ever there were over 24,000 gun suicides."[5]

8.      "Firearms were the leading cause of death for children and teens ages 1-19, prematurely taking the lives of 4,357 young people. Homicides are the most common type of gun death among children and teens — 64% of child and teen gun deaths were homicides and 30% were suicides. While teenagers account for the majority of these deaths, younger children were not immune. An average of eight children ages 0-12 were killed by guns every single week in 2020. Every 2.5 days a child or teen was killed by an unintentional gun injury. Black children and teens face alarmingly high rates of gun victimization. More than half of all Black teens (15-19) who died in 2020 — a staggering 52% — were killed by gun violence. Gun violence remains a leading cause of death for young adults in their 20s and 30s. These age groups are particularly impacted by gun homicide. People ages 20–39 years old made up 27% of the population but accounted for 61% of all homicide victims in 2020."[6]

9.      The United States leads the world in the number of people and the number of children who die and are injured each year by guns. The yearly toll of several thousand persons killed compares with no more than a few hundred per year in every other industrialized country. A teenager in the United States is more likely to die from a gunshot wound than from all natural causes combined.

10.     According to a report issued on July 1, 2020, by the New York State Division of Criminal Justice Services, *New York State Gun Involved Violence Elimination (GIVE) Initiative Crime, Arrest, and Firearm Activity Report*,[7]  below is a chart of Violent Crimes by Firearm in Buffalo as of April 24, 2020:[8]

---

[5]  *Id.* at 7.

[6]  *Id.* at 13-14.

[7]  https://www.criminaljustice.ny.gov/crimnet/ojsa/greenbook.pdf

[8]  *Id.* at 201.

**Violent Crimes by Firearm**
As of 04/24/2020
Buffalo City Police Department (UCR)

*PLEASE SEE Definitions Page for Reporting Changes to the Index Crime of Rape effective March 2016, which also impacts violent crime totals.*

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year and 10-year Averages are rounded to the nearest whole number.

11.   Below is also a chart of Firearm Activity:[9]

**Firearm Activity**
As of 5/11/2020
Buffalo City Police Department

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Average is rounded to the nearest whole number.

---

[9]  *Id.* at 202.

4

12. Defendants manufactured or distributed thousands of firearms recovered in crimes committed in the City of Buffalo and New York State.

13. On May 14, 2022, gunman Payton S. Gendron, age 18, killed ten people and wounded three in a mass shooting at a Buffalo supermarket.[10] Of the thirteen people shot, eleven were Black and two were white.[11] Gendron used a Bushmaster XM-15, which was the same model that was used by a 20-year-old man to kill 26 people at Sandy Hook in 2012.[12] Gendron bought the rifle at Vintage Firearms in Endicott.[13]

14. In the period from January 1, 2020, through December 31, 2020, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), through its National Firearms Tracing Database, traced 7,254 firearms.[14]

15. Of the 7,254 firearms, there were 4,889 pistols, 1,129 revolvers, 696 rifles, and 422 shotguns.[15]

16. The top categories reported on firearm traces with a New York recovery for that year are as follows:[16]

---

[10] https://buffalonews.com/news/local/complete-coverage-10-killed-3-wounded-in-mass-shooting-at-buffalo-supermarket/collection_e8c7df32-d402-11ec-9ebc-e39ca6890844.html.

[11] *Id.*

[12] https://buffalonews.com/news/local/crime-and-courts/tops-markets-shooter-chose-ar-15-to-stoke-controversy/article_28ed09a0-d54f-11ec-841c-6f77fed17035.html

[13] *Id.*

[14] https://www.atf.gov/resource-center/firearms-trace-data-new-york-2020#total.

[15] *Id.*

[16] *Id.*

## Top Categories Reported on Firearm Traces with a New York Recovery

JANUARY 1, 2020 – DECEMBER 31, 2020

| | |
|---|---|
| Possession of Weapon | 3,867 |
| Firearm Under Investigation | 959 |
| Found Firearm | 653 |
| Weapon Offense | 408 |
| Dangerous Drugs | 390 |
| Simple Assault | 112 |
| Traffic Offense | 103 |
| Health – Safety | 84 |
| Homicide | 78 |
| Firing Weapon | 59 |

NOTE: There were 541 additional traces that were associated with other categories.

     17.     The top 15 source states for firearms with a New York recovery for that year are as follows:[17]

---

   [17] *Id.*

6

## Top 15 Source States for Firearms with a New York Recovery

**JANUARY 1, 2020 – DECEMBER 31, 2020**

| | |
|---|---|
| New York | 910 |
| Georgia | 632 |
| Virginia | 491 |
| South Carolina | 427 |
| North Carolina | 370 |
| Florida | 347 |
| Pennsylvania | 334 |
| Ohio | 234 |
| Alabama | 150 |
| Texas | 122 |
| Tennessee | 101 |
| West Virginia | 74 |
| Maine | 69 |
| Mississippi | 66 |
| Vermont | 56 |

**NOTE:** An additional 34 states accounted for 514 other traces. The source state was identified in 4,897 total traces.

18.     The age of possessors for firearms with a New York recovery for that year is as follows:[18]

---

[18]   *Id.*

## Age of Possessors for Firearms with a New York Recovery

**JANUARY 1, 2020 – DECEMBER 31, 2020**

| | |
|---|---|
| 17 and Under | 266 |
| 18 to 21 | 931 |
| 22 to 24 | 642 |
| 25 to 30 | 1,240 |
| 31 to 40 | 1,206 |
| 41 to 50 | 478 |
| Over 50 | 508 |

1/1/2020–12/31/2020 New York Average Age of Possessor: **32 Years**

1/1/2020–12/31/2020 National Average Age of Possessor: **34 Years**

19.     The top recovery cities for firearms with a New York recovery for that year are as follows:[19]

---

[19]  *Id.*

## Top Recovery Cities for Firearms with a New York Recovery

**JANUARY 1, 2020 – DECEMBER 31, 2020**

| | |
|---|---|
| New York City | 3,323 |
| Rochester | 708 |
| Buffalo | 478 |
| Syracuse | 249 |
| Albany | 115 |
| Yonkers | 94 |
| Niagara Falls | 68 |
| Elmira | 56 |
| Schenectady | 56 |
| Troy | 49 |

**NOTE:** There were 507 additional municipalities that accounted for 2,050 other traces. The recovery city could not be determined for eight traces.

20.     Buffalo is third on the list with 478.

21.     The top recovery cities for firearms with a New York recovery for 2019 are as follows:[20]

---

[20]  https://www.atf.gov/file/147286/download

9



## Top Recovery Cities for Firearms with a New York Recovery

### January 1, 2019 – December 31, 2019

| New York City | Buffalo | Rochester | Syracuse | Albany | Yonkers | East Nassau | Niagara Falls | Jamestown | Schenectady |
|---|---|---|---|---|---|---|---|---|---|
| 3,495 | 615 | 548 | 225 | 93 | 92 | 89 | 56 | 48 | 47 |

**NOTE:** There were 453 additional municipalities that accounted for 2,052 other traces. The recovery city could not be determined for three traces.

22.    Buffalo is second on the list, behind the City of New York, with 615.

23.    The top recovery cities for firearms with a New York recovery for 2018 are as follows:[21]

---

[21]   https://www.atf.gov/file/137211/download



## Top Recovery Cities for Firearms with a New York Recovery

### January 1, 2018 – December 31, 2018

| New York City | Buffalo | Rochester | Syracuse | Albany | Jamestown | Niagara Falls | Elmira | Newburgh | Brentwood | Poughkeepsie |
|---|---|---|---|---|---|---|---|---|---|---|
| 3,710 | 571 | 530 | 269 | 92 | 69 | 64 | 54 | 49 | 48 | 48 |

**NOTE:** There were 544 additional municipalities that accounted for 2,185 other traces.

24.  Buffalo is again second on the list, behind New York City, with 571.

25.  Because some guns used in a crime start off as legal firearms, it is evident that guns manufactured by Defendant Firearm Manufacturers and distributed by Defendant Firearm Distributors are diverted into an illegal gun market which caters to juveniles, criminals and other persons who are prohibited from owning guns. In addition, Ghost Gun Defendants sell to consumers who otherwise could not legally purchase firearms from a licensed retailer. Worse yet, ghost guns are sold online without the background checks legally mandated for all gun sales in New York, making them still more attractive to an illicit market comprised of felons, domestic abusers, children —  anyone barred by law from acquiring guns.

26.  This diversion is a result of Defendants' failure to institute appropriate marketing and distribution practices.

11

27.     Defendants knew or should have known that (a) some of the firearms they manufacture and/or distribute would be diverted into the hands of those who would violate the law, and (b) they could take steps to reduce the number of firearms that fall into the hands of criminals by changing their merchandising practices.

28.     Reasonable measures are available to help ensure that the guns sold and distributed by Defendants do not find their way into a secondary illegal market.

29.     Defendants could, but do not, monitor, supervise or otherwise regulate the sale and distribution of their guns by their downstream distributors or dealer-customers. Defendants could, but do not, monitor, supervise or train distributors or dealers to avoid sales that feed the illegal secondary market. Defendants make no effort to identify the distributors and dealers whose sales disproportionately supply the illegal secondary market.

30.     On July 27, 2022, the U.S. House of Representatives issued a Memorandum from the Committee on Oversight and Reform's Investigation into Gun Industry Practices and Profits.[22]  The Memorandum, in part, found:

- Gun manufacturers employ a variety of financing tactics and manipulative marketing campaigns to sell AR-15-style rifles to civilians, including young people.

    i.  Materials obtained by the Committee show how sellers tout assault rifles' military pedigree, make covert references to violent white supremacists like the Boogaloo Boys, and prey on young men's insecurities by claiming their weapons will put them "at the top of the testosterone food chain."

---

[22]https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%207-7-2022%20FC%20Gun%20Manufacturer%20Hearing.pdf

      ii.  Smith & Wesson markets its assault rifle with advertisements that mimic first-person shooter video games popular with children.

     iii.  Sig Sauer describes its military-style weapon sold to civilians as an "apex predator" that meets the "demands of the Special Operations community."

- Gun manufacturers fail to track or otherwise monitor deaths, injuries, or crimes that occur using their products, and fail to track when their products have been illegally modified.

      i.  All five companies acknowledged that they have no system or process in place to gather safety data related to their products, and they were unable to produce any internal analyses of the dangers caused by selling their military-style weapons to civilians.

      ii.  Sig Sauer asserted that it does "not have the means" to track deaths caused by its products, while Ruger said it only learns of these incidents through its "customer service department," the media, or "occasionally" from lawsuits.

     iii.  Bushmaster claimed that, because the brand has been newly acquired by another company, it was "aware of no such deaths or injuries" caused by its products, even though the racist shooter in Buffalo killed ten people with a Bushmaster-branded assault weapon in May 2022.

31.    Residents of the City of Buffalo are exposed to death and injury from firearms. The extent of that exposure would be reduced in New York if Defendants followed more prudent merchandising policies.

13

32.     Defendants' conduct in the design, manufacturing, importing, selling, marketing and distribution of their firearms has created, contributed to, and maintained the public nuisance of unlawful possession, transportation and disposition of firearms and the utilization of guns in the commission of an offense by a) marketing that emphasizes firearm characteristics such as their high capacity and ease of concealment, which appeals to prospective purchasers with criminal intent, including but not limited to through advertisement, product placement in movies and social media; b) purposely supplying more firearms than the legitimate market can bear in order to induce sales in the secondary market; c) not training dealers to avoid straw sales and other illegal transactions; and d) refusing to terminate contracts with distributors who sell to dealers with disproportionately high volumes of guns traced to crime scenes.

33.     In particular, Firearm Manufacturers and Distributors' failure to institute appropriate marketing and distribution practices results in diversion of guns to the illegal secondary market.

34.     In addition to the manufacturers and distributors of finished guns, the manufacturers and distributors of "ghost guns"[23] sell directly to consumers untraceably, without a background check, and without any federally required record of their sale. In many cases, Ghost Gun Defendants sell to consumers who otherwise could not legally purchase firearms from a licensed retailer. Worse yet, ghost guns are sold online without the background checks legally mandated for all gun sales in New York, making them still more attractive to an illicit market comprised of felons, domestic abusers, children — anyone barred by law from acquiring guns.

35.     Ghost guns and their central component, so-called "unfinished" or "80%" frames or lower receivers, are illegal to sell or possess under the laws of New York State, and constitute a statutory and common law public nuisance, which Ghost Gun Defendants cause and to which they contribute.

---

[23] These firearms are called "ghost guns" because they lack serial numbers and thus when discovered at crime scenes are untraceable — invisible to law enforcement scrutiny.

Ghost Gun Defendants peddle ghost gun components over the internet to Buffalo residents and surrounding areas, thwarting federal and state firearms laws.

36.     Ghost gun sellers operate on the pretense that their products are not firearms because they are "unfinished," and hence when sold require neither serial numbers nor background checks. Ghost Gun Defendants' business model is to sell "unfinished" frames to persons who, following Ghost Gun Defendants' simple instructions, will finish them, and — by adding the remaining components Ghost Gun Defendants also provide — assemble fully operational weapons.

37.     The City of Buffalo is experiencing the entirely predictable result of Defendants' lawless behavior: exponentially increasing numbers of firearms, including untraceable ghost guns used in crimes in the City, including multiple murders and other crimes of violence, often committed by persons who could never legally acquire a conventional firearm in the first place.[24] As of January 2022, it was reported that the Buffalo Police Department seized 1300% more ghost guns in 2021 than 2020.[25]

38.     Nationally, the federal government estimates that between 2016 and 2021, law enforcement recovered more than 45,000 ghost guns from crime scenes, including 692 murder or attempted murder scenes. The annual totals recovered increased tenfold during the course of the six-year period analyzed by the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"),[26]

---

[24] *See* Aaron Besecker, "With Buffalo in ghost gun 'pandemic,' new state laws take aim at problem," https://buffalonews.com/news/local/crime-and-courts/with-buffalo-in-ghost-gun-pandemic-new-state-laws-take-aim-at-problem/article_06d53a46-38af-11ec-94ae-4fd26657b9ab.html (last visited July 12, 2022); Olivia Proia, "Buffalo Police: Ghost guns are a huge problem for us," https://www.wkbw.com/news/local-news/buffalo-police-ghost-guns-are-a-huge-problem-for-us (last visited July 12, 2022).

[25] *Id.*

[26] ATF, Final Rule, "Definition of 'Frame or Receiver' and Identification of Firearms," 87 FR 24652, 24656 (April 26, 2022). Available here: https://www.federalregister.gov/documents/2022/04/26/2022-08026/definition-of-frame-or-receiver-and-identification-of-firearms. (Corrections available here: https://www.govinfo.gov/content/pkg/FR-2022-08-22/pdf/2022-17741.pdf).

15

bearing in mind that these numbers are limited to *recovered* ghost guns: countless more remain on the streets or in homes — unlicensed, untraceable, and invisible to law enforcement.

39.     All Defendants have betrayed their obligations under New York law through a persistent course of misconduct, all while failing to take the necessary steps — or any steps at all — to keep their ghost gun products and firearms out of the hands of people who are prohibited from accessing firearms. Indeed, there are numerous commonsense, scientifically grounded policies and practices that, if implemented, would reduce the risk of Defendants' guns being used in murder, suicide, or violent crime.

40.     The very nature of the Ghost Guns Defendants' business model subverts and undermines the laws designed to protect New Yorkers' right to public safety. Ghost Gun Defendants also engage in fraudulent conduct, deception, and false advertising in violation of New York law. Through their marketing and customer communications, Ghost Gun Defendants mislead customers directly and indirectly about the legality of possessing the unfinished frames sold by them as well as the completed "ghost guns" created with the kits sold to consumers.

41.     Ghost Gun Defendants' illegal conduct thus results in a proliferation of firearms and unserialized, untraceable, unlawful ghost guns on the streets and in the homes of the City of Buffalo, making the City more dangerous for both the public and law enforcement, causing a quintessential public nuisance.

42.     Plaintiff's cause of action and claims for relief arise from the injuries occurring within the State of New York; the injuries were caused by actions either in the State of New York or by an act or omission outside of the State of New York; each of the Defendants regularly did business, and/or solicited business and/or engaged in other persistent courses of conduct within the State of New York;

16

each of the Defendants derived substantial revenues from goods and/or services consumed and/or used in the State of New York; and each of the Defendants placed in the stream of commerce in the United States and in the State of New York firearms and/or accessories or after-market parts which are the subject of this litigation.

## JURISDICTION AND VENUE

43.     This Court has jurisdiction over this action pursuant to New York Constitution, article VI, § 7(a) and CPLR 301 and 302.

44.     This action is non-removable because there is no complete diversity of citizenship, and no substantial federal question is presented.

45.     Jurisdiction is proper under CPLR 302(a)(1) because each Defendant transacts substantial business within the State by supplying goods into New York State.

46.     Jurisdiction is also proper under CPLR 302(a)(3) because each Defendant commits tortious acts outside New York State that cause injury to persons or property within New York State, and because each Defendant (1) regularly solicits business in New York State, (2) engages in persistent conduct towards New York State consumers, (3) derives substantial revenue from goods used or consumed in New York State, and (4) expects or should reasonably expect its sale of its unfinished frames and receivers to have consequences in New York State and derives substantial revenue from interstate commerce.

47.     This Court has personal jurisdiction over all Defendants, as Defendants are manufacturers and distributors of firearms that caused injury and damage in New York and Defendants, at the time of placing their parts into the stream of commerce, could have foreseen, realized, expected and/or anticipated that the product might eventually be found in New York by reason of its nature and Defendants' business practices.

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 30 of 208

48.     Venue in Erie County is proper under CPLR 503(a) because Defendants' tortious conduct, including shipments of unfinished frames and receivers, occurred within Erie County and is a substantial part of the events giving rise to the claim.

49.     Venue in Erie County is further proper under CPLR 503(a) and 509 because it is the county designated by the Plaintiff.

## PARTIES

### I.   Plaintiff.

50.     Plaintiff the City of Buffalo is a municipal corporation organized under the laws of the State of New York.

### II.   Defendants.

#### A.   Manufacturers/Makers

51.     Defendant Smith & Wesson Brands, Inc., is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business in Massachusetts located at Springfield, MA 01104; its registered agent is Registered Agent Solutions, Inc., at 44 School Street, Suite 505, Boston, MA 02108. At all times relevant to this action, Smith & Wesson Brands, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to Smith & Wesson's website, it has ten dealers located within nineteen miles of Buffalo, including in Kenmore, NY, Grand Island, NY, and Cheektowaga, NY.[27]

52.     Defendant Beretta U.S.A. Corp. is a corporation organized and existing under the laws of the State of Maryland, with its principal place of business in Maryland located at 17601 Beretta Drive,

---

[27]   https://www.smith-wesson.com/dealer-locator?location=14202

Accokeek, MD 20607; its registered agent is Steven Biondi at 17601 Beretta Drive, Accokeek, MD 20607.

At all times relevant to this action, Beretta U.S.A. Corp. manufactured, assembled and/or imported

firearms which were marketed, distributed and/or sold in the United States, and which were distributed,

marketed, sold and/or possessed within the City of Buffalo. Beretta operates a gallery in New York

located at 718 Madison Avenue New York, NY 10065.[28]  Below is a photograph of Beretta's gallery in

New York:



53.     Defendant Bushmaster Firearms Industries, Inc., is a corporation organized and existing

under the laws of the State of Nevada, with its principal place of business in Nevada at 3505 Arrowhead

---

[28] https://berettagalleryusa.com/pages/new-york-store.

19

Drive, Carson City, NV 89706; its registered agent is Sun Naegele at 3505 Arrowhead Drive, Carson

City, NV 8970. At all times relevant to this action, Bushmaster Firearms Industries, Inc. manufactured,

assembled and/or imported firearms which were marketed, distributed and/or sold in the United States,

and which were distributed, marketed, sold and/or possessed within the City of Buffalo.

54.   Defendant Colt's Manufacturing Company, LLC, is a corporation organized and existing

under the laws of the State of Delaware, with its principal place of business in Connecticut located at

545 New Park Avenue, West Hartford, CT 06110; its registered agent is Corporation Service Company

located at 251 Little Falls Drive, Wilmington, DE 19808. At all times relevant to this action, Colt's

Manufacturing Company, LLC manufactured, assembled and/or imported guns which were marketed,

distributed and/or sold in the United States, and which were distributed, marketed, sold and/or

possessed within the City of Buffalo. According to Colt's website it has dealers located within 20 miles

of the City of Buffalo. They are located at Kenmore, NY; Buffalo, NY; Cheektowaga, NY; Depew, NY;

Alden, NY; and Boston, NY.[29]

55.   Defendant Glock, Inc., is a corporation organized and existing under the laws of the

State of Georgia, with its principal place of business in Georgia located at 6000 Highlands Parkway SE,

Smyrna, GA 30082-7204; its registered agent is Carlos Guevara c/o 6000 Highlands Pkwy, Attn: Legal

Dept., Smyrna, GA, 30082. At all times relevant to this action, Glock, Inc. manufactured, assembled

and/or imported firearms which were marketed, distributed and/or sold in the United States, and which

were distributed, marketed, sold and/or possessed within the City of Buffalo. According to Glock's

---

[29] https://www.colt.com/dealer-locator

website it has over 30 dealers in New York.[30]  These include locations in Kenmore, NY, Cheektowaga,

NY, Lackawanna, NY, Depew, NY, Tonawanda, NY, Grand Island, NY, Akron, NY, and Corfu, NY.[31]

56.    Defendant Hi-Point Firearms, a/k/a Strassel's Machine, Inc., is a corporation organized

and existing under the laws of the State of Ohio, with its principal place of business in Ohio located at

1015 Springmill Rd., Mansfield, OH 44906; its registered agent is Joseph M. Strassell at 1015 Springmill

Street, Mansfield, OH 44906. At all times relevant to this action, Hi-Point Firearms, a/k/a Strassel's

Machine, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed

and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within

the City of Buffalo. According to Hi-Point's website it has four dealers within 20 miles of Buffalo. The

dealers are located in Buffalo, NY; North Tonawanda, NY; Alden, NY; and Lockport, NY.[32]

57.    Defendant JA Industries, LLC, f/k/a Jennings Firearms, f/k/a Bryco Arms, f/k/a

Jimenez Arms, is a corporation organized and existing under the laws of the State of Nevada, with its

principal place of business in Nevada located at 249 Elliott Road Unit 1, Henderson, Nevada 89011; its

registered agent is the Amin Law Group NV, Ltd., at 3753 Howard Hughes Pkwy, Suite 200, Las Vegas,

NV 89169. At all times relevant to this action, JA Industries LLC, f/k/a Jennings Firearms, f/k/a Bryco

Arms, f/k/a Jimenez Arms, manufactured, assembled and/or imported firearms which were marketed,

distributed and/or sold in the United States, and which were distributed, marketed, sold and/or

possessed within the City of Buffalo. On March 30, 2022, the U.S. Attorney's Office for the Southern

District of New York in *Everytown for Gun Safety Support Fund et al. v. Bureau of Alcohol, Tobacco, Firearms and*

---

[30]  https://us.glock.com/en/Dealer-Locator-USA

[31]  *Id.*

[32]  https://www.hi-pointfirearms.com/dealer-locator/index.php

21

*Explosives et al.*, 21 Civ. 0376 (ALC) filed a letter stating that the ATF, on March 24, 2022, sent JA industries a notice of revocation of its firearms license.[33]

58.    Defendant Kel-Tec CNC Industries, Inc., is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Florida at 1475 Cox Road, Cocoa, Florida; its registered agent is Ganon J. Studenberg, Esq., 1119 Palmetto Avenue, Melbourne, FL 32901. At all times relevant to this action, Kel-Tec CNC Industries, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to Kel-Tec's website it has a distributor in New York located in Rochester, NY.[34]

59.    Defendant O.F. Mossberg & Sons, Incorporated, is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business in Connecticut at 7 Grasso Avenue, North Haven, CT 06473; its registered agent is Corporation Service Company at Goodwin Square 225 Asylum Street, 20th Floor, Hartford, CT 06103. At all times relevant to this action, O.F. Mossberg & Sons, Incorporated, manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to O.F. Mossberg & Sons, Incorporated's website, it has eleven dealers located within 20 miles or less of Buffalo.[35]

60.    Defendant RemArms, LLC, a/k/a Remington Firearms, is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York; its registered agent is Corporation Service Company at 251 Little Falls Drive, Wilmington, DE 19808. At

---

[33]   https://www.documentcloud.org/documents/21563108-20220330-joint-letter-to-court

[34]   https://www.keltecweapons.com/

[35]   https://www.mossberg.com/dealers/

all times relevant to this action, RemArms, LLC, a/k/a Remington Firearms, manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to RemArms' website, "In 2020, RemArms acquired the Remington Firearms legacy manufacturing facility in Ilion, NY and the proud opportunity to build Remington firearms.   Our new company, RemArms, is designing, producing and shipping new Remington firearms to our dealers and customers across the country each and every day."[36]  According to Remington's website it has two dealers within 20 miles of Buffalo and they are located in Cheektowaga, NY, and Lockport, NY.[37]

61.     Defendant Savage Arms, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Massachusetts, located at 100 Springdale Rd, Westfield, MA 01085; its registered agent is Thomas W. Humphrey at 100 Springdale Road, Westfield, MA 01085. At all times relevant to this action, Savage Arms, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. Savage Arms, Inc., purchased Stevens Arms and is an importer for firearms manufactured by Sun City Machinery Co. According to Savage Arms' website, it has several dealers in New York, including three dealers within eight miles of Buffalo, located in Cheektowaga, NY; Amherst, NY; and Tonawanda, NY.[38]

62.     Defendant SIG Sauer, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New Hampshire, located at 72 Pease Boulevard, Newington, NH 03801; its registered agent is Cogency Global, Inc., at 850 New Burton Road, Suite 201,

---

[36]  https://www.remarms.com/about-us

[37]  https://www.remington.com/where-to-buy.html

[38]  https://www.savagearms.com/where.php

23

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 36 of 208

Dover, DE 19904. At all times relevant to this action, SIG Sauer, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to SIG Sauer's website, it has two dealers within 25 miles of Buffalo and they are located in Cheektowaga, NY and Buffalo, NY.[39]

63.     Defendant Springfield Armory, Inc., is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Illinois, located at 420 West Main Street, Geneseo, IL 61254; its registered agent is James S. Zmuda at 1515 5th Avenue, Suite 700, Moline, IL 61265. At all times relevant to this action, Springfield Armory, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to Springfield's website, it has several retailers in New York, including locations in Kenmore, NY; Cheektowaga, NY; Depew, NY; Amherst, NY; and Eden, NY.[40]

64.     Defendant Sturm, Ruger & Co., Inc. ("Sturm"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Connecticut, located at 1 Lacey Place, Southport, CT 06890; its registered agent is The Corporation Trust Company at Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801. At all times relevant to this action, Sturm manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. In September 2020, Sturm purchased Marlin Firearms, which had previously acquired Hopkins & Allen Arms Company. According to Sturm's website, it has eight retailers within 22

_____

[39]   https://www.sigsauer.com/dealer-locator

[40]   https://www.springfield-armory.com/find-a-retailer/

24

miles of Buffalo, NY, which include locations in Kenmore, NY; Cheektowaga, NY; Lancaster, NY; Eden, NY; Angola, NY; Lockport, NY; and North Collins, NY.[41]

65.      Defendant SCCY Industries, LLC, is a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Florida, at 1800 Concept Court, Daytona Beach, FL 32114; its registered agent is Palmetto Charter Services, Inc., at 149 S. Ridgewood Avenue, Suite 700, Daytona, Beach, FL 32114. At all times relevant to this action, SCCY Industries, LLC manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to SCCY's website, under the title, "Partners" it lists distributors of SCCY firearms.[42] One of the dealers is Lipsey's, which has numerous dealers in New York, including several in the Buffalo vicinity, such as in Tonawanda.[43]

66.      Defendant Taurus Holdings, Inc., a/k/a Taurus International Manufacturing, Inc., is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business in Georgia, located at 100 Taurus Way, Bainbridge, GA 39817; its registered agent is Thomas Conger at 100 Taurus Way, Bainbridge, GA 39817. At all times relevant to this action, Taurus Holdings, Inc., a/k/a Taurus International Manufacturing, Inc., manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. According to Taurus's website it has one

---

[41]  https://www.ruger.com/dataProcess/retailerLocator/

[42]  https://sccy.com/about/distributors/

[43]  https://www.lipseys.com/dealerstate?st=NY

25

dealer within 20 miles of Buffalo, located in Lockport, NY.[44] Taurus also has dealers in Olean, NY, and Rochester, NY.[45]

### B. Ghost Gun Defendants

67.　　Defendant Arm or Ally, LLC is a North Carolina limited liability corporation with its principal place of business in Indian Trail, NC, located at 1021-C Technology Drive, Indian Trail, NC 28079. It has a subsidiary named Arm or Ally S, LLC. The registered agent of Arm or Ally, LLC, is James F. Tobin at 6416 Providence Farm Lane, Apt. 1319, Charlotte, NC 28277.

68.　　Defendant Brownells, Inc. ("Brownells"), also known as Brownells or Bob Brownell's, is an Iowa corporation with its headquarters in Grinell, Iowa, located at 3006 Brownells Pkwy, Grinnell, IA 50112. Its subsidiaries include Brownells International, Inc.; Brownells Manufacturing Co.; Brownells Manufacturing, Inc.; Brownell's Project Management Services, Inc.; and Brownells Properties Inc. Brownells' registered agent is Corporation Service Company at 505 5th Avenue, Suite 729, Des Moines, IA 50309.

69.　　Defendant GS Performance, L.L.C., also known as Glockstore, GSPC, and Double Diamond ("Glockstore"), is a Tennessee limited liability corporation with offices in Nashville, Tennessee, located at 1930 Air Lane Drive, Nashville, TN 37210, and in San Diego, California. It is the successor of a California limited liability corporation also named GS Performance, L.L.C., headquartered in San Diego. Glockstore's registered agent is Leonard L. Magill at 1930 Air Lane Dr., Nashville, TN 37210-3810.

---

[44] https://www.taurususa.com/dealer-locator

[45] *Id.*

26

70.     Defendant Indie Guns, LLC, is a Florida limited liability corporation with its headquarters in Orlando, Florida, located at 3208 E. Colonial Drive, #262, Orlando, FL 32803. Indie Guns' registered agent is Lawrence Destefano at 3000 Huntington Street, Orlando, FL 32803.

71.     Defendant JSD Supply is a Pennsylvania corporation with its principal place of business in Prospect, Pennsylvania, located at 1052 New Castle Road, Prospect, PA 16052. JSD's Officer is Jordon J. Vinroe, located at 106 Poplar Lane, Portersville, PA 16051.

72.     Defendant KM Tactical, LLC ("KM Tactical") is a Missouri limited liability corporation, with its registered office located 6 SW Industrial Drive, Lee's Summit MO, 64081. KM Tactical's registered agent is Kyle Wayne Murphy at 19009 E 31st Terr. Ct. S., Independence, MO 64057.

73.     Defendant Polymer80, Inc., is a Nevada-based corporation engaged in the business of advertising, offering, selling, and providing firearms located at 134 Lakes Blvd, Dayton, NV 89403. Polymer 80, Inc.'s registered agent is Mark H. Gunderson, Gunderson Law Firm, at 3895 Warren Way, Reno, NV 89509. Polymer80, Inc., was incorporated in December 2014 and, since that time, has advertised, offered and, on information and belief, sold and provided firearms to consumers in New York, and the City of Buffalo, both directly and indirectly.

74.     Defendant Primary Arms, L.L.C., is a Texas limited liability corporation, with its headquarters in Houston, Texas, located at 3219 S Sam Houston Pkwy E #100, Houston, TX 77047. Its subsidiaries include Primary Arms Optics, Primary Arms Wholesale, Primary Arms Online and Primary Arms Government. Primary Arms' registered agent is Marshall Lerner at 3219 S. Sam Houston Parkway, Houston, TX 77047.

75.     Defendant Rainier Arms, LLC, is a Washington State limited liability corporation with its principal place of business in Auburn, Washington, located at 2504 Auburn Way N, Auburn, WA 98002. It has subsidiaries including Rainier Arms Holdings, LLC; Rainier Arms International, Inc.; and

27

Rainier Arms Manufacturing, LLC. Rainier Arms' registered agent is John Hwang at 2504 Auburn Way N, Auburn, WA 98002-2420.

76.     Defendant Rock Slide USA, LLC, is a North Carolina limited liability company with its principal place of business in Broadway, North Carolina, located at 303 N Main Street, Broadway, NC 27505. Rock Slide USA's registered agent is Ian O. Frampton at 303 N. Main St., Broadway, NC 27505.

77.     Defendant Salvo Technologies, Inc., also known as 80P Builder or 80P Freedom Co. ("80P Builder"), is a Florida corporation headquartered in Clearwater, Florida, and does business as 80P Builder, which is based in Largo, Florida, located at 8060 Bryan Dairy Rd, Largo, FL 33777. 80P Builder's registered agent is Heather Dunn at 8192 Hopwell Court, Seminole, FL 33777.

### C. Distributors

78.     Defendant Beretta U.S.A. Corp. is a corporation organized and existing under the laws of the State of Maryland, with its principal place of business in Maryland, located at 17601 Beretta Drive, Accokeek, MD 20607; its registered agent is Steven Biondi at 17601 Beretta Drive, Accokeek, MD 20607. At all times relevant to this action, Beretta U.S.A. Corp. manufactured, assembled and/or imported firearms which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of Buffalo. Beretta's website identified three dealers within 25 miles of Buffalo.[46]  The three stores are Cabela's 058, Johnson's Country Store, and Runnings.[47] Beretta operates a gallery in New York located at 718 Madison Avenue New York, NY 10065.[48] Below is a picture of Beretta's gallery in New York:

---

[46]  https://www.beretta.com/en-us/dealer-locations/?F_City=buffalo&F_State=NY&F_Proximity=25&F_Type=0&F_Lng=-78.8783689&F_Lat=42.88644679999999

[47]  *Id.*

[48]  https://berettagalleryusa.com/pages/new-york-store

28



Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 42 of 208

79.     Defendant Bangers, L.P., n/k/a Iron Valley™ Supply Co. ("Bangers"), is a corporation organized and existing under the laws of the State of Alabama with its principal place of business in Alabama, located at 101 London Pkwy, Birmingham, AL 35211; its registered agent is Rick Bestwick at #10 South 14th Street, Birmingham, AL 35233. At all times relevant to this action, Bangers marketed, distributed and/or sold firearms in the United States, which were distributed, marketed, sold and/or possessed within the City of Buffalo. Bangers has several dealers located in New York, at least one less than 20 miles from the City of Buffalo.[49]  Bangers distributes firearms from the following Defendant Manufacturers: Colt, Glock, Hi-Point, Kel-Tec, Marlin, Mossberg, Polymer 80, Remington, RemArms, Savage Arms, SCCY, Sig Sauer, Smith & Wesson, Ruger, Springfield Armory, and Taurus.[50]



80.     Defendant Gun Center Inc., a/k/a GC Wholesale, is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Cheektowaga, New York, located at 3385 Harlem Rd, Cheektowaga, NY 14225. At all times relevant to this action, Gun Center marketed, distributed, and/or sold firearms in New York which were distributed, marketed,

---

[49]  https://www.ironvalleysupply.com/find-a-dealer

[50]  https://www.ironvalleysupply.com/

sold and/or possessed within the City of Buffalo. In 2016, the ATF issued a Firearms Inspection Report to Gun Center, Inc. and noted that on February 25, 2016, Gun Center's cited violations were: (1) failure to prohibit the transfer of firearm to an individual that was denied by a NICS background check; and (2) failure to locate firearms and/or disposition information for firearms listed as present in inventory in the licensee's acquisition and disposition record on one separate occasion.[51]  The report noted that the second violation was a repeat violation from 2011.[52]  A 2018 violation was also noted for failure to report multiple sales of handguns.[53]

81.     Defendant RSR Group, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Florida, located at 4405 Metric Drive, Winter Park, FL, 32792-6904; its registered agent is Incorporated Services, Ltd., at 3500 S Dupont Hwy, Dover, DE 19901. At all times relevant to this action, RSR Group, Inc., marketed, distributed and/or sold firearms in the United States, which were distributed, marketed, sold and/or possessed within the City of Buffalo. RSR's website lists the manufacturers for which it distributes firearms, which include the following Manufacturer Defendants: Beretta, Colt, Glock, Hi-Point, Marlin, Mossberg, Remington, Savage, SCCY, SIG Sauer, Kel-Tec, Smith & Wesson, Springfield, Ruger, and Taurus.[54]  RSR has a location at 20 Cedarfield Commons, Rochester, NY 14612.

82.     Defendant Vintage Firearms, LLC, is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, located at 120 Nanticoke

---

[51] https://gunstoretransparency.org/sites/default/files/reports/NYC133837900000003.007.pdf

[52] *Id.*

[53] https://gunstoretransparency.org/gun-store/gc-wholesale

[54] https://www.rsrgroup.com/search?Category=1

Ave, Endicott, NY 13760. At all times relevant to this action, Vintage Firearms LLC marketed, distributed, and/or sold firearms in New York which were distributed, marketed, sold and/or possessed within the City of Buffalo. On May 14, 2022, gunman Payton S. Gendron, 18, killed ten people and wounded three in a mass shooting at a Buffalo supermarket.[55] Of the thirteen people shot, eleven were Black and two were white.[56] Gendron used a Bushmaster XM-15, which was the same model that was used by a 20-year-old man to kill 26 people at Sandy Hook in 2012.[57] Gendron bought the rifle at Vintage Firearms in Endicott.[58]

83. Defendant Wolcott Guns Inc., is a corporation organized and existing under the laws of the State of New York, with its principal place of business in Erie, New York, located at 3052 Walden Ave, Depew, NY 14043. At all times relevant to this action, Wolcott Guns marketed, distributed, and/or sold firearms in New York which were distributed, marketed, sold and/or possessed within the City of Buffalo. In 2016, the ATF issued a violation to Wolcott Guns for "[f]ailure to conduct NICS background check prior to the transfer of a firearm, licensee used expired NICS check (over 30 days old) on [redacted] occasion."[59] In the section "Corrective Action to be Taken," the document stated: "The licensee was advised that a NICS check must be conducted prior to all over-the-counter transfers of a firearm. Additionally, the licensee was instructed to conduct a new NICS check if the initial check passes

---

[55] https://buffalonews.com/news/local/complete-coverage-10-killed-3-wounded-in-mass-shooting-at-buffalo-supermarket/collection_e8c7df32-d402-11ec-9ebc-e39ca6890844.html.

[56] *Id.*

[57] https://buffalonews.com/news/local/crime-and-courts/tops-markets-shooter-chose-ar-15-to-stoke-controversy/article_28ed09a0-d54f-11ec-841c-6f77fed17035.html

[58] *Id.*

[59] https://gunstoretransparency.org/sites/default/files/reports/NYC88147200000002.024.pdf.

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 45 of 208

30 days before the firearm is transferred."[60] According to Wolcott Guns, Inc.'s website it sells firearms

from the following Manufacturer Defendants: Glock, Springfield Armory, Remington, Savage, Ruger,

Mossberg, Kel-Tec, Beretta, Sig Sauer, Smith & Wesson, Marlin, and Bushmaster.[61]

## **FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION**

I.   **Firearm Violence in the United States, State of New York, and City of Buffalo**

84.     Defendants' actions have created, maintained, or contributed to a condition in Buffalo

that impacts the health and well being of us all.[62]  In 2020, gun deaths reached the highest number ever

recorded. "According to data released by Centers for Disease Control and Prevention (CDC), more than

45,000 people died by gun violence in the U.S. As we struggled against the COVID-19 pandemic, a

concurrent public health crisis intensified. Gun homicides rose dramatically across the country,

increasing by 35% in just one year. Nearly 5,000 more lives were lost to gun homicide in 2020 than in

2019. Gun suicides remained at historically high levels. *Guns were the leading cause of death among children and*

*teens in 2020, accounting for more deaths than COVID-19, car crashes, or cancers.*"[63]

---

[60]  *Id.*

[61]  https://wolcottgunsinc.com/manufacturers

[62]  *See* The Johns Hopkins Center for Gun Violence Solutions, *A Year in Review: 2020 Gun Deaths in the U.S.* (Apr. 28, 2022). Available at: https://publichealth.jhu.edu/sites/default/files/2022-05/2020-gun-deaths-in-the-us-4-28-2022-b.pdf.

[63]  *Id.* at 4 (emphasis in original) (citing National Center for Health Statistics, *Provisional death counts for Coronavirus disease 2019 (COVID-19)* (2022)). Available at: https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm#SexAndAge.

85.     "Coincident with the rise in gun-related deaths, 2020 was also a year of record gun sales. Millions of people, including many first-time purchasers, bought guns. Tens of thousands of these new guns turned up at crime scenes across the country — almost twice as many as in 2019."[64]

86.     "Gun violence was a leading cause of death in 2020. On average, 124 individuals died from gun violence every day in 2020, an additional 15 more gun deaths per day than in 2019. The overall gun death rate increased by 15% from 2019 reaching the highest level ever recorded. This increase was driven by a dramatic rise in gun homicides — nearly 5,000 more gun homicides than in 2019 — and persistently high numbers of gun suicides."[65]

87.     "Firearm homicides increased by nearly 5,000 deaths, or 35%, from 2019 to 2020. The firearm homicide spike was experienced in communities across the country — both rural and urban. The overall gun death rate among children and teens under age 19 increased by 30% — this increase was driven by a dramatic (40%) increase in the gun homicide rate and 11% increase in the gun suicide rate. There was a 47% increase in the firearm homicide rate among Black women from 2019 to 2020. The rate of gun suicides was the second highest in three decades, and 2020 was only the second time ever there were over 24,000 gun suicides."[66]

88.     "Firearms were the leading cause of death for children and teens ages 1-19, prematurely taking the lives of 4,357 young people. Homicides are the most common type of gun death among children and teens — 64% of child and teen gun deaths were homicides and 30% were suicides. While teenagers account for the majority of these deaths, younger children were not immune. An average of

---

[64]    *Id.* (citing C. Barton, "New data suggests a connection between pandemic gun sales and increased violence," *The Trace* (2021). Available at: https://www.thetrace.org/2021/12/atf-time-to-crime-gun-data-shooting-pandemic).

[65]    *Id.* at 5.

[66]    *Id.* at 7.

34

eight children ages 0-12 were killed by guns every single week in 2020. Every 2.5 days a child or teen was killed by an unintentional gun injury. Black children and teens face alarmingly high rates of gun victimization. More than half of all Black teens (15–19) who died in 2020 — a staggering 52% — were killed by gun violence. Gun violence remains a leading cause of death for young adults in their 20s and 30s. These age groups are particularly impacted by gun homicide. People ages 20-39 years old made up 27% of the population but accounted for 61% of all homicide victims in 2020."[67]

89.     The United States leads the world in the number of people and the number of children who die and are injured each year by guns. The yearly toll of several thousand persons killed compares with no more than a few hundred per year in every other industrialized country. A teenager in the United States is more likely to die from a gunshot wound than from all natural causes combined.

90.     According to a report issued on July 1, 2020, by the New York State Division of Criminal Justice Services, *New York State Gun Involved Violence Elimination (GIVE) Initiative Crime, Arrest, and Firearm Activity Report*,[68]  below is a chart of Violent Crimes by Firearm in Buffalo as of April 24, 2020:[69]

---

[67] *Id.* at 13-14.

[68] https://www.criminaljustice.ny.gov/crimnet/ojsa/greenbook.pdf

[69] *Id.* at 201.

35

**Violent Crimes by Firearm**
As of 04/24/2020
Buffalo City Police Department (UCR)

| | Apr 18 | May 19 | Jun 19 | Jul 19 | Aug 19 | Sep 19 | Oct 19 | Nov 19 | Dec 19 | Jan 20 | Feb 20 | Mar 20 | Current Month 2019 | Current Month 2020 | % Change From Month in Previous Year | 2019 | 2020 | % Change 2019-20 | 5 Year Average 2015-19 | 2020 | % Change 5 Year Avg. vs. 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Violent Crimes | 161 | 201 | 245 | 289 | 244 | 237 | 252 | 189 | 219 | 204 | 158 | 170 | 167 | 170 | 1.8% | 506 | 532 | 5.1% | 530 | 532 | 0.3% |
| Firearm Related | 50 | 52 | 87 | 79 | 66 | 70 | 92 | 69 | 70 | 68 | 52 | 61 | 33 | 61 | 84.8% | 141 | 171 | 21.3% | 168 | 171 | 1.8% |
| Percent Firearm | 31.1% | 25.9% | 35.5% | 36.0% | 26.6% | 29.5% | 36.5% | 34.2% | 32.0% | 28.4% | 32.9% | 35.9% | 19.8% | 35.9% | | 27.9% | 32.1% | | 31.7% | 32.1% | |
| Murder | 4 | 4 | 3 | 6 | 7 | 6 | 2 | 3 | 4 | 7 | 2 | 6 | 3 | 6 | | 6 | 17 | | 6 | 17 | |
| Firearm Related | 2 | 2 | 3 | 4 | 5 | 6 | 1 | 2 | 4 | 3 | 2 | 5 | 3 | 5 | | 6 | 10 | | 7 | 10 | |
| Percent Firearm | 50.0% | 50.0% | 100.0% | 66.7% | 71.4% | 100.0% | 50.0% | 66.7% | 100.0% | 42.9% | 100.0% | 62.5% | 100.0% | 62.5% | | 100.0% | 58.8% | | 79.6% | 58.8% | |
| Rape* | 9 | 14 | 3 | 13 | 5 | 13 | 11 | 13 | 5 | 6 | 3 | 3 | 16 | 3 | | 35 | 15 | -57.1% | N/A | 15 | N/A |
| Firearm Related | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 0 | | N/A | 0 | N/A |
| Percent Firearm | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 7.7% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | | 0.0% | 0.0% | | N/A | 0.0% | N/A |
| Robbery | 41 | 53 | 72 | 71 | 80 | 83 | 102 | 75 | 78 | 85 | 41 | 50 | 33 | 50 | 51.5% | 149 | 106 | 4.7% | 205 | 106 | -24.1% |
| Firearm Related | 20 | 16 | 26 | 24 | 21 | 24 | 51 | 33 | 32 | 17 | 16 | 15 | 5 | 15 | | 59 | 48 | -18.6% | 82 | 48 | -41.5% |
| Percent Firearm | 48.8% | 30.2% | 36.1% | 33.8% | 26.3% | 28.9% | 50.0% | 44.0% | 42.1% | 26.2% | 39.0% | 30.0% | 15.2% | 30.0% | | 39.6% | 30.8% | | 39.9% | 30.8% | |
| Aggravated Assault | 107 | 130 | 167 | 179 | 152 | 130 | 137 | 108 | 134 | 123 | 112 | 109 | 115 | 109 | -5.2% | 316 | 344 | 8.9% | 281 | 344 | 22.6% |
| Firearm Related | 28 | 34 | 58 | 42 | 39 | 38 | 40 | 32 | 34 | 38 | 34 | 41 | 25 | 41 | 64.0% | 76 | 113 | 48.7% | 79 | 113 | 42.7% |
| Percent Firearm | 26.2% | 26.2% | 34.7% | 23.5% | 25.7% | 28.6% | 29.2% | 29.6% | 25.4% | 30.9% | 30.4% | 37.6% | 21.7% | 37.6% | | 24.1% | 32.8% | | 28.2% | 32.8% | |

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015* | 2016* | 2017* | 2018* | 2019* | % Change 2018-19 | 5 Year Average 2014-18 | % Change 5 Year Avg. vs. 2019 | 10 Year Average 2009-18 | % Change 10 Year Avg. vs. 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Violent Crimes | 3,599 | 3,208 | 3,380 | 3,251 | 3,114 | 2,886 | 2,957 | 2,610 | 2,691 | 2,533 | -5.9% | 2,832 | -10.5% | 3,196 | -19.7% |
| Firearm Related | 1,026 | 1,022 | 1,076 | 950 | 940 | 678 | 1,004 | 777 | 818 | 765 | -6.5% | 864 | -13.4% | 966 | -20.8% |
| Percent Firearm | 28.5% | 31.4% | 31.8% | 29.3% | 30.2% | 35.3% | 35.1% | 29.8% | 30.4% | 30.2% | | 31.2% | | 30.7% | |
| Murder | 53 | 36 | 48 | 47 | 60 | 41 | 44 | 40 | 57 | 47 | -17.5% | 48 | -2.9% | 49 | -3.7% |
| Firearm Related | 43 | 29 | 41 | 35 | 37 | 35 | 35 | 35 | 45 | 37 | -17.8% | 37 | -1.1% | 39 | -3.9% |
| Percent Firearm | 79.2% | 80.6% | 85.4% | 74.5% | 61.7% | 85.4% | 79.5% | 87.5% | 78.9% | 78.7% | | 78.6% | | 79.5% | |
| Rape* | 157 | 121 | 138 | 150 | 114 | 172 | 153 | 141 | 167 | 121 | -27.5% | N/A | N/A | N/A | N/A |
| Firearm Related | 4 | 4 | 5 | 11 | 8 | 3 | 3 | 3 | 3 | 1 | | N/A | N/A | N/A | N/A |
| Percent Firearm | 2.5% | 3.3% | 3.6% | 7.3% | 7.0% | 1.7% | 2.0% | 2.1% | 1.8% | 0.8% | | N/A | | N/A | |
| Robbery | 1,466 | 1,459 | 1,388 | 1320 | 1,277 | 1,033 | 1,049 | 857 | 906 | 802 | -11.5% | 1,024 | -21.7% | 1,230 | -35.3% |
| Firearm Related | 510 | 578 | 574 | 480 | 475 | 410 | 458 | 283 | 327 | 308 | -5.8% | 574 | -21.7% | 468 | -34.6% |
| Percent Firearm | 34.8% | 39.6% | 41.4% | 36.4% | 37.2% | 39.7% | 43.7% | 33.0% | 36.1% | 38.3% | | 57.9% | | 37.9% | |
| Aggravated Assault | 1,921 | 1,634 | 1,806 | 1734 | 1,663 | 1,640 | 1,611 | 1,572 | 1,561 | 1,563 | 0.1% | 1,609 | -2.9% | 1,723 | -9.3% |
| Firearm Related | 469 | 411 | 456 | 424 | 420 | 431 | 508 | 456 | 443 | 421 | -5.0% | 452 | -6.9% | 456 | -7.4% |
| Percent Firearm | 24.4% | 25.2% | 25.2% | 24.5% | 25.3% | 26.3% | 31.5% | 29.0% | 28.4% | 26.9% | | 28.1% | | 26.5% | |

*PLEASE SEE Definitions Page for Reporting Changes to the Index Crime of Rape effective March 2016, which also impacts violent crime totals.

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year and 10-year Averages are rounded to the nearest whole number.

91.     Below is also a chart of Firearm Activity:[70]

**Firearm Activity**
As of 5/11/2020
Buffalo City Police Department

| | Apr 19 | May 19 | Jun 19 | Jul 19 | Aug 19 | Sep 19 | Oct 19 | Nov 19 | Dec 19 | Jan 20 | Feb 20 | Mar 20 | Current Month 2019 | Current Month 2020 | % Change From Month in Previous Year | 2019 | 2020 | % Change 2019-20 | 5 Year Average 2015-19 | 2020 | % Change 5 Year Avg. vs. 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shooting Incidents Involving Injury | 5 | 12 | 23 | 16 | 15 | 14 | 18 | 10 | 14 | 9 | 9 | 14 | 11 | 14 | 27.3% | 26 | 32 | 23.1% | 35 | 32 | -9.1% |
| Shooting Victims (Persons Hit) | 6 | 13 | 29 | 18 | 16 | 16 | 22 | 14 | 20 | 11 | 9 | 16 | 15 | 16 | 6.7% | 31 | 36 | 16.1% | 39 | 36 | -8.2% |
| Individuals Killed by Gun Violence | 2 | 2 | 3 | 4 | 5 | 4 | 3 | 2 | 3 | 2 | 5 | 5 | 3 | 5 | | 6 | 10 | | 7 | 10 | |

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | | | | | | | % Change 2018-19 | 5 Year Average 2014-18 | % Change 5 Year Avg. vs. 2019 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shooting Incidents Involving Injury | 229 | 217 | 171 | 205 | 204 | 262 | 200 | 206 | 153 | | | | | | | -25.7% | 215 | -29.0% | | | |
| Shooting Victims (Persons Hit) | 255 | 268 | 201 | 257 | 242 | 296 | 236 | 236 | 183 | | | | | | | -22.5% | 253 | -27.8% | | | |
| Individuals Killed by Gun Violence | 29 | 41 | 35 | 37 | 35 | 35 | 35 | 45 | 37 | | | | | | | -17.8% | 37 | -1.1% | | | |

NOTE: Percentage change is not calculated when counts are fewer than 10 and the 5-year Average is rounded to the nearest whole number.

---

[70] *Id.*

92.     Defendants manufactured or distributed thousands of firearms recovered in crimes committed in the City of Buffalo and New York State.

93.     In the period from January 1, 2020, through December 31, 2020, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), through its National firearms Tracing Database traced 7,254 firearms.[71]

94.     Of the 7,254 firearms, there were 4,889 pistols, 1,129 revolvers, 696 rifles, and 422 shotguns.[72]

95.     The top categories reported on firearm traces with a New York recovery for that year are as follows:[73]

---

[71]  https://www.atf.gov/resource-center/firearms-trace-data-new-york-2020#total.

[72]  *Id.*

[73]  *Id.*

37

## Top Categories Reported on Firearm Traces with a New York Recovery

**JANUARY 1, 2020 – DECEMBER 31, 2020**

| | |
|---|---|
| Possession of Weapon | 3,867 |
| Firearm Under Investigation | 959 |
| Found Firearm | 653 |
| Weapon Offense | 408 |
| Dangerous Drugs | 390 |
| Simple Assault | 112 |
| Traffic Offense | 103 |
| Health – Safety | 84 |
| Homicide | 78 |
| Firing Weapon | 59 |

**NOTE:** There were 541 additional traces that were associated with other categories.

96. The top 15 source states for firearms with a New York recovery for that year are as follows:[74]

---

[74] *Id.*

## Top 15 Source States for Firearms with a New York Recovery

**JANUARY 1, 2020 – DECEMBER 31, 2020**

| | |
|---|---|
| New York | 910 |
| Georgia | 632 |
| Virginia | 491 |
| South Carolina | 427 |
| North Carolina | 370 |
| Florida | 347 |
| Pennsylvania | 334 |
| Ohio | 234 |
| Alabama | 150 |
| Texas | 122 |
| Tennessee | 101 |
| West Virginia | 74 |
| Maine | 69 |
| Mississippi | 66 |
| Vermont | 56 |

**NOTE:** An additional 34 states accounted for 514 other traces. The source state was identified in 4,897 total traces.

97.     The age of possessors for firearms with a New York recovery for that year is as follows:[75]

---

[75]   *Id.*

## Age of Possessors for Firearms with a New York Recovery

**JANUARY 1, 2020 – DECEMBER 31, 2020**

| | |
|---|---|
| 17 and Under | 266 |
| 18 to 21 | 931 |
| 22 to 24 | 642 |
| 25 to 30 | 1,240 |
| 31 to 40 | 1,206 |
| 41 to 50 | 478 |
| Over 50 | 508 |

1/1/2020–12/31/2020 New York Average Age of Possessor: **32 Years**

1/1/2020–12/31/2020 National Average Age of Possessor: **34 Years**

98.     The top recovery cities for firearms with a New York recovery for that year are as follows:[76]

---

[76]  *Id.*

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 53 of 208

### Top Recovery Cities for Firearms with a New York Recovery

JANUARY 1, 2020 – DECEMBER 31, 2020

| | |
|---|---|
| New York City | 3,323 |
| Rochester | 708 |
| Buffalo | 478 |
| Syracuse | 249 |
| Albany | 115 |
| Yonkers | 94 |
| Niagara Falls | 68 |
| Elmira | 56 |
| Schenectady | 56 |
| Troy | 49 |

**NOTE:** There were 507 additional municipalities that accounted for 2,050 other traces. The recovery city could not be determined for eight traces.

99.     Buffalo is number three on the list with 478.

100.    The top recovery cities for firearms with a New York recovery for 2019 are as follows:[77]

---

[77]   https://www.atf.gov/file/147286/download



## *Top Recovery Cities for Firearms with a New York Recovery*

### January 1, 2019 – December 31, 2019

| New York City | Buffalo | Rochester | Syracuse | Albany | Yonkers | East Nassau | Niagara Falls | Jamestown | Schenectady |
|---|---|---|---|---|---|---|---|---|---|
| 3,495 | 615 | 548 | 225 | 93 | 92 | 89 | 56 | 48 | 47 |

**NOTE:** There were 453 additional municipalities that accounted for 2,052 other traces. The recovery city could not be determined for three traces.

101.    Buffalo is second on the list, behind the City of New York, with 615.

102.    The top recovery cities for firearms with a New York recovery for 2018 are as follows:[78]

---

[78]    https://www.atf.gov/file/137211/download



## Top Recovery Cities for Firearms with a New York Recovery

### January 1, 2018 – December 31, 2018

| New York City | Buffalo | Rochester | Syracuse | Albany | Jamestown | Niagara Falls | Elmira | Newburgh | Brentwood | Poughkeepsie |
|---|---|---|---|---|---|---|---|---|---|---|
| 3,710 | 571 | 530 | 269 | 92 | 69 | 64 | 54 | 49 | 48 | 48 |

**NOTE:** There were 544 additional municipalities that accounted for 2,185 other traces.

103.    Buffalo is again second on the list, behind New York City, with 571.

104.    Firearm Manufacturer and Distributor Defendants manufactured or distributed a large number of guns recovered in crimes committed in the City of Buffalo.

105.    From 2010 through July 2022, Buffalo Police Department recovered the following approximate number of firearms by maker/manufacturer:

| Maker/Manufacturer | Approximate Count |
|---|---|
| Beretta | 102 |
| Bryco (Defendant JA Industries, LLC) | 78 |
| Bushmaster | 14 |
| Colt | 143 |
| Glock | 407 |

43

| Maker/Manufacturer | Approximate Count |
|---|---|
| Hi-Point | 325 |
| Jiminez (Defendant JA Industries, LLC) | 62 |
| Kel-Tec | 94 |
| Marlin (Defendant Sturm, Ruger & Co., Inc.) | 157 |
| Mossberg | 286 |
| Polymer | 115 |
| Remington | 179 |
| Savage | 102 |
| SCCY | 54 |
| Sig Sauer | 57 |
| Smith & Wesson | 750 |
| Springfield | 108 |
| Sturm Ruger | 383 |
| Taurus | 423 |

106.    From 2021 through July 2022, Buffalo Police Department recovered the following approximate number of firearms by maker/manufacturer:

| Maker/Manufacturer | Approximate Count |
|---|---|
| Beretta | 20 |
| Bryco (Defendant JA Industries, LLC) | 5 |
| Bushmaster | 2 |
| Colt | 5 |

44

| Maker/Manufacturer | Approximate Count |
|---|---|
| Glock | 124 |
| Hi-Point | 28 |
| Jiminez (Defendant JA Industries, LLC) | 6 |
| Kel-Tec | 10 |
| Marlin (Defendant Sturm, Ruger & Co., Inc.) | 7 |
| Mossberg | 17 |
| Polymer | 93 |
| Remington | 14 |
| Savage | 14 |
| SCCY | 19 |
| Sig Sauer | 13 |
| Smith & Wesson | 132 |
| Springfield | 32 |
| Sturm Ruger | 61 |
| Taurus | 101 |

## II.    The Primary and Secondary Market for Guns

107.    The firearms market consists of a primary and a secondary market.

108.    The primary market consists of transactions through which new firearms move from manufacturers or importers through distributors and retailers to a first retail purchaser.

109.    Although there is a legitimate secondary market for firearms, that market also includes an illegal segment made up of private transactions among non-federally-licensed individuals.

110.     The illegal, secondary market is a significant source of firearms to criminals. Most firearms acquired by criminals are acquired through transactions in the secondary market.

111.     Criminals are an important market segment for the gun industry. Gun-trace studies have demonstrated that 11% of handguns sold between 1996 and 2000 were used in violent crimes by the year 2000; 18% of handguns sold in the year 1990 were in the hands of violent criminals or used in violent crimes by the year 2000.

112.     Empirical studies have shown that guns move quickly from the legal to the illegal market: 13% of guns recovered in crimes were recovered within one year of their sale, and 30% were recovered within three years of their first sale. ATF trace data indicate that as many as 43% of guns used in crimes in urban centers across the United States were purchased from retail dealers less than three years prior to commission of the crime. A relatively short interval between the retail sale of a gun and its recovery in a crime is an accepted indicator that a party to the initial retail transaction intended to transfer the gun to a prohibited user or into the illegal market.

**III.     Diversion to the Illegal Market**

113.     Upon information and belief, diversion of guns from the primary, legal market to the illegal, secondary market is caused in large part through Defendants' marketing practices and unlawful and unreasonable conduct.

114.     Upon information and belief, Defendants are aware that many guns that they sell, directly or indirectly, to retail dealers find their way into the secondary market as a result of specific sales practices by gun dealers.

115.     Upon information and belief, Defendants have failed to prevent diversion to the illegal market by, inter alia, failing to: monitor corrupt dealers; require retail sales only through storefront establishments; limit sales made at gun shows; prohibit straw purchases by dealers; limit multiple sales; and limit sales to dealers in states with lax gun laws.

46

### A. Illegal Sales at Gun Shows

116.    Gun shows are a significant source of guns that fall into the hands of criminals. Sales at gun shows by non-licensed persons to private citizens fall outside the three-tier process of the sale of a new firearm from a manufacturer through a distributor and dealer to a first retail purchaser. This constitutes a loophole for guns to be supplied to criminals, and, upon information and belief, Defendants are aware of this loophole.

117.    Although a Federal Firearms Licensee ("FFL") selling at a gun show must comply with the same regulations that apply for a sale at a business establishment, FFLs circumvent that rule in practice. Defendants are aware that FFL's selling at gun shows circumvent that rule.

118.    Although federal law requires background checks for all gun sales by licensed gun dealers, it does not require background checks for guns sold by unlicensed sellers, like non-dealers who sell guns online or at gun shows. This loophole enables people with felony convictions, with domestic abuse restraining orders against them, and other people with a personal history such that they are prohibited from possessing guns, to buy guns with no questions asked.[79]

119.    Upon information and belief, firearms manufactured, imported or distributed by Defendants that have been acquired at gun shows are diverted to the illegal market in New York and used to cause injury, death or the threat thereof to residents of the City of Buffalo.

### B. Private Sellers and Other Non-Storefront Sales

120.    The law does not require private sellers of firearms — so-called "non-stocking" or "kitchen-table" dealers who are not "engaged in the business" of selling firearms and who do not operate from a storefront — to conduct background checks or to maintain records that an FFL is required to

---

[79]  https://www.everytown.org/solutions/background-checks/

maintain. This constitutes a loophole for diversion of guns to criminal elements, and upon information and belief, Defendants are aware of this loophole.

121.    Upon information and belief, Defendants could sharply limit or eliminate sales by non-stocking, or kitchen-table, dealers through the use of prudent merchandising practices at little cost or loss of business.

122.    Upon information and belief, firearms that Defendants have sold through non-stocking or kitchen table dealers are diverted to the illegal market in New York and used to cause injury, death or the threat thereof to residents of the City of Buffalo.

### C. Straw Purchases

123.    Straw purchases, wherein the purchaser buys the gun from a licensed dealer for a person who is not qualified to purchase the firearm under federal and state regulations, are a major source of firearms for the secondary market. One law enforcement study found that more than 50% of the firearms subject to firearm trafficking investigations had been acquired as part of a straw purchase. The circumstances of many of these purchases indicated or should have indicated to the firearms sellers that they were "straw purchases."

124.    A seller who knowingly makes a sale to someone who is a straw purchaser conducts an illegal transaction and therefore commits a felony. Defendants are aware that this law does not deter a substantial number of sellers from engaging in straw purchases.

125.    Upon information and belief, Defendants could sharply limit straw sales by regulating their own customers through the use of prudent merchandising practices. This result could be achieved at little cost or loss of business.

126.    Upon information and belief, a substantial number of firearms manufactured, imported or distributed by Defendants were acquired by a straw purchase, diverted to the secondary market in New York, and used to cause injury, death or the threat thereof to residents of the City of Buffalo.

48

### D. Multiple Sales

127.    Guns are diverted to the illegal secondary market after being sold as part of a "multiple sale," in which the purchaser buys more than one gun at the same time or over a limited time period from a licensed dealer with the intention of later transferring the guns to persons unqualified to purchase under federal and state gun laws. Large multiple sales to one person by a single FFL are a further source of firearms for the illegal secondary market.

128.    Upon information and belief, firearms manufactured, imported or distributed by Defendants are acquired as part of a multiple purchase, diverted to the illegal market in New York, and used to cause injury, death or the threat thereof to residents of the City of Buffalo.

### E. Corrupt FFLs

129.    Guns acquired by criminals can be obtained through intentional trafficking by an FFL. Defendants are aware that some FFLs are corrupt and that they should not do business with such dealers, but, upon information and belief, Defendants nevertheless continue selling to such dealers until ATF revokes the dealers' licenses, which often takes years.

130.    Guns are diverted to the illegitimate gun market through corrupt dealers. According to an ATF study, just 1.2% of dealers accounted for over 57% of the crime guns traced to current dealers in 1998.[80] For example, in 1998, just over 450 licensed dealers had ten or more crime guns with a time-to-crime interval of three years or less traced to them. In addition, a congressional study of ATF data found that an extraordinary number of crime guns were purchased from the same "high crime" gun dealers. The same 137 dealers were the source of more than 34,000 crime guns between 1996 and 1998.

### F. Other Means of Diversion

---

[80] https://www.usatoday.com/story/opinion/2013/03/21/gun-dealers-inventory-atf-editorials-debates/2007657/

131.    Upon information and belief, guns manufactured, imported or distributed by Firearm Manufacturer Defendants and Firearm Distributor Defendants are stolen from FFLs with poor security arrangements; moreover, FFLs falsely report thefts to conceal trafficking. These guns are diverted to the secondary market in New York, and used to cause injury, death or the threat thereof to residents of the City of Buffalo. Some Firearm Manufacturer Defendants and Firearm Distributor Defendants sell guns in states in which gun regulations are lax. Upon information and belief, these Defendants know or should know that the guns would be taken into the State of New York, including the City of Buffalo, to be used illegally. These Defendants produce, market and/or distribute substantially more handguns than they reasonably expect to be sold to law-abiding purchasers. They oversupply states with weak handgun controls and restrictions, such as certain southern states along the I-95 corridor, with substantially more handguns than will be purchased by legitimate purchasers in those states, as these Defendants know or should know. These Defendants do so with the actual or constructive knowledge that the oversupply will be sold to prohibited purchasers in states, counties and cities, like the City of Buffalo, which have strong restrictions on the purchase and ownership of firearms. Guns are thereby diverted to the illegal market through sales in states with weak gun control laws to persons who transport the guns to places with strict gun control laws, such as the City of Buffalo.

132.    On October 25, 2016, the New York State Office of the Attorney General issued a report, "Target on Trafficking: Analysis of New York Crime Guns."[81] According to the report, a majority of guns confiscated in New York come from out of state.[82] The study looked at the state of

---

[81] https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-first-its-kind-analysis-illustrating-gun-trafficking-ny

[82] https://spectrumlocalnews.com/news/2016/10/27/schneiderman-gun-trafficking-database-law-enforcement-tool-crime

origin of more than 53,000 guns recovered in New York over a five-year period, from 2010 to 2015.[83] The report found that 74% of all guns recovered by law enforcement came from out of state; a rate that is more than twice the national average, and 86% of all handguns recovered in New York crime scenes came into New York from out of state.[84]  Most of those handguns coming from states referred to by law enforcement as the "Iron Pipeline": Florida, Georgia, North and South Carolina, Pennsylvania, Virginia, and Ohio.[85]  Additional findings include:[86]

- 52,915 Total Gun Recoveries
    i. New York State law enforcement agencies recovered 52,915 firearms between 2010-2015. In the most recent year of data, 2015, New York recovered 7,827 guns.

- Only 6% Of Guns Were Recovered From a Possessor Who Was Also The Original Purchaser
    i. Only 3,208 guns were recovered from a possessor who was also the original purchaser of the gun. About half of these were low time-to-crime guns.

- 74% of All Recovered Guns Total (handguns, rifles, etc) Originated Out-of-State

---

[83] *Id.*

[84] *Id.*

[85] *Id.*

[86] https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-first-its-kind-analysis-illustrating-gun-trafficking-ny

51

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 64 of 208

   i. 34,344 of the 46,514 recovered guns with a known purchase state

      originated outside of New York — well above the national average. Over

      half of these guns originated in Iron Pipeline states.

• 86% of Recovered Handguns Came From Out-of-State

   i. Nearly nine out of ten recovered handguns, the weapon of choice for

      violent criminals, came from out-of-state.

• 57% of All Recovered Guns Were Out-of-State Handguns

   i. For all the guns recovered in New York State, over half belong to a single

      category: out-state handguns. Handguns are known as the weapon of

      choice among violent criminals.

• New York has a low per-capita rate of gun recovery

   i. With 39.5 recoveries per 100,000 people in 2015, New York had half the

      per-capita recoveries than the national per-capita average (84 per 100,000

      people).

• But New York has a very high rate of out-of-state gun recoveries

   i. A strong majority of crime guns originated out-of-state in 2015 (75%),

      more than double the national average (29%) of out-of-state sources of

      crime guns.

• 1 in 5 Recovered Guns Were "Recently Trafficked"

   i. Of the 30,595 guns for which there is complete data, 6,162 exhibited

      indicia of recent trafficking into New York.

133.   On October 25, 2016, the *Buffalo News* issued an article, "Report: Guns brought into NY

from States with Weaker Gun Laws," discussing the report from the Office of the New York Attorney

General.[87]  The article states, "In Buffalo and Niagara Falls, nearly six in 10 guns recovered by law enforcement came from outside the state. Of 424 "likely-trafficked" guns in Erie and Niagara counties, 19 percent came from Ohio, 18 percent came from Georgia and 17 percent from Pennsylvania."[88] "There were 5,255 guns recovered by police in Erie and Niagara counties over the six-year period, a number that represented 10 percent of all guns recovered by law enforcement in New York over that time, according to the report."[89] "The report, citing difficulty in compiling full histories of individual firearms, concluded 6,162 guns were 'likely-trafficked' into the state over the six-year period. In the Buffalo area, 94 percent of 'likely-trafficked' firearms were handguns, according to the report."[90]

134.    According to the report, "As the second largest market for crime guns in New York State, Buffalo and neighboring Niagara Falls (Erie and Niagara Counties) together recovered 5,255 crime guns or 10% of statewide recoveries. Buffalo also has the second highest number of low time-to-crime recoveries (605) and likely-trafficked guns (424). Buffalo recovered 3,076 handguns, making it the third largest market for handguns in the State, with handguns making up 59% of recoveries in the market. Erie County showed a high per capita recovery rate of 82 guns per 100,000 residents, with Niagara lower at 58 per 100,000. Five zip codes (14215, 14211, 14213, 14207, 14212) accounted for almost 50% of the region's recoveries, or 2,476 guns. These recoveries were located in or around the City of Buffalo and had a slightly higher average out-of-state percentage than the rest of the market."[91]

---

[87]  https://buffalonews.com/news/local/crime-and-courts/report-guns-brought-into-ny-from-states-with-weaker-gun-laws/article_41ba386b-d2c0-5e1c-921e-d6ec9b67cc07.html

The report is available here: https://targettrafficking.ag.ny.gov/#part1

[88]  *Id.*

[89]  *Id.*

[90]  *Id.*

[91]  *Id.*

53

135.   The report also provided:



The Pipeline reaches as far west in New York as Buffalo-Niagara. Of its 424 likely-trafficked guns, the biggest out-of-state supplier is nearby Ohio with 19%. Following Ohio was Georgia and Pennsylvania, with 18% and 17% respectively. 94% of guns that were likely-trafficked to Buffalo were handguns.



136. The report contained the following graphic:



137.   The report also contains a graphic for Buffalo:



138.    An example of such diversion was reported by the United States Attorney's Office for the Northern District of Georgia on August 6, 2012.[92]  The press release stated: "Charles Horton, 36, of Buffalo, New York, was sentenced today by United States District Judge Thomas W. Thrash, Jr. to serve over 17 years in federal prison for the offenses of being a felon in possession of firearms, transporting guns from Georgia to New York without a license, and using straw purchasers to make false statements to gun dealers. United States Attorney Sally Quillian Yates said that, 'Horton persuaded four women, one of whom was homeless, to buy twenty firearms on his behalf, and when he learned he was under investigation, he attempted to tamper with a witness who agreed to testify against him at trial.   Law enforcement officers later recovered some of these firearms at crime scenes in the Buffalo area, including at the scene of a murder.' 'Gun traffickers commit a worse crime than the illegal purchase, sale and transportation of firearms. These criminals provide an iron pipeline of potentially deadly weapons for their own selfish profit at the expense of law abiding citizens and their families,' said Scott Sweetow, Special Agent in Charge of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) in Atlanta. 'The unlawful trafficking in firearms is a serious crime which feeds and amplifies the violence experienced in so many cities today. I applaud the efforts of the agents and the prosecutors who brought the Mr. Horton to justice.' . . . According to United States Attorney Yates, the charges and other information presented in court:   Horton, a convicted felon who was prohibited by federal and state law from possessing firearms, recruited four women to act as straw purchasers and buy a total of twenty firearms on his behalf.   Horton gave the straw purchasers the money for the guns, drove them to various gun stores in Georgia and South Carolina, and told them which firearms to purchase.   At the time of the gun sales, the straw purchasers falsely claimed that they were buying the guns for themselves. Horton was captured in video surveillance footage as he escorted three of the women to several gun

---

[92]  https://www.justice.gov/archive/usao/gan/press/2012/08-06-12.html

57

stores.    A tip from a gun dealer about a car tag resulted in ATF determining that during the time of the straw purchases Horton used various rental cars to travel back and forth between Buffalo and Atlanta on multiple occasions.    Law enforcement officers subsequently recovered these weapons at crime scenes in Buffalo, New York.    When Horton learned that he was the subject of an investigation by ATF, he attempted to interfere with the investigation by asking one of the straw purchasers to falsely claim that the guns he purchased through the straw buyers had been stolen.    Unbeknownst to Horton, the straw purchaser was cooperating with the ATF."[93]

139.    The criminal indictment in *United States of America v. Charles Horton*, United States District Court for the Northern District of Georgia, 1:11-CR-427, identifies the manufacturers and models of the firearms Horton possessed which includes, in part: Hi-Point manufactured pistols; a Bryco manufactured pistol; and an SCCY Industries manufactured pistol. Additionally, the indictment provides that Horton transported Hi-Point manufactured pistols into the State of New York, and three of those pistols were recovered in Buffalo, New York.

140.    On January 11, 1997, members of the Buffalo Violent Crime and Career Criminal Task Force arrested Jonathan Long of Buffalo, New York.[94]  Long and five others conducted a gun-running operation from a small town outside of Atlanta, Georgia and onto Buffalo's streets.[95]

141.    On September 23, 2018, it was reported that on March 23, Buffalo police officers investigated a report about a man holding a woman at gunpoint recovered a pistol.[96]  They submitted the

---

[93] *Id.*

[94] https://buffalonews.com/news/six-arrested-in-gun-ring-agents-say-group-was-buying-weapons-from-georgia-shop/article_4a97cd27-2faa-5c64-b9ae-e28f8cfb4651.html

[95] https://buffalonews.com/news/six-arrested-in-gun-ring-agents-say-group-was-buying-weapons-from-georgia-shop/article_4a97cd27-2faa-5c64-b9ae-e28f8cfb4651.html

[96] https://buffalonews.com/news/local/the-90-connection-how-an-ohio-to-buffalo-gun-trafficking-ring-was-busted/article_bc70094c-e223-5c55-bb32-5fe6f90068e7.html

INDEX NO. 815602/2022

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 71 of 208

RECEIVED NYSCEF: 12/20/2022

gun — a Glock, Model 33, .357 caliber handgun — for analysis.[97]  According to federal court records, the gun had been purchased in November at a pawn shop in Ashtabula, Ohio, a lakeside city of about 18,000 that is just over a two-hour drive west of Buffalo on the Thruway.[98]  The article further stated: "It also turned out be one of 29 guns an Ashtabula man is accused of buying at nine locations throughout that city over four months, according to federal prosecutors. The discovery marked the beginning of an investigation that led Buffalo police and agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives to uncover what they allege is a gun-trafficking ring involving the illegal purchases of more than 100 firearms in and around Ashtabula, many of which are believed to have ended up in Buffalo."[99]  Sixty-two of those guns were bought for one Buffalo man, Robert L. Williams Jr., according to court records. He has been charged with federal counts of weapons possession as a convicted felon, and with illegally transporting firearms into New York. Nine Ashtabula residents were charged with conspiracy to traffic in firearms, six of whom are accused of buying the guns for Williams as straw purchasers.[100]  Also, the article stated: "Most of the firearms recovered by law enforcement agencies in New York State that the ATF traces originate from out of state. Many are stolen and then sold on the street."[101]  The article further stated: "Increasingly, gun traffickers are buying guns in other states with less restrictive gun laws and bringing them here to sell, often at a profit, said James P. Kennedy, U.S. Attorney for the Western District of New York. 'They're buying a gun in one of those states for $500 and can sell it up

---

[97]  *Id.*

[98]  *Id.*

[99]  *Id.*

[100]  *Id.*

[101]  *Id.*

here for $800 to $1,000,' Kennedy said. 'Turning that kind of profit on 10 guns — that can become very lucrative.' Traffickers are also bringing guns to New York to trade for heroin and other drugs which they bring back to their home states to sell, doubling and even tripling profits. 'Firearms can be used as currency,' Taylor said."[102]  The article then concluded: "Last year, law enforcement agencies in New York State asked the ATF to run traces on more than 9,000 firearms. The ATF was able to determine the source state — where the gun was legally purchased — in 5,565 of those firearms. Just over 4,200 of those originated from out of state. The ATF said 271 came from Ohio. Ohio consistently ranked around eighth in states from where firearms recovered in New York and analyzed by the ATF originated, including New York itself, according to annual ATF reports between 2013 and 2017."[103]

142.    On October 16, 2020, the Department of Justice issued a press release titled, "CBL/BFL Member Going To Prison For More Than 15 Years For Racketeering Conspiracy And Other Charges; Buffalo Woman Also Going To Prison For Lying About A Murder By Another CBL/BFL Gang Member."[104] CBL/BFL Gang, which stands for, among other things, "Cash Been Long" and "Brothers for Life."[105]  "The gang, which was involved in the illegal possession and distribution of narcotics, was formed around 2009 and operates primarily in the City of Buffalo at the Towne Gardens Housing Complex."[106] According to the Third Superseding Indictment in *United States of America v. Woods, et al.* (17-CR-103-V), the defendants were in possession of the following firearms, among others:

---

[102]  *Id.*

[103]  *Id.*

[104]  https://www.justice.gov/usao-wdny/pr/cblbfl-member-going-prison-more-15-years-racketeering-conspiracy-and-other-charges

[105]  *Id.*

[106]  *Id.*

- One (1) Taurus, semi-automatic pistol, Model No. PT111 Millennium G2, 9mm Luger caliber, bearing serial number TIX27131, and ammunition;

- One (1) Taurus, semi-automatic pistol, Model No. PT809, 9mm caliber, bearing serial number TJS29126, and ammunition;

- One (1) Glock, semi-automatic pistol, Model 30, 45 caliber, bearing serial number HLE328, and ammunition;

- One (1) Smith & Wesson, semi-automatic pistol, Model No. 410, 40 Smith & Wesson caliber, bearing serial number VMM1496, and ammunition;

- One (1) Savage Arms pump action 12 gauge shotgun, Model Stevens 67 Series E, bearing serial number E684403;

- One (1) Glock, semi-automatic pistol, Model 23, 40 caliber, bearing serial number HWY660, and ammunition;

- One (1) Glock, semi-automatic pistol, Model 23, 40 caliber, bearing serial number AANV538, and ammunition;

- One (1) Hipoint, semi-automatic pistol, Model C, 9mm, bearing serial number 804358, and ammunition;

- One (1) Beretta, semi-automatic pistol, Model 84 FS Cheetah, 380 caliber, bearing serial number E99268Y, and ammunition;

- One (1) Springfield Armory, semi-automatic pistol, Model XDs, 45 caliber, bearing Serial Number S3256419, and ammunition;

- One (1) Hipoint, semi-automatic pistol, Model JCP, 40 Smith and Wesson, 40 caliber, with a defaced serial number, and ammunition;

61

- One (1) Hipoint, semi-automatic pistol, Model JHP, 45 caliber, bearing serial number X4250584, and ammunition;

- One (1) Springfield Armory, semi-automatic pistol, Model XD-40, 40 caliber, bearing serial number XD489138, and ammunition;

- One (1) Colt, semi-automatic pistol, 22 long rifle, bearing serial number PH32434, and ammunition;

- One (1) Smith and Wesson, Model 18-3 revolver, 22 long rifle, bearing serial number 3K93144, and ammunition;

- One (1) Ruger, model P95, 9mm semi-automatic pistol, bearing serial number 318-1933, and ammunition;

- One (1) Smith & Wesson, Model 686, 357 revolver, bearing serial number AJF3679, and ammunition; and

- One (1) Beretta Model 92FS, semi-automatic pistol, 9mm Luger, bearing serial number BER171801Z, and ammunition.

143.     On March 9, 2016, the Department of Justice issued a press release titled, "Rochester Man Pleads Guilty to Drug Charge."[107]  According to the press release, the Defendant Ronald Dodd "had three bags of marijuana, two bags of heroin, and two bags of cocaine in his pants. There was a stolen, Bryco Arms .380 semi-automatic handgun on the ground next to a tree where Dodd was apprehended."[108]  According to the Complaint in *United States of America v. Dodd* (Case No. 15-MJ-4141),

---

[107]  https://www.justice.gov/usao-wdny/pr/rochester-man-pleads-guilty-drug-charge-2

[108]  *Id.*

62

the Bryco firearm was a ".380 semi-automatic handgun bearing serial number 115400 that was reported stolen on August 13, 2015."

144.    On September 27, 2019, the Department of Justice issued a press release titled, "Medina Husband And Wife Indicted By A Federal Grand Jury On Multiple Drug And Gun Charges."[109]  The federal grand jury "returned an indictment charging Anthony Allee, 28, and Tashira Allee, 36, both of Medina, NY, with maintaining a drug-involved premises, possession of firearms in furtherance of drug trafficking, unlawful possession of a short-barreled shotgun, and unlawful possession of a short-barreled rifle."[110]  According to the Complaint in *United States of America v. Allee, et al.* (Case No. 19-MJ-137), a Colt .45 ACP pistol and Ruger model 10-22 carbine, bearing serial number 249-52473 were found during the search. The press release further provided, "Investigators seized 11 firearms, numerous articles of property reported as stolen, marijuana, pills believed to be controlled substances, ammunition, scales, bags, and other items of evidence including Tashira Allee's cell phone. The firearms included a Taurus Judge pistol that had been reported stolen in the Town of Tonawanda."[111]

145.    On January 23, 2020, the Department of Justice issued a press release titled, "Rochester Man Going To Prison For Over 7 Years On Gun Trafficking And Drug Charges."[112]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Carlos Cruz-Garcia, 37, of Rochester, NY, who was convicted of conspiring to distribute, and possessing with intent to distribute, cocaine,

---

[109]  https://www.justice.gov/usao-wdny/pr/medina-husband-and-wife-indicted-federal-grand-jury-multple-drug-and-gun-charges

[110]  *Id.*

[111]  https://www.justice.gov/usao-wdny/pr/medina-husband-and-wife-indicted-federal-grand-jury-multple-drug-and-gun-charges

[112]  https://www.justice.gov/usao-wdny/pr/rochester-man-going-prison-over-7-years-gun-trafficking-and-drug-charges

and possession of a firearm in furtherance of a drug trafficking crime, was sentenced to serve 87 months in prison U.S. District Judge Elizabeth A. Wolford."[113]  Additionally, the press release indicated, "At the time of Cruz-Garcia's arrest, law enforcement officers found a loaded Glock .40 caliber pistol, which the defendant possessed in connection with the drug conspiracy."[114]

146.    On June 21, 2022, the Department of Justice issued a press release titled, "Buffalo Man Pleads Guilty to Drug Charge."[115]  The press release stated: "U.S. Attorney Trini E. Ross announced today that Girard Jackson, 28, of Buffalo, NY, pleaded guilty before U.S. District Judge Lawrence J. Vilardo to possession of a firearm in furtherance of a drug trafficking crime."[116]  Additionally, the press release indicated, "Assistant U.S. Attorney Jeremiah E. Lenihan, who is handling the case, stated that in the early morning hours of June 19, 2021, law enforcement officers encountered Jackson on the 500 block of West State Street in Olean, NY, at which time they executed a search warrant of Jackson for firearms, narcotics, and U.S. currency. Located in a bag Jackson wore around his waist, officers found and seized a loaded Glock 9mm semi-automatic pistol. Wrapped around Jackson's ankle, officers found quantities of methamphetamine and cocaine."[117]

147.    On June 11, 2019, the Department of Justice issued a press release titled, "Buffalo man Pleads Guilty to Drug and Gun Charges."[118]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Leon R. Williams, 39, of Buffalo, NY, pleaded guilty before U.S. District Judge

---

[113] *Id.*

[114] *Id.*

[115] https://www.justice.gov/usao-wdny/pr/buffalo-man-pleads-guilty-drug-charge-11

[116] *Id.*

[117] *Id.*

[118] https://www.justice.gov/usao-wdny/pr/buffalo-man-pleads-guilty-drug-and-gun-charges-7

Elizabeth A. Wolford to possession with intent to distribute heroin, and possession of a firearm in furtherance of drug trafficking activity."[119] The press release further indicated, "On November 29, 2017, a New York State search warrant was executed at the Williams' Texas Street residence in Buffalo. Investigators recovered heroin and cocaine, scales, razor blades, cutting agents, and $73,743 in U.S. currency, which was concealed inside of a vacuum cleaner, a backpack, and within a drop ceiling between two bedrooms. In addition, a Glock, .40 caliber firearm was recovered along with a magazine containing 10 rounds of ammunition loaded within the firearm."[120]

148.    On December 3, 2020, the Department of Justice issued a press release titled, "Rochester Man Pleads Guilty to Possession of a Machine Gun."[121]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Aaron Graff, 44, of Rochester, NY, pleaded guilty today before U.S. District Judge David G. Larimer to possession of a machine gun."[122]  Additionally, the press release indicated, "Assistant U.S. Attorney Charles Moynihan, who is handling the case, stated that Graff was arrested after members of law enforcement intercepted and searched a package sent to him from an address in China. Officers found the package contained a Glock® conversion device which, when installed on a Glock® semi-automatic pistol, allows the pistol to discharge ammunition in fully automatic mode. On May 24, 2019, investigators delivered the package containing the device to Graff and then searched his residence pursuant to a search warrant.   During the search, officers found the intercepted

---

[119]   *Id.*

[120]   *Id.*

[121]   https://www.justice.gov/usao-wdny/pr/rochester-man-pleads-guilty-possession-machine-gun

[122]   *Id.*

65

Glock® conversion device, as well as a second Glock® conversion device which the defendant admitted to ordering about a month earlier."[123]

149.     On August 12, 2019, the Department of Justice issued a press release titled, "Buffalo Man Going To Prison For More Than 21 Years For Selling Heroin And Fentanyl That Led To The Deaths Of Two People."[124]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Aaron J. McDuffie, a/k/a "G", 24, of Buffalo, NY, who was convicted of distribution of heroin and butyryl fentanyl causing death, and distribution of fentanyl, butyryl fentanyl, and furanyl fentanyl causing death, was sentenced to serve 262 months in prison by U.S. District Judge Lawrence J. Vilardo."[125]  Additionally, the press release indicated, "On November 30, 2016, law enforcement officers arrested McDuffie leaving his residence in Buffalo. The defendant was on his way to distribute a quantity of powder that contained fentanyl, butyryl fentanyl, and furanyl fentanyl. Under McDuffie's's living room couch, officers recovered a Hi-Point, .40 caliber semi-automatic handgun that was loaded with eight rounds of .40 caliber ammunition."[126]

150.     On July 16, 2018, the Department of Justice issued a press release titled, "Buffalo Man Sentenced For Being A Felon In Possession Of Firearms."[127]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that David Hunter, 22, of Buffalo, NY, who was convicted of

---

[123] https://www.justice.gov/usao-wdny/pr/rochester-man-pleads-guilty-possession-machine-gun

[124] https://www.justice.gov/usao-wdny/pr/buffalo-man-going-prison-more-21-years-selling-heroin-and-fentanyl-led-deaths-two

[125] *Id.*

[126] *Id.*

[127] https://www.justice.gov/usao-wdny/pr/buffalo-man-sentenced-being-felon-possession-firearms

66

being a felon in possession of firearms, was sentenced to serve 27 months in prison by U.S. District Judge Elizabeth A. Wolford."[128]  Additionally, the press release indicated, "Assistant U.S. Attorney Joseph M. Tripi, who handled the case, stated that between March 3, 2017, and March 12, 2017, the defendant posted images to "Snap Chat" depicting himself in possession of a Hi-Point, model JH-45 semi-automatic firearm. On April 1, 2017, New York State Parole Officers, assisted by members of the Buffalo Police Department, searched Hunter's residence, recovered a Hi-Point, model CF380, .380 caliber semi-automatic firearm, and arrested the defendant. The defendant was previously convicted in state court of Criminal Possession of a Weapon in February 2014 and is legally prohibited from possessing a firearm."[129]

151.    On August 24, 2016, the Department of Justice issued a press release titled, "Wyoming County man Sentenced on Gun Charge."[130]  The press release stated: "Attorney William J. Hochul Jr. announced today that Scott A. Wilcox, 46, of Pike, NY, who was convicted of being a felon in possession of a firearm, was sentenced to 21 months in prison by U.S. District Elizabeth A. Wolford."[131]  Additionally, the press release indicated, "Assistant U.S. Attorney Frank T. Pimentel, who handled the case, stated that on January 25, 2015, Wyoming County Sheriff's deputies searched the defendant's residence at 7998 Wiscoy Road in Pike and found a Marlin .44 magnum caliber rifle, which belonged to Wilcox. Deputies also found 76 rounds of .44 caliber ammunition in an access panel in a bathroom. The defendant is a three-time convicted felon and is prohibited from legally possession firearms."[132]

---

[128]  https://www.justice.gov/usao-wdny/pr/buffalo-man-sentenced-being-felon-possession-firearms

[129]  *Id.*

[130]  https://www.justice.gov/usao-wdny/pr/wyoming-county-man-sentenced-gun-charge

[131]  *Id.*

[132]  *Id.*

67

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 80 of 208

152.    On May 14, 2019, the Department of Justice issued a press release titled, "Greece Man Pleads Guilty to Lying to the FBI."[133]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Thomas Alonzo Bolin, a/k/a Peter Vincent, 22, of Greece, NY, pleaded guilty before U.S. District Judge David G. Larimer to making a false statement to the FBI."[134]  Additionally, the press release indicated, "On March 30, 2019, members of the FBI, as part of their investigation, interviewed the defendant. During the interview, Bolin falsely stated that he did not possess any firearms in New York State. At the time of the statement, the defendant knew that he possessed a Mossberg 12-gauge shotgun in his bedroom closet at 34 Third Avenue in Greece. This false statement was material to the FBI's investigation of possible civil rights and firearms violations by Bolin and others. The FBI recovered the shotgun during a subsequent search of the defendant's bedroom closet."[135]

153.    On March 18, 2015, the Department of Justice issued a press release titled, "City of Tonawanda Man Sentenced On A Gun Charge."[136]  The press release stated: "U.S. Attorney William J. Hochul, Jr. announced today that Christopher Simmance, 38, of City of Tonawanda, NY, who was convicted of possession of a firearm after having been committed to a mental institution, was sentenced to time served (19 months) and two years supervised release by Senior U.S. District Judge William M. Skretny."[137]  Additionally, the press release indicated, "Assistant U.S. Attorney John M. Alsup, who handled the matter, stated that on November 12, 2011, law enforcement officers responded to the

---

[133]  https://www.justice.gov/usao-wdny/pr/greece-man-pleads-guilty-lying-fbi

[134]  *Id.*

[135]  *Id.*

[136]  https://www.justice.gov/usao-wdny/pr/city-tonawanda-man-sentenced-gun-charge

[137]  *Id.*

defendant's Tonawanda residence where they located a Remington shotgun. Simmance had previously received mental health treatment preventing him from legally possessing any firearms."[138]

154.   On January 6, 2014, the Department of Justice issued a press release titled, "Lockport Man Sentenced on Drug Charges."[139]   The press release stated: "U.S. Attorney William J. Hochul, Jr. announced today that Damian Ard, 33, of Lockport, N.Y., who was convicted of conspiracy to possess with intent to distribute, and to distribute, cocaine base, was sentenced to six years in prison by Chief U.S. District Judge William M. Skretny."[140]   Additionally, the press release indicated, "During the execution of a federal search warrant at Ard's residence on August 17, 2010, law enforcement officers seized a Remington Model 597 rifle, two .22 caliber rifle magazines and a .22 caliber high capacity magazine; a RML 7.62 x 39 caliber semi-automatic rifle, two magazines and ammunition; a New England Firearms Pardner Model SBI 20 gauge shotgun, and ammunition."[141]

155.   On January 23, 2018, the Department of Justice issued a press release titled, "Penn Yan Man Sentenced On Gun And Witness Tampering Charges." The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that James E. Sandford, III, 29, of Penn Yan, NY, who was convicted of possessing a stolen firearm, being a felon in possession of a firearm, and witness tampering, was sentenced to 156 months in prison by U.S. District Judge David G. Larimer."[142]   Additionally, the press release indicated, "Eventually, Sandford was charged in a superseding indictment which alleged

---

[138]   *Id.*

[139]   https://www.justice.gov/usao-wdny/pr/lockport-man-sentenced-drug-charges

[140]   *Id.*

[141]   *Id.*

[142]   https://www.justice.gov/usao-wdny/pr/penn-yan-man-sentenced-gun-and-witness-tampering-charges

that he distributed synthetic cannabinoids (designer drugs) between July 2014 and March 24, 2015, in the Penn Yan area. He was further charged with distributing such substances — and controlled substance analogues, which are designed to mimic the effects of controlled substances — both to individuals under the age of 21 and within 1000 feet of St. Michael's School, a private elementary school in Penn Yan. In addition, the superseding indictment alleged that on February 22, 2015, the defendant traded synthetic cannabinoids to a minor in exchange for a stolen Savage .410 double barrel shotgun. At the time, the defendant had two prior felony convictions preventing him from legally possessing a gun."[143]

156.    On May 31, 2017, the Department of Justice issued a press release titled, "Buffalo Man Indicted For Distribution Of Cocaine, Crack Cocaine, Butyryl Fentanyl And Marijuana."[144]  The press release stated: "Acting U.S. Attorney James P. Kennedy, Jr. announced today that a federal grand jury has returned a 14-count indictment charging Tracy Bankston, 50, of Buffalo, NY, with conspiracy to distribute crack cocaine, cocaine, butyryl fentanyl, and marijuana. The defendant was also charged with possessing controlled substances with the intent to distribute; maintaining a drug-involved premises; possessing of a firearm in furtherance of a drug trafficking crime; and possessing of a firearm as a convicted felon."[145]  Additionally, the press release indicated, "Inside Bankston's bedroom, police recovered over 28 grams of crack cocaine, two ounces of marijuana, scales, baggies, a Smith and Wesson

---

[143]  https://www.justice.gov/usao-wdny/pr/penn-yan-man-sentenced-gun-and-witness-tampering-charges

[144]  https://www.justice.gov/usao-wdny/pr/buffalo-man-indicted-distribution-cocaine-crack-cocaine-butyryl-fentanyl-and-marijuana

[145]  *Id.*

70

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 83 of 208

.357 caliber revolver, and a TEC-9 9mm pistol with an extended clip as well as nearly 100 rounds of .357 and 9mm ammunition with the 2 handguns."[146]

157.     On September 2, 2015, the Department of Justice issued a press release titled, "Lackawanna Man Indicted On Gun Charge."[147] The press release stated: "U.S. Attorney William J. Hochul Jr. announced today that a federal grand jury has returned an indictment charging Justin Vazquez, 29, of Lackawanna, NY, with being a felon in possession of a firearm."[148] Additionally, the press release indicated, "Officers apprehended Vazquez in the kitchen. The mother told police that Vazquez's gun was located in the back bedroom. A search recovered a loaded Smith & Wesson AR-15 rifle. The defendant was previously convicted on a state charge of Aggravated Criminal Contempt and therefore is not allowed to legally possess a firearm."[149]

158.     On September 12, 2014, the Department of Justice issued a press release titled, "Rochester Man Sentenced for Possessing Ammunition as a Convicted Felon."[150] The press release stated: "U.S. Attorney William J. Hochul, Jr. announced today that Frederick Stokes, 36, of Rochester, NY, who was convicted of possessing ammunition while being a convicted felon, was sentenced to 63 months in prison by U.S. District Court Judge David G. Larimer."[151] Additionally, the press release indicated, "Assistant U.S. Attorneys Craig Gestring and Charles E. Moynihan, who handled the case,

---

[146] *Id.*

[147] https://www.justice.gov/usao-wdny/pr/lackawanna-man-indicted-gun-charge

[148] *Id.*

[149] *Id.*

[150] https://www.justice.gov/usao-wdny/pr/rochester-man-sentenced-possessing-ammunition-convicted-felon

[151] *Id.*

71

stated that Stokes was previously convicted in 2002 in Monroe County of Forgery in the Second Degree and in 1999 in Oneida County of Assault in the Second Degree. As a result of these previous convictions, the defendant was prohibited from possessing any firearms or ammunition. On April 12, 2013, members of the Rochester Police Department Tactical Unit arrested Stokes in the area of Ringle Street and Post Avenue in Rochester. Officers were looking for the defendant in connection with an unrelated investigation.  When officers attempted to take Stokes into custody, he ran from them which resulted in a foot chase. During the chase, the defendant discarded a dark, denim jacket in the area of 93 Post Avenue. Officers arrested Stokes in front of 95 Post Avenue and recovered the jacket nearby. They found seven rounds of .45 caliber ammunition, which were placed inside of a magazine for a Sturm Ruger .45 caliber semiautomatic pistol, inside one of the jacket pockets."[152]

159.    On February 27, 2018, the Department of Justice issued a press release titled, "Niagara Falls Man Sentenced On Heroin Charge."[153]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Shaquan M. Shingledecker, 23, of Niagara Falls, NY, who was convicted of possession with intent to distribute heroin, was sentenced to 30 months by U.S. District Judge Elizabeth A. Wolford."[154]  Additionally, the press release indicated, "Inside Shingledecker's vehicle at the accident scene, police found 95 glassine envelopes containing heroin, a loaded Ruger handgun with 10 rounds of ammunition, and $1,439.08 in United States currency."[155]

---

[152] *Id.*

[153] https://www.justice.gov/usao-wdny/pr/niagara-falls-man-sentenced-heroin-charge

[154] *Id.*

[155] *Id.*

160.    On September 18, 2019, the Department of Justice issued a press release titled, "Rochester Man Sentenced For Heroin Possession And Being A Felon In Possession Of A Gun."[156] The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Joseph Delisio, 47, of Rochester, NY, who was convicted of possession of heroin with intent to distribute and possession of a firearm and ammunition by a convicted felon, was sentenced to serve 100 months in prison by U.S. District Judge Elizabeth A. Wolford."[157] Additionally, the press release indicated, "Assistant U.S. Attorney Cassie Kocher, handled the case, stated that the defendant sold heroin between September 29, 2017, and April 11, 2018 to individuals working with the Drug Enforcement Administration. Delisio was arrested on April 11, 2018, following a vehicle stop. The defendant had approximately $34,650 in cash in his possession and officers found a bottle in the vehicle containing residue of suspected heroin, scales which are commonly used to process narcotics for distribution, and a .22 caliber Ruger handgun. During a subsequent search of Delisio's residence, officers recovered three more firearms and ammunition. The defendant was previously convicted in Wayne County Court in 2013 of Criminal Possession of a Controlled Substance in the Fourth Degree; in 2009 of Criminal Sale of a Controlled Substance in the Fifth Degree; and in 2002 of Burglary in the Third Degree. As a result, Delisio is legally prohibited from possessing firearms and ammunition."[158]

161.    On June 13, 2019, the Department of Justice issued a press release titled, "Armed Drug Trafficker Pleads Guilty."[159]  The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced

---

[156] https://www.justice.gov/usao-wdny/pr/rochester-man-sentenced-heroin-possession-and-being-felon-possession-gun

[157] *Id.*

[158] *Id.*

[159] https://www.justice.gov/usao-wdny/pr/armed-drug-trafficker-pleads-guilty-3

73

today that Demetrius Jackson, 43, of Rochester, NY, pleaded guilty today before U.S. District Judge Charles J. Siragusa to possession with intent to distribute cocaine, and possession of a firearm and ammunition by a convicted felon."[160] Additionally, the press release indicated, "While searching the location, police officers found a green container with 10 small ziplock bags of cocaine in a bedroom which Jackson later admitted belonged to him. In the same bedroom, secreted in a crawl space, officers found a Taurus .45 caliber semiautomatic handgun which was loaded with 11 rounds of ammunition."[161]

162. On March 9, 2022, the Erie County District Attorney's Office issued a press release titled, "Convicted Murderer Pleads Guilty to Manslaughter Charge for Killing Victim in Shooting on City's East Side in 2017."[162] The press release provided, "Erie County District Attorney John J. Flynn announces that 29-year-old Kenyatta Austin of Buffalo pleaded guilty this morning before Erie County Court Judge Kenneth Case to one count of Manslaughter in the First Degree (Class "B" violent felony). On March 19, 2017 at approximately 3:00 p.m., the defendant shot the victim on East Ferry Street near Bissell Avenue in the City of Buffalo. The victim, 24-year-old Luis Flores, died from his injuries a short time later. Austin faces a maximum of 25 years in prison when he is sentenced on Monday, May 9, 2022 at 2:00 p.m. The defendant continues to remain held without bail on this case. Austin is currently serving 64 years to life in prison after being convicted in a separate homicide case. A judge found the defendant guilty of murder, assault and gun charges for committing a shooting outside a home on Grape Street in

---

[160] *Id.*

[161] *Id.*

[162] "Convicted Murderer Guilty to Manslaughter Charge for Killing Victim in Shooting on City's East Side in 2017," available at https://www2.erie.gov/da/index.php?q=press/convicted-murderer-pleads-guilty-manslaughter-charge-killing-victim-shooting-citys-east-side-2

the City of Buffalo that killed 54-year-old Yvette Johnson and her 17-month-old grandson, Kyrie Johnson, on July 2, 2018. Two other individuals were injured by gunfire, but survived."[163]

163.     On June 28, 2022 (last updated June 29, 2022), WGRZ published an article titled, "Man and 2-year-old child shot on Decker Street Tuesday afternoon."[164]  The story provided, "Buffalo Police said a man and child were shot Tuesday afternoon. The shooting happened just before 4p.m. on the first block of Decker Street. Police said the man, 32, is in stable condition at ECMC, and his 2-year-old daughter is listed in stable condition at Oishei Children's Hospital. "The father and the daughter were innocent victims. In this case, they were shot through a fence," Buffalo Police commissioner Joe Gramaglia said Wednesday during a news conference. "So clearly, there's really not a lot that they could have seen when you're on the other side of a fence. But here we are another child in the City of Buffalo that's been shot, and we need some justice for this. You've got people that are firing weapons, randomly firing weapons, and you look at the results of what can happen there."[165]

164.     On September 27, 2022, Fox29 News At Ten published an article titled, "17-year-old shot and killed in Buffalo's Riverside neighborhood."[166]  The article provided, "A 17-year-old high school student was shot and killed in the riverside neighborhood Monday night. Buffalo police were called to the 200-block of Esser Avenue just before 10p.m. "He was a good kid. He was just trying to stay out of the way. He went right to the charter school." Says Eric Johnson, Mylik's brother. "I just don't

---

[163] *Id.*

[164] "Man and 2-year-old child shot on Decker Street Tuesday afternoon," available at https://www.wgrz.com/article/news/crime/man-and-child-shot-on-decker-street-tuesday-afternoon-crime-buffalo-community/71-e4e99873-0a72-423c-a7b1-31a2aeb93988

[165] *Id.*

[166] "17-year-old shot and killed in Buffalo's Riverside neighborhood," available at https://wutv29.com/news/local/17-year-old-shot-and-killed-in-buffalos-riverside-neighborhood

understand." Says Elijah Johnson, Mylik's brother. The brothers of high school student Mylik Johnson in shock today after learning the 17-year-old was killed in a shooting Monday night in front of All Saints Church in the riverside neighborhood. Mylik was a senior at Charter School for Applied Technologies…Buffalo police say the shooting appeared to be targeted in nature, though they have not yet arrested a suspect. Addressing the situation Mayor Byron Brown, commented "we are continuing to follow up on leads, follow up on videographic evidence." Buffalo Mayor Byron Brown says he has been working to end violence since the May 14th mass shooting. But since then, there have been more than 30 homicides in the city of Buffalo."[167]

165. On December 22, 2020, an article was published titled, "Gun Trafficking Across State Lines Is a Problem for Buffalo."[168] The article discussed two men, one from Ashtabula, Ohio and the other from Buffalo, bringing guns into Buffalo.[169] The article quoted a U.S. Attorney for the Western District of New York, stating: "They were both drug dealers and they used heroin customers that they had to make these straw purchases from gun shops in Ohio and they trafficked over 100 guns which actually made their way through these straw purchasers up here to the streets in the City of Buffalo[.]"[170]

166. Handguns manufactured, imported or distributed by Defendants are acquired in states and cities where gun regulations are lax, diverted to the illegal market in New York, and used to cause injury, death or the threat thereof to residents of the City of Buffalo.

## IV. The Trace Database

---

[167] *Id.*

[168] https://www.wgrz.com/article/news/gun-trafficking-across-state-lines-is-a-problem-for-buffalo/71-e74c157b-be28-48a8-85d9-acdd373235f5

[169] *Id.*

[170] *Id.*

76

167.     An ATF gun "trace" identifies (a) the FFL that initially sold a gun recovered at a crime scene, (b) the manufacturer of the gun, and (c) the initial gun purchaser. The Trace Database traces a gun through the primary market, namely from the gun manufacturer or importer, distributor and retail dealer to the first retail purchaser. Defendants are an integral part of the tracing system because they receive requests for gun traces from ATF and other local law enforcement agencies.

168.     The gun traces contained in the Trace Database overwhelmingly involve guns recovered in connection with a crime.

169.     There is a statistically significant relationship between the number of homicides in various states and the number of dealers with firearms traced in those states.

170.     By receiving trace requests from the ATF, manufacturers and distributors learn that guns sold by them were involved in crimes and can easily determine which specific retail dealers sold the guns.

171.     Although trace data do not provide manufacturers and distributors with all conceivable information about a particular trace, when a disproportionate number of traces is attributable to a particular retailer, a prudent manufacturer or distributor has the ability to ensure that its guns are not falling into criminals' hands through lax practices by that retailer. Excessive numbers of traces to specific retailers or first purchasers can serve as cause for concern on the part of the manufacturers and distributors, who are not foreclosed from closing off illegal flows of their guns to such retailers. Defendants can take steps based on trace leads without interfering with or endangering law enforcement personnel. There is no ATF position or pronouncement that would preclude Defendants from using the elements of trace data available to them to institute more prudent merchandising practices to reduce the numbers of guns obtained from their retail dealers by criminals for use in crimes.

172.     Although an FFL with a large number of sales may for that reason have a larger number of traces, data from the Trace Database have established that for many dealers, the number of traces is much larger than would be predicated based on sales volume. Although a large number of traces is not

77

itself proof of wrongdoing by the FFL, there is nothing to prevent Defendants from investigating whether volume alone accounts for the traces.

173.    Responsible merchandising using trace data available to Defendants would not interfere with pending or prospective law enforcement proceedings and there is nothing inconsistent between ATF's efforts and use of the data by Defendants to reduce the flow of their firearms to criminal elements.

174.    There are indicators other than amount of sales that predict that a dealer's guns are more likely to end up in the hands of criminals. Some indicators are: (1) out-of-state traces; (2) obliterated serial number traces; (3) multiple traces for the same purchaser; (4) multiple traces for the same purchaser and same dealer; (4) multiple sales forms; (5) traces from multiple sales; (6) record- keeping problems; (7) multiple licenses at same location; and (8) bypassed geographically closer dealers — i.e., the purchaser for illegal use goes out of his way geographically to buy from certain retailers. If manufacturers made use of these indicators to police their customers, the volume of their guns diverted into the secondary market would be reduced.

175.    Sufficient information in the trace database has been made available to Defendants (or would have been made available to any Defendant that had sought the information) so that each Defendant could have improved its distribution system to reduce the number of guns obtained by criminals.

176.    Upon information and belief, firearms manufactured, imported, or distributed by Defendants that were sold by dealers with a disproportionately large number of traces or other indicators of improper sales practices have been, and continue to be, diverted to the illegal market in New York, and used to cause injury or death or the threat thereof to residents of the City of Buffalo and surrounding communities.

**V.    Indications that Defendants Have Knowledge of the Diversion of Handguns to the Illegal Market**

78

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 91 of 208

177.   According to Robert Haas, the former Senior Vice President for Marketing and Sales for defendant Smith & Wesson, the gun industry knows that the criminal market is fueled by the industry's distribution practices, but does nothing:

> The company and the industry as a whole are fully aware of the extent of the criminal misuse of firearms. The company and the industry are also aware that the black market in firearms is not simply the result of stolen guns but is due to the seepage of guns into the illicit market from multiple thousands of unsupervised federal firearms licensees. In spite of their knowledge, however, the industry's position has consistently been to take no independent action to insure responsible distribution practices . . . .

> I am familiar with the distribution and marketing practices of all of the principal U.S. firearms manufacturers and wholesale distributors and none of them, to my knowledge, . . . investigate, screen or supervise the wholesale distributors and retail outlets that sell their products to insure that their products are distributed responsibly.

178.   In March 2000, Smith & Wesson agreed to accept a wide array of restrictions on the way it makes, sells and distributes hundreds of thousands of handguns each year in exchange for ending some lawsuits that had threatened to bankrupt it.[171]  Under the agreement, which was immediately criticized by other gun manufacturers, Smith & Wesson would place a second, hidden set of serial numbers in all its new guns to make it harder for criminals to scratch away those identifying marks.[172]  The company promised to sell with each new handgun a small lock that prevents the trigger from being pulled.[173]  And the agreement required, within three years, "smart-gun technology" that would allow each of its new handguns to be fired only by authorized users.[174]  The agreement also established a "code of conduct" for Smith & Wesson's authorized dealers and distributors that would prohibit them, under threat of

---

[171]  https://www.nytimes.com/2000/03/18/us/under-legal-siege-gun-maker-agrees-to-accept-curbs.html

[172]  *Id.*

[173]  *Id.*

[174]  *Id.*

79

losing their franchises, from selling guns at gun shows unless the buyers have passed background checks.[175] Additionally, in a provision intended to discourage illegal gun trafficking, people who buy more than one gun from a Smith & Wesson dealer would be allowed to take home just one gun on the day of the sale, and will have to return 14 days later to claim the rest.[176]  Unfortunately, Defendants such as Glock refused to sign on to the Smith & Wesson deal.[177]

179.    "But pro-gun advocates saw the agreement as a rank betrayal, and the National Rifle Association said the company had 'run up the white flag of surrender.' Under pressure from the boycott, sales fell 40 percent, and Smith & Wesson closed two factories. In 2001, Tompkins PLC, its British owner, sold the company to a U.S. buyer for $15 million, a fraction of the price it had paid for it just a few years earlier."[178]  "Yet in just a few years, Smith & Wesson was back on its feet and well on its way to regaining its position at the top of U.S. gun manufacturers. A key element of its strategy was openly repudiating the terms of the Clinton gun safety deal and introducing a new line of high-capacity pistols and its first-ever, assault-style rifle, which became top-sellers for the company."[179]

---

[175] *Id.*

[176] *Id.*

[177] https://www.cnn.com/2000/ALLPOLITICS/stories/03/21/glock.guns/

[178] https://www.huffpost.com/entry/smith-wesson-clinton-bush-nra_n_2348503

[179] *Id.*

80

180.     As evidenced by Smith & Wesson's agreement to accept the restrictions in 2000,[180] Defendants are able to implement such restrictions, but choose not to.[181]

181.     Robert Ricker, an individual with years of experience as a National Rifle Association and gun industry trade association official, has testified in another lawsuit that the gun industry is aware of the means by which firearms are diverted from the legal to the illegal market. He has testified that the industry knows that gun traces are indicators of problems at the dealer level and are adequate notice to all upstream distribution entities of these problems. He has testified that dealers often falsely report guns as stolen, as a means of covering up trafficking. According to Mr. Ricker, industry members have not addressed the problems posed by unsupervised dealers because "if the industry took voluntary action, it would be admitting responsibility," and "the concept that if you are proactive and take steps to remedy the problem, then you have recognized that you are responsible partially for the problem."

## VI.     Merchandising Practices that Could Reduce Illegal Diversion

182.     Certain merchandising practices by the Gun Manufacturer Defendants and the Gun Distributor Defendants could substantially reduce guns flowing into criminal hands, thereby avoiding many murders and injuries.

183.     There is a statistically significant relationship between the use of certain distribution oversight practices followed by a manufacturer and the manufacturer's ratio of trace share to market share.

---

[180]  For a summary of the deal, see: https://archives.hud.gov/news/2000/gunagree.html. The full text is available here: https://www.nraila.org/articles/20000317/smith-wesson-settlement-agreement.

[181]  For analysis of the decision of Smith & Wesson not to abide by the deal, *see* Daniel P. Rosner, Note, *In Guns We Entrust: Targeting Negligent Firearms Distribution*, 11 Drexel L. Rev. 421, 438-41 (2018).

184. Manufacturers that have adopted the following practices have smaller crime-gun ratios (i.e. ratio of guns traced, as part of a criminal investigation, to total guns sold): (i) requiring evidence of a storefront, (ii) having an authorized dealer program, (iii) maintaining records of sales to individual dealers, (iv) visiting dealers frequently, (v) commissioning market studies, (vi) maintaining distributor agreements, (vii) imposing controls over how the product is advertised, and (viii) inquiring about inventory level of distributors.

185. Standard marketing mechanisms that could have been employed by these Defendants using their existing marketing infrastructures to prevent diversion of guns into the secondary market include: (i) requiring dealers and distributors to report the number of trace requests upstream to manufacturers and distributors; (ii) developing a management code establishing standards of conduct on the part of members of the distribution system, including guidelines regarding sales to types of dealers, such as stocking dealers with storefront establishments; (iii) requiring minimum inventory; (iv) imposing liability insurance standards; (v) limiting sales at gun shows; (vi) limiting multiple sales; (vii) limiting how the consumer gun transaction can be conducted to insure security; (viii) education and training of dealers; and (ix) monitoring dealers through visitation and other regular interaction.

186. If the Gun Manufacturing Defendants entered into such marketing and distribution agreements with their distributors and dealers, there would be a significant reduction in the flow of firearms into the State of New York, including the City of Buffalo.

187. If the Gun Manufacturing Defendants and Gun Distribution Defendants provided training in proper sales and distribution practices to those in the primary firearms market, many firearms would not have found, and will not in the future find, their way into the secondary market in New York and Buffalo.

188. If these Defendants had studied available trace request data and acted upon that data to better control their downstream customers, they could have used the information to prevent injury or

82

death or the threat thereof to the City of Buffalo and its residents. The necessary information was and is available to them.

189. Upon information and belief, the Gun Manufacturing Defendants make no meaningful effort to supervise or regulate the practices of either the distributors or dealers who sell their products to the public, despite their knowledge that particular dealers are known to supply large numbers of guns used to commit crimes. Because it is to their economic advantage, these Defendants exercise contractual control over their distributors and dealers in such areas as pricing and advertising, but fail to impose on the same distributors and dealers contractual arrangements by which they could regulate the sale and disposition of their guns. The Gun Manufacturing Defendants have instead adopted a strategy of willful blindness to the conduct of their distributors and dealers that facilitates the entry of their guns into the illegitimate market.

## VII.  2022 U.S. House of Representatives Committee on Oversight and Reform's Investigation into Gun Industry Practices and Profits

190. On July 27, 2022, the U.S. House of Representatives issued a Memorandum by the Committee on Oversight and Reform's Investigation into Gun Industry Practices and Profits.[182] "Following mass shootings in Buffalo, New York, and Uvalde, Texas, the Committee launched an investigation into the leading manufacturers of AR-15-style assault rifles."[183]

191. The Memorandum contained the following findings:

- "These companies sell weapons to civilians that are engineered to kill many people as fast as possible. These rifles are the weapon of choice for mass murderers who have terrorized and slaughtered young children at school,

[182] https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf

[183] *Id.* at 1.

worshippers at churches and synagogues, and families celebrating the Fourth of July. On May 26, 2022, the Committee sent letters to five gun manufacturers seeking information on their sale and marketing of these deadly firearms and any efforts to monitor or track safety data related to their products. The manufacturers — Bushmaster, Daniel Defense, Sig Sauer, Smith & Wesson, and Sturm, Ruger & Company — have all made and sold AR-15-style semiautomatic weapons that have been used in mass shootings."[184]

- "The Committee has learned that gun companies collected more than $1 billion over the last decade from selling military-style assault weapons to civilians, even as gun violence increased across the United States. These companies used disturbing sales tactics — including marketing deadly weapons as a way for young men to prove their manliness and selling guns to mass shooters on credit — while failing to take even basic steps to monitor the violence and destruction their products have unleashed."[185]

192.    "Documents and information obtained by the Committee show":[186]

- Gun manufacturers collected more than $1 billion from the sale of AR-15-style semiautomatic weapons in the last decade — and sales are increasing as gun deaths and mass shootings rise.

    i.  Ruger's gross earnings from AR-15-style rifles also nearly tripled from 2019 to 2021, increasing from $39 million to over $103 million.

---

[184] *Id.*

[185] *Id.*

[186] *Id.*

84

    ii.  Smith & Wesson's revenue from all long guns, which include AR-15-style rifles, more than doubled between 2019 and 2021, from $108 million to $253 million.

    iii.  Combined, these five manufacturers push hundreds of thousands of military-grade AR-style rifles into communities every year.

- Gun manufacturers employ a variety of financing tactics and manipulative marketing campaigns to sell AR-15-style rifles to civilians, including young people.

    i.  Materials obtained by the Committee show how sellers tout assault rifles' military pedigree, make covert references to violent white supremacists like the Boogaloo Boys, and prey on young men's insecurities by claiming their weapons will put them "at the top of the testosterone food chain."

    ii.  Smith & Wesson markets its assault rifle with advertisements that mimic first-person shooter video games popular with children.

    iii.  Sig Sauer describes its military-style weapon sold to civilians as an "apex predator" that meets the "demands of the Special Operations community."

- Gun manufacturers fail to track or monitor deaths, injuries, or crimes that occur using their products, and fail to track when their products have been illegally modified.

    i.  All five companies acknowledged that they have no system or process in place to gather safety data related to their products, and they were unable to produce any internal analyses of the dangers caused by selling their military-style weapons to civilians.

85

  ii. Sig Sauer asserted that it does "not have the means" to track deaths caused by its products, while Ruger said it only learns of these incidents through its "customer service department," the media, or "occasionally" from lawsuits.

  iii. Bushmaster claimed that, because the brand has been newly acquired by another company, it was "aware of no such deaths or injuries" caused by its products, even though the racist shooter in Buffalo killed ten people with a Bushmaster-branded assault weapon in May 2022.

193. Additionally:

- Bushmaster made the assault weapon used in the Sandy Hook mass shooting in Newtown, Connecticut, in 2012, and in the recent white supremacist attack in Buffalo, New York. A Bushmaster AR-15-style rifle was also used in the sniper attacks in Washington, D.C., in 2002. The company was previously a part of Remington, the nation's largest gun company. Remington filed for bankruptcy in 2018, and Franklin Armory purchased the Bushmaster trademark and continues to manufacture substantially similar AR-15-style rifles, trading on the reputation, history, and notoriety of the Bushmaster name.[187]

- Sig Sauer sold the AR-15-style rifle used by a mass shooter to kill 49 people at Pulse nightclub in Orlando, Florida, in 2016, and three of the weapons used by the shooter in Las Vegas, Nevada, in 2017 to kill 60 people. The company recently won the contract to replace the U.S. Army's M-4 carbine and is selling a

---

[187] *Id.* at 3-4 (internal citations omitted).

version of its new rifle to civilians "in a configuration that is a near match" to what America's soldiers will soon be carrying into battle.[188]

- Smith & Wesson sold the assault weapons used in the Fourth of July massacre in Highland Park, Illinois, as well as the mass shootings in Parkland, Florida, in 2018, and San Bernadino, California, in 2015. Smith & Wesson was the second largest maker of rifles in the United States in 2020.[189]

- Sturm, Ruger & Company, Inc. Ruger's AR-15-style rifle and pistol variants were used by mass shooters in Sutherland Springs, Texas, in 2017 and Boulder, Colorado, in 2021. Ruger is the largest maker of rifles of all types in the United States.[190]

194. The Memorandum continued with findings regarding profits, sales, and deaths from guns:[191]

- The Committee has obtained internal financial data showing that major gun manufacturers have been enjoying record-breaking sales and profits from AR-15-style rifles, even as gun deaths and mass shootings have risen in the United States.

- In the past decade, these five manufacturers have collectively amassed more than $1 billion in revenue from AR-15-style firearms. Sales skyrocketed in 2021. According to data obtained by the Committee, in 2021, Daniel Defense and

---

[188] *Id.*

[189] *Id.* at 4-5.

[190] *Id.* at 5.

[191] *Id.* at 5-6.

Ruger nearly doubled their revenues from the sale of AR-15-style firearms compared to the previous year, with each company accumulating more than $100 million in gross sales from these weapons.

- Smith & Wesson refused to provide specific revenue and profit information for its AR-15-style firearms, instead providing aggregate "long gun" revenues that totaled over $250 million in 2021, more than doubling from 2020. Smith & Wesson informed the Committee that assault rifles make up more than half of overall long gun sales, meaning the company brought in at least $125 million from AR-15 style rifles in 2021 alone.

- Sig Sauer claimed it did not track revenue and profits from specific product lines but stated that AR-15-style rifles make up approximately 3% of its total revenues — financial figures that it has refused to provide to the Committee.

- Bushmaster claimed to the Committee that, as a "new company," it had no financial data from the previous owners of the Bushmaster trademark, despite public reporting that the 2020 sale of the brand to Franklin Armory included "historic sales, vendor and customer data," and "the technical data packages for numerous Bushmaster-branded firearms."[192]

---

[192] *Bushmaster Announces a Comeback*, Guns.com (Feb. 15, 2021) (available at www.guns.com/news/2021/02/15/bushmaster-announces-a-comeback).

| Figure 1:  AR-15-Style Rifle Revenue and Recent Mass Murders | | |
| --- | --- | --- |
| | *AR-15-Style Rifle Revenue, 2012-2021* | *Recent Mass Murders with the Company's AR-15-Style Rifles* |
| SMITH & WESSON | At Least $695 Million | Highland Park (7 dead) Parkland (17 dead) San Bernardino (14 dead) |
| RUGER | $514 Million | Sutherland Springs (25 dead) Boulder (10 dead) |
| DANIEL DEFENSE | $528 Million | Uvalde (21 dead) Las Vegas (60 dead)* |
| SIG SAUER | REFUSED | Orlando (49 dead) Las Vegas (60 dead)* |
| BUSHMASTER | $2.9 Million (2021 Only) | Buffalo (10 dead) Sandy Hook (27 dead) |

* Killer used weapons from multiple companies

195.    In addition, the Memorandum set forth:[193]

- Figure 2 below shows annual rifle revenues for Smith & Wesson, Daniel Defense, and Ruger from 2012 through 2021. Each of these companies has seen significant increases in revenue from assault weapons since 2019. Ruger's gross earnings from AR-15-style rifles also nearly tripled from 2019 to 2021, increasing from $39 million to over $103 million. Smith & Wesson provided only data on gross revenues from all long-gun sales, which include AR-15-style rifles. The company's revenue from that broad category of weapon more than doubled between 2019 and 2021, from $108 million to $253 million.

---

[193]https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf, at 6-9.



- During the Committee's June 8, 2022, hearing on gun violence, gun industry expert Nick Suplina noted that "the gun industry has grown tremendously over the last two decades, business is booming, [and] profits are breaking records." He further remarked that "so are rates of gun violence."

- According to data from the Centers for Disease Control and Prevention and other sources, 2020 and 2021 witnessed the highest gun-related death totals in the United States in decades.

- Studies by the Harvard Injury Control Research Center have found a strong correlation between an increase in gun availability and rates of homicides, suicides, and accidental gun deaths.[194]

---

[194] Citing Harvard T.H. Chan School of Public Health, Harvard Injury Control Research Center, *Firearms Research — Homicide* (online at www.hsph.harvard.edu/hicrc/firearms-research/guns-and-death) (accessed July 14, 2022).

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 103 of 208

- Figure 3 below shows the annual number of gun-related deaths from 2012 through 2021.

- Figures 4a and 4b show internal rifle sales data from this same period. Daniel Defense and Ruger's figures are for "AR platform" rifles only. Smith & Wesson reported total long gun sales, although the company reported that AR-15-style rifles comprise more than half of that category. Sig Sauer and Bushmaster refused to provide concrete information on the number of AR-15-style rifles sold during this requested time-period.







*Figures 4a and 4b include "AR platform" rifles sold by Daniel Defense and Ruger and all long guns sold by Smith & Wesson.*

91

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 104 of 208

- The Committee's findings are consistent with longstanding trends of the gun industry. Gun sales tend to peak in the immediate aftermath of elections, civil unrest, and mass shootings, resulting partly from consumer anxieties and panic-purchasing.[195] This pattern culminated in record-breaking sales numbers for all firearm types during the coronavirus pandemic.[196]

- A June 2021 Smith & Wesson investor presentation bragged, "In a year of turmoil, we gained market share" and concluded, "we're just getting started."[197]

- The editor of a gun industry trade magazine described the first year of the coronavirus pandemic, when gun sales and gun deaths reached unprecedented levels, as a moment of "opportunity" for gun manufacturers.[198]

196.    The Memorandum also provided its findings regarding the marketing practices of gun manufacturers:[199]

- The Committee's investigation found that gun manufacturers' multimillion-dollar marketing campaigns have emphasized the AR-15-style rifle's military

---

[195]  Citing "An Arms Race in America: Gun Buying Spiked During the Pandemic. It's Still Up," *New York Times* (May 29, 2021) (online at www.nytimes.com/2021/05/29/us/gun-purchases-ownership-pandemic.html); "The Pandemic and Fears of Civil Unrest Led to a Historic Boom in Gun Sales This Year," *Buzzfeed News* (Nov. 3, 2020) (online at www.buzzfeednews.com/article/peteraldhous/2020-record-us-gun-sales-election).

[196]  *Id.*

[197]  Citing *Shootings Have Surged—and Gun Companies Have Made Billions*, Rolling Stone (May 27, 2022) (online at www.rollingstone.com/politics/politics-news/gun-profits-surge-violence-1359155).

[198]  *Id.*

[199]
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf, at 9-20.

92

roots and its capacity to kill. The investigation also showed that gun makers use aggressive financing tactics to entice buyers. This is consistent with testimony at the Committee's June 8, 2022, hearing from Nick Suplina, who explained that "in a now crowded field, manufacturers of these guns are trying to market in increasingly brazen ways, often touting the deadliness of products, glorifying combat, and attempting to appeal to younger audiences."[200]

- Documents obtained by the Committee show that gun manufacturers use a variety of incentives and tactics to increase sales, including allowing their products to be purchased easily online, and offering rebates, free gifts, and financing opportunities for purchasing their weapons. Although these sales and financing innovations are not unique to the gun industry, these products are far more dangerous than other consumer goods. Daniel Defense, the manufacturer of the rifle purchased and used by the Uvalde shooter, offers its firearms for sale through a buy-now, pay-later, financing system advertised on the front page of its website.[201] To order the exact weapon used by the shooter in Uvalde requires

---

[200]  Citing Committee on Oversight and Reform, Testimony of Nick Suplina, Senior Vice President for Law and Policy, Everytown for Gun Safety, *Hearing on The Urgent Need to Address the Gun Violence Epidemic* (June 8, 2022) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Suplina%20Testimony.pdf).

[201]  Citing "Buy Now, Pay Later Dragged into Uvalde Shooting Controversy," *Australian Financial Review* (May 30, 2022) (online at www.afr.com/markets/equity-markets/buy-now-pay-later-dragged-into-uvalde-shooting-controversy-20220529-p5apdi); Daniel Defense, *Shooting Sports Financing* (online at https://danieldefense.com/daniel-defense-financing) (accessed June 23, 2022).

93

just five clicks, and a pickup at a local gun store which includes a background check and proof of age.[202]

• The Committee has obtained documents showing that gun manufacturers seek to leverage the military lineage of the AR-15 to increase sales to civilians, depicting their AR-15-style rifles with military and law enforcement units and alongside their uniforms. These advertisements draw a direct connection between AR-15-style weapons on the civilian market and weapons of war, whose sole purpose is to inflict as many casualties in combat as possible.

• One advertisement produced to the Committee — shown below — depicts a Smith & Wesson M&P rifle, a variant of the AR-15, as "the chosen one" that is "selected by professionals," featuring the insignia of police, sheriff, highway patrol, and other law enforcement. In a complaint to the Federal Trade Commission alleging unfair and deceptive marketing practices, the Brady Center to Prevent Gun Violence and Everytown for Gun Safety have alleged that Smith & Wesson advertisements contain false endorsements from military and law enforcement. The complaint details that "only a small percentage of Smith & Wesson's overall sales are to law enforcement, and those appear to be mostly handguns, not rifles." The complaint also notes that Smith & Wesson has secured only one military contract in the past decade, a 2012 contract to deliver 250 revolvers destined for Thailand.[203]

---

[202] Citing "We Ordered the Same Gun Used in Uvalde. Here's How Easy It Was," *Quartz* (May 26, 2022) (online at https://qz.com/2170207/we-ordered-the-ar-15-rifle-used-in-uvalde-heres-how-easy-it-is).

[203] Citing "Letter from Brady: United Against Gun Violence and Everytown for Gun Safety to Acting Director Samuel Levine, Bureau of Consumer Protection, Federal Trade Commission" (Aug.

94



- Young people with an affinity for law enforcement and the military have purchased assault weapons marketed in this manner, and some of these young people have used them to kill civilians. The shooters in the Parkland, Florida; Kenosha, Wisconsin; and Poway, California; synagogue shootings were all teenagers drawn to the military and law enforcement. The Parkland shooter was a student in his Junior Reserve Officer Training Corps class and member of the school's air rifle team, while Kyle Rittenhouse, who fatally shot two people and injured a third at a Black Lives Matter protest in Kenosha, Wisconsin, planned a career in law enforcement after being turned away from the military. The Poway, California, shooter wrote a militaristic, anti-Semitic manifesto and described himself as a soldier defending his country. All three used Smith & Wesson M&P rifles, like the one pictured above.[204]

- Sig Sauer also prominently features its military connections in advertisements to civilian gun buyers. Sig Sauer advertisements obtained by the Committee make explicit visual and textual connections between their AR-15-style civilian rifles

---

17, 2021) (online at https://everytownlaw.org/wp-content/uploads/sites/5/2021/08/2021.08.17-SW-FTC-Submission.pdf).

[204] Citing *id.*

and the military. The advertisement for the company's popular SIG MCX Virtus

AR-15 platform, below, exemplifies several of these techniques.



- Though the rifle is being advertised to civilians, the advertisement shows five

  men in a destroyed building in a warzone. All are wearing military-style

  camouflage and tactical gear emblazoned with camouflage American flags and

  are carrying military versions of the Sig Sauer rifle. The rifle held by one the

  central kneeling figures appears to be modified with a grenade launcher. The text

96

of the advertisement emphasizes that the rifle's "modularity" makes it "ready for every possible mission."

- Sig Sauer's website reinforces the impression that this rifle, despite being sold to civilians, is intended for military use. The product page for the "patrol" version of the MCX Virtus boasts that the original version of the rifle was "conceived for the demands of the Special Operations community" and describes the rifle as "the apex predator of the carbine world."[205]

- Ruger did not produce any marketing materials to the Committee that referenced military or law enforcement themes. In 2010, however, the company used military themes to market weapons of war to civilians. As documented by the Violence Policy Center, Ruger advertised its Mini-14 Tactical Rifle (below) as "Combat Customized."[206]



- Advertisements obtained by the Committee also seek to appeal to consumers' masculinity, suggesting that purchasing an assault rifle will allow the consumer

---

[205] Citing Sig Sauer, "Sig MCX Virtus Patrol" (online at www.sigsauer.com/sig-mcx-virtus-patrol.html) (accessed July 18, 2022).

[206] Citing Violence Policy Center, *The Militarization of the U.S. Civilian Firearms Market* (June 2011) (online at https://vpc.org/studies/militarization.pdf).

97

to retain their "manhood." One Bushmaster advertisement depicts an AR-15 with the caption, "Consider your mancard reissued." Another advertisement suggests that by purchasing an AR-15, "your status at the top of the testosterone food chain is now irrevocable." One commentator found that the intended effect of these advertisements appeared to be to "humiliate men into arming themselves with combat weapons."[207]

 

- Gun manufacturer advertisements often combine the promise of an adrenaline rush with violent undertones. One Smith & Wesson advertisement obtained by the Committee depicts spent shell casings, its M&P rifle, and the caption, "Kick Brass." The advertisement claims the rifle will deliver "Pure Adrenaline."

---

[207] Citing "How Gun Makers Bait Insecure Young Men into Buying Weapons," *MSNBC* (Feb. 20, 2022) (online at www.msnbc.com/opinion/msnbc-opinion/gun-maker-sandy-hook-settlement-exposed-predatory-ads-n1289394).



- Other manufacturers have used similar advertising techniques. In April 2022, Remington settled a landmark lawsuit for $73 million with the parents of children killed in Sandy Hook Elementary School, marking the first time since the enactment of the Protection of Lawful Commerce in Arms Act (PLCAA) that a firearm manufacturer was held liable for the destruction and death caused by its product. Plaintiffs successfully argued that Remington "tapped into anxieties of masculinity" to sell firearms to "impressionable" and lonely young men who are prone to violence.[208]

---

[208] Citing "How Gun Makers Bait Insecure Young Men into Buying Weapons," *MSNBC* (Feb. 20, 2022) (online at www.msnbc.com/opinion/msnbc-opinion/gun-maker-sandy-hook-settlement-exposed-predatory-ads-n1289394).

99

- The firearm industry has been marketing directly and indirectly to white supremacist and extremist organizations for years, playing on fears of government repression against gun owners and fomenting racial tensions. The increase in racially motivated violence has also led to rising rates of gun ownership among Black Americans, allowing the industry to profit from both white supremacists and their targets.

- Extremist imagery has frequently appeared on merchandise available at large industry-sponsored conventions such as the National Shooting Sports Foundation (NSSF) Shot Show and the NRA Annual Meeting, as well as in advertisements by major gun manufacturers.[209]

- There have been an increasing number of mass shootings in recent years carried out by shooters acting on their white supremacist beliefs, including the shootings in Buffalo, El Paso, and at the Tree of Life Synagogue in Pittsburgh.[210]

- As a result of the increase in racially motivated violence, firearms manufacturers profit from the business of both white supremacists and those extremists' targets. Gun ownership among Black Americans has soared by more than 50% since 2020, in response to increasing gun violence and the spike in anti-Black hate

---

[209] Citing "The Gun Industry Created a New Consumer. Now It's Killing Us," *The Atlantic* (July 25, 2022) (online at www.theatlantic.com/ideas/archive/2022/07/firearms-industry-marketing-mass-shooter/670621).

[210] Citing "White Supremacist Extremism Takes Up Arms in the United States," *El País* (May 22, 2022) (online at https://english.elpais.com/international/2022-05-22/white-supremacism-takes-up-arms-in-the-united-states.html).

crimes.[211]  The firearms industry has capitalized on this fear and begun marketing directly to minority communities with taglines such as "it's a jungle out there," and "mi casa no es sú casa."[212]  This marketing has increased the number of guns in these communities, which are already the most negatively impacted by rampant gun violence. Black Americans experience gun violence and assaults at dramatically higher rates than other ethnicities.[213]

- Documents provided to the Committee show how manufacturers use the imagery of first-person shooter video games to market their products. Below is a comparison of two Smith & Wesson M&P advertisements and the video game Call of Duty Modern Warfare, in which the player is using a similar M4 rifle.[214]

- Smith and Wesson advertisements:

---

[211] Citing "Why More Black People Are Looking for Safety in Gun Ownership," *NBC News* (June 14, 2022) (online at www.nbcnews.com/news/nbcblk/black-people-are-looking-safety-gun-ownership-rcna32150); "Black Americans Flock to Gun Stores and Clubs: 'I Needed to Protect Myself,'" *The Guardian* (Apr. 5, 2021) (online at www.theguardian.com/us-news/2021/apr/05/us-gun-ownership-black-americans-surge).

[212] Citing Violence Policy Center, *How the Firearms Industry and NRA Market Guns to Communities of Color* (Jan. 2021) (online at www.vpc.org/studies/marketingexecsum2021.pdf).

[213] Citing Everytown for Gun Safety, *Impact of Gun Violence on Black Americans* (online at www.everytown.org/issues/gun-violence-black-americans) (accessed June 30, 2022).

[214] Citing "Just Found Out About the Cleanest Iron Sight for the M4," *Reddit* (May 3, 2020) (online at www.reddit.com/r/modernwarfare/comments/gcnhdr/just_found_out_about_the_cleanest_iron_sight_for) (accessed July 25, 2022).

101



- Call of Duty Modern Warfare video game:



- Gun manufacturers also enter into licensing agreements to have their weapons featured in first-person shooter video games. Ralph Vaughn, who negotiates licensing agreements with game developers on behalf of sniper rifle manufacturer Barrett, said: "It is hard to qualify to what extent rifle sales have increased as a result of being in games, but video games expose our brand to a young audience who are considered possible future owners."[215]

197.   The Memorandum also set forth the Committee's findings with regard to the gun industry's failure to track crimes and deaths caused by its products:[216]

- The Committee's investigation found that the five gun manufacturers under review do not have any systems in place to monitor and analyze deaths and injuries associated with their products.[217]

- In response to the Committee's inquiries, all five companies asserted that they do not monitor or track injuries and deaths caused by their AR-15-style rifles, either from accidental discharge, product malfunction, or deliberate use, nor do they track crimes committed with the products.

---

[215] Citing "Shooters: How Video Game Fund Arms Manufacturers," *Eurogamer* (May 14, 2019) (online at www.eurogamer.net/shooters-how-video-games-fund-arms-manufacturers).

[216] https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf at 20-22.

[217] Citing Committee on Oversight and Reform, *Press Release: Chairwoman Maloney Launches Investigation into Manufacturers of Assault Weapons Used in Mass Shootings* (May 27, 2022) (online at https://oversight.house.gov/news/press-releases/chairwoman-maloney-launches-investigation-into-manufacturers-of-assault-weapons).

103

- Bushmaster represented that it "does not formally 'monitor' or 'track'" incidents,[218] and also claimed that there were no such deaths or injuries with its products, even though the mass shooter in Buffalo used a Bushmaster-brand assault weapon to kill ten people.[219]

- Ruger emphasized that the company becomes aware of deaths, injuries, and crimes associated with its products only through its "customer service department, through media reports, or occasionally in connection with actual or potential litigation." Ruger maintained that it deals with each customer claim of injuries or deaths associated with its products individually, and "does not create or maintain records based upon the nature of the injury claimed."[220]

- Sig Sauer asserted that it does "not have the means" to track such incidents.[221]

- Both Daniel Defense and Smith & Wesson asserted that they do "not monitor or track this information."[222]

---

[218] Citing *Internal letter from Bushmaster Firearms International to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform* (June 3, 2022).

[219] Citing "Buffalo Supermarket Shooting: What Do We Know So Far?," *Associated Press* (May 16, 2022) (online at https://apnews.com/article/buffalo-shooting-what-to-know-bcb5e0bd2aedb925d20440c2005ffef8).

[220] Citing *Internal letter from Sturm, Ruger & Company, Inc. to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform* (June 3, 2022).

[221] Citing *Internal letter from Sig Sauer, Inc. to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform* (June 6, 2022).

[222] Citing *Internal letter from Daniel Defense to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform* (June 6, 2022); *Internal letter from Smith & Wesson to Chairwoman Carolyn B. Maloney, Committee on Oversight and Reform* (June 7, 2022).

104

- In response to the Committee's request for internal company analyses of the use of their assault weapons "in mass shootings or other homicides," the "risks posed" by the marketing or sale of these weapons, and "the ability to modify these weapons to increase their lethality," none of the five companies produced a single document.

- These gun companies fail to track the deaths and crimes caused by their products even though they are included in a tracing process run by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). When law enforcement seizes a gun at a crime scene, they contact ATF's National Tracing Center to track the firearm from the manufacturer, through dealers and retailers, and into the hands of the most recent buyer.[223] During this tracing process, ATF works directly with firearm manufacturers to gain information about the gun.[224] Despite their involvement in this tracing process, each company claimed that they do not monitor or track this information.

- As the Committee has previously demonstrated, a "small number of retailers" are often responsible for supplying an inordinate number of guns used in crimes, suggesting that industry attention to where and how their products are misused by criminals could help curb violent crime or rising homicide rates.[225]

---

[223] Citing Bureau of Alcohol, Tobacco, Firearms and Explosives, *National Tracing Center* (online at www.atf.gov/firearms/national-tracing-center) (accessed June 23, 2022).

[224] *Id.*

[225] "6 Gun Shops, 11,000 "Crime Guns": A Rare Peek at the Pipeline," *New York Times* (Apr. 28, 2022) (online at www.nytimes.com/2022/04/28/us/politics/gun-shops-weapons-resell.html).

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 118 of 208

- Gun manufacturers' failure to monitor injuries, deaths, and crimes associated with their products also stands in stark contrast with other consumer product industries, which are required to alert the public to risk of harm from their products through Consumer Product Safety Commission (CPSC). Manufacturers, importers, distributors, and retailers of consumer products must notify the CPSC within 24 hours if they become aware of information suggesting their product "creates an unreasonable risk of serious injury or death."[226]

- Other industries have similar requirements. For instance, the Food and Drug Administration (FDA) requires companies with prescription drugs to submit detailed "adverse event" information to FDA, and manufacturers of medical devices are "required to report to the FDA when they learn that any of their devices may have caused or contributed to a death or serious injury."[227]

- Even where a product operates as intended, an industry typically will face legal liability where their distribution or marketing practices yield excessive or unintended use of the product. For instance, a pharmaceutical company will face legal liability for failing to curb negligent monitoring or distribution practices of dangerous drugs such as opioids. Yet the gun industry faces no such consequences for its failure to track deaths, injuries, or crimes committed with their products.

---

[226] 15 U.S.C. § 2064(b).

[227] 21 C.F.R. § 314.80(a) (2014); Food and Drug Administration, *Mandatory Reporting Requirements: Manufacturers, Importers and Device User Facilities* (online at www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/PostmarketRequirements/ReportingAdverseEvents/ucm2005737.htm) (accessed July 25, 2022).

## VIII.    AR-15-Style Assault Weapon Defendants

198.    As the Committee's Memorandum documented, several of the Defendants named in this action have marketed, and continue to market, AR-15-Style Assault Weapons: Smith & Wesson Brands, Inc.; Bushmaster Firearms Industries, Inc.; RemArms, LLC, a/k/a Remington Firearms; Sig Sauer, Inc.; and Sturm, Ruger & Co., Inc. (hereinafter "AR-15-Style Assault Weapon Defendants" or simply, "AR-15 Defendants").

199.    Born out of the exigencies of modern combat, the AR-15 was designed for the United States Military to be used in combat.

200.    The AR-15 was designed with features that were chosen to maximize casualties and engineered to deliver maximum carnage with extreme efficiency on the battlefield.

201.    The AR-15's combination of features resulted in a weapon so lethal that the United States Military adopted the AR-15 as its standard-issue service rifle, renaming it the M16.

202.    The AR-15 remains the United States Military's weapon of choice today.

203.    The AR-15-style assault weapons produced by the AR-15 Defendants maintain the design, functionality and appearance of its military counterpart, the M16.

204.    AR-15-style assault weapons have become the weapon of choice for mass shooters.

205.    The AR-15 Defendants produce the majority of AR-15-style assault weapons sold in New York, including in Buffalo.

206.    The AR-15 Defendants have marketed, and continue to market, their AR-15s by promoting their militaristic and assaultive uses.

207.    The AR-15 Defendants' militaristic marketing promotes the image of their AR-15s as combat weapons used for the purpose of waging war and killing human beings.

208.     The AR-15 Defendants market their sporting and competition rifles with five- and ten-round magazines while marketing their AR-15 rifles with magazines containing up to 30 rounds.

209.     The AR-15 Defendants' marketing glorifies the lone gunman.

210.     The AR-15 Defendants' marketing promotes lone gunman assaults.

211.     The AR-15 Defendants' marketing glorifies the military design, functionality and appearance of their AR-15s.

212.     The AR-15 Defendants' marketing promotes their AR-15s for use in mass casualty assaults.

213.     The AR-15 Defendants' marketing promotes criminal use of their AR-15s by their target market.

214.     The AR-15 Defendants' marketing targets high-risk users.

215.     The AR-15 Defendants' marketing targets impulsive young men who have an interest in military weapons who are particularly likely to be attracted to the unique capacities of AR-15-style assault weapons.

216.     The AR-15 Defendants' marketing targets adolescents drawn to the excitement and risk-taking associated with militaristic weapons or combat missions, including young players of popular and realistic first-person shooter video games, which prominently feature variants of the weapons sold by the AR-15 Defendants in real life.

217.     The AR-15 Defendants market their AR-15s as well-suited for civilians to carry out offensive military-style combat missions against their perceived enemies.

218.     The AR-15 Defendants have continued to market AR-15s in the manner set forth in this complaint despite evidence of their increasing use in mass shootings.

219.     The AR-15 Defendants have marketed, and continue to market, their AR-15s without regard for public safety.

220.    The AR-15 Defendants' marketing of these lethal weapons is unethical.

221.    The AR-15 Defendants' marketing of these lethal weapons is immoral.

222.    The AR-15 Defendants' marketing of these lethal weapons is unscrupulous.

223.    The AR-15 Defendants' marketing of these lethal weapons is oppressive.

224.    The AR-15 Defendants' marketing of these lethal weapons is reckless.

225.    The AR-15 Defendants have marketed these lethal weapons, and continue to market them, in the above manner both directly and through third parties.

## IX.    Ghost Gun Defendants

### A.    Ghost Gun Defendants' Firearm Products Are Manufactured to Be Easily Converted in to Working, Untraceable Firearms, and Are Sold Without Background Checks or Other Public Safety Concerns.

226.    Ghost Gun Defendants market and sell firearm components from which purchasers quickly and easily build fully functional weapons. Ghost guns have the same deadly force as conventional firearms and are designed to resemble, and be compatible with, the current popular firearms offered by traditional firearms manufacturers, such as semi-automatic Glock handguns, and AR-10 and AR-15 assault rifles. But ghost guns are untraceable and designed to evade background checks, licensing, and other state and local rules governing sales, making the weapons extremely attractive to criminals, and dangerous to the public.

227.    The absence of serial numbers in ghost guns makes the investigation of crimes committed using them far more difficult. As the United States House Committee on Homeland Security concluded in a 2019 report, "[g]host guns not only pose a challenge on the front end, enabling prohibited buyers to purchase deadly weapons with just a few clicks online, but also on the back end, hamstringing

law enforcement's ability to investigate crimes committed with untraceable weapons."[228]  ATF itself has explained that the absence of serial numbers "makes it more difficult for Federal, State, and local law enforcement to identify and prosecute illegal firearms traffickers who are often tied to violent criminals and armed narcotics traffickers."[229]

228.     The unfinished frames and receivers marketed by Ghost Gun Defendants and sold into the City of Buffalo, the surrounding area, and New York State are designed to subvert the federal and state statutes that aim to prevent guns from falling into the hands of people who cannot and should not possess them.

229.     As discussed further below, an "unfinished frame or receiver," also known as an "80% lower" or a "receiver blank," is the core part of a handgun, rifle, or shotgun — it is merely missing a few drill holes and contains a small amount of extra plastic, and is easily convertible into the finished product, a deadly weapon.

230.     The term "frame" generally refers to the core part of a pistol or handgun, whereas the term "receiver" generally refers to the core part of a rifle, shotgun, or other long gun. Current federal regulations define "firearm frame or receiver" as "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 C.F.R. § 478.11. It is this definition that Ghost Gun Defendants' unfinished frames seek to circumvent, by simply leaving a few key holes undrilled or plastic unfilled.

---

[228]  ATF, Notice of Proposed Rulemaking, "Definition of 'Frame or Receiver' and Identification of Firearms," 86 FR 27220, 27223 (May 21, 2021) (quoting H.R. Rep. No. 116-88, at 2 (May 28, 2019)).

[229]  *Id.* at 27225.

110

Case 1:23-cv-00066-FPG Document 1-1 Filed 01/23/23 Page 123 of 208

231. Because these unfinished frames or receivers purportedly fall outside the federal definition of a "firearm" under 18 U.S.C. § 921, Ghost Gun Defendants sell them directly to consumers without following any of the federal laws and regulations that apply to the sale of firearms, and in particular without conducting a background check, placing a serial number on the gun, or entering it into a federal database so that it can be traced back to its source when used in a crime.

232. The finished weapons made from these unfinished frames or receivers are commonly known as "ghost guns," so named because they are untraceable and there is no record of their sale, or even of their existence.[230] *Cf.* N.Y. Penal Law § 265.00(32) (defining "ghost gun" as a firearm that fails to comply with tracing and serialization requirements in Penal Law § 265.07).

233. Because of these characteristics, unfinished frames and receivers, and the ghost guns made from them, are particularly popular among (and, naturally, marketed to) persons who would not be able to purchase guns legally, or who want a gun that cannot be traced back to them.

234. But although Ghost Gun Defendants sell unfinished frames and receivers as part of this scheme to evade federal and state laws, there is little practical difference between their "unfinished" receivers and a "finished" receiver meeting the federal definition of a firearm in 18 U.S.C. § 921(a)(3).

235. Finishing a frame or receiver is easy and can be carried out by an amateur in under an hour using basic hand tools.

236. These unfinished frames and receivers are designed to become working ghost guns; they have no other function or purpose.

---

[230] The term "ghost gun" is also sometimes used to refer to firearms made with a 3D printer, which are similarly unserialized and impossible to trace. Although these 3D-printed firearms generally also meet New York's statutory definition of a ghost gun, *see* N.Y. Penal Law §§ 265.00(32); 265.07, the term as used in this Complaint refers to guns made from commercially purchased unfinished frames and receivers, such as those sold by Ghost Gun Defendants. The ghost guns created out of the products marketed by Ghost Gun Defendants, which are the subject of this action, create a much higher quality firearm and are far more prevalent.

237.     The result is that Ghost Gun Defendants sell these almost-but-not-quite guns online and ship them to New York consumers, with the full knowledge that many of these consumers cannot legally purchase a deadly weapon, making no effort to employ internal controls that would verify the identity of the customer and the appropriateness of the sale.

238.     The core component of any gun, including a ghost gun, is the frame, also known as the lower receiver. The frame or lower receiver[231] houses all or most of the gun's other essential components, including the trigger, magazine, slide, and barrel.

239.     Under federal law, a frame or lower receiver is regulated in the same way as a complete firearm. Indeed, federal law defines "firearm" to include a complete (or near-complete) gun and the "frame or receiver" of a firearm. Specifically, the Gun Control Act defines "firearm," in relevant part, as:

> (A) any weapon … which will or is designed to *or may readily be converted to* expel a projectile by the action of an explosive; [or] (B) *the frame or receiver of any such weapon.*

18 U.S.C. § 921(a)(3) (emphasis added). A frame or receiver is accordingly subject to the same serialization and federal background check requirements as a complete firearm.

240.     The business model of Ghost Gun Defendants is to sell so-called "unfinished" frames or receivers to persons who will assemble them into fully operational firearms, using parts or kits purchased from Ghost Gun Defendants or other ghost-gun dealers. Ghost Gun Defendants sell frames or receivers that they claim are partly "unfinished," or "80%" complete, and thereby purport to skirt the statutory definition of a firearm and avoid the application of federal law and regulation altogether. In fact, as sold by Ghost Gun Defendants, frames and receivers are "firearms" because they are "designed

---

[231]  The term "frame" is typically used for handguns, while "receiver" or "lower receiver" is typically used for longer guns, such as AR-15s.

to or may readily be converted to expel a projectile by the action of an explosive" or are "the frame or receiver of any such weapon."

241.    Independently, "unfinished" frames and receivers and "80% frames" are illegal under local and state law. Legislatures responded to the ghost gun ruse by expressly so specifying. The sale and delivery of "unfinished" frames or receivers into New York has been illegal under N.Y. Penal Law §§ 265.60-.64 since April 26, 2022.

242.    By purporting to sell "unfinished" frames and receivers to consumers without background checks, without serial numbers, and without complying with any other federal and state laws governing firearms, Ghost Gun Defendants assist and facilitate the evasion of federal and state laws banning the sale or possession of "unfinished" frames and receivers.

243.    Indeed, evasion of regulation is the core of Ghost Gun Defendants' business model. The appeal of ghost guns is rooted largely, if not entirely, in their purported status as outside the reach of the firearms laws. Polymer80, Inc., the dominant ghost gun manufacturer in the United States, has admitted in court that if its "80%" frames and receivers were deemed firearms under federal law, sales of its products would decline precipitously: "annual revenue would be diminished by more than fifty (50) percent, and perhaps by as much as seventy-five (75) percent."[232]

244.    It is simple and quick to turn an "unfinished" frame or receiver into a finished frame or receiver, and then assemble a fully functional gun. Ghost Gun Defendants make the finishing process still simpler and quicker by selling the "unfinished" frame or receiver in a kit that includes a template (known as a "jig"), drill bits, and other hardware. The jig is a molded case into which the "unfinished"

---

[232]    *See* Declaration of David L. Borges in Support of Motion of Polymer80 Inc. to Intervene in this Action, dated Dec. 30, 2020, *City of Syracuse, NY v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 20-cv-6885 (S.D.N.Y.) (ECF # 80).

frame or receiver fits, with holes labeled for insertion of drill bits, and with directions for the removal of certain polymer tabs.

245. Step-by-step instruction manuals, easily accessible on the internet and from ghost gun manufacturers, explain to customers the steps to complete the frame or receiver and assemble an operable firearm using simple tools. *See, e.g.,* Polymer80 Website, "How to" (https://perma.cc/9A3U-K7FR?type=image). Retailers also provide guidance. S*ee* Arm or Ally's Website, "In the comfort and privacy of your own home you can assemble your own firearm for personal-use with nothing more than simple hand-tools" (https://www.armorally.com/polymer80).

246. Persons seeking to mass produce ghost guns can purchase the "Ghost Gunner," a machine that finishes the frame or receiver still faster and with less work than hand assembly — an especially attractive option for those seeking to traffic ghost guns in large quantities.[233]

247. The difference between an "unfinished" frame and a finished frame is negligible, as is the effort required to convert the former into the latter.

248. Compare, for instance, the following two pictures. On the left is a photograph of an "unfinished" Polymer80 Glock-compatible pistol frame recently sold and shipped into New York by Defendant Indie Guns. On the right is a photograph of a finished Polymer80 Glock-compatible pistol frame taken from the website of Defendant Primary Arms, where the frame is sold as a finished firearm, complete with serialization and a background check:

---

[233] *See* https://ghostgunner.net (also available at https://perma.cc/55AU-AEUA).



249. The two weapons — one an "unfinished" frame that Ghost Gun Defendants sell over the internet and ship into New York without serializing or conducting a background check, the other a finished frame that meets the definition of "firearm" under 18 U.S.C. § 921(a)(3) and is subject to these requirements — are nearly identical to the naked eye. That's because there is essentially no difference between them.

250. The differences amount to drilling three small holes and milling down a small amount of plastic at the top of the frame. A finished frame sold by Defendant Primary Arms is illustrated as follows:



251. The differences are equally minor in the context of an "unfinished" lower receiver for a rifle.

115

252.     In the case of both "unfinished" frames (for handguns) and "unfinished" receivers (for rifles and shotguns), Ghost Gun Defendants' business model is simple: sell the core of a working firearm that requires just a bit of unsophisticated finishing work. Based on the need for that tiny bit of finishing by the consumer, Ghost Gun Defendants pretend that they are selling something that falls short of the legal definition of a "firearm," and on that basis they justify selling their product to anyone over the internet, without any controls or procedures to protect the public's safety.

253.     With such a small difference between an "unfinished frame" and a finished frame, it takes very little time, effort, or skill to convert an "unfinished" frame or receiver into a working ghost gun.

254.     Defendants make this ease of conversion a key part of their marketing.[234]

255.     Defendants' customers agree. For instance, one of the reviews on the webpage for Brownells' exclusive Polymer80 Glock-compatible pistol frame is entitled "EASY AS CAN BE," and begins, "So I bought roughly three frames from Brownells and not one of them came to me in bad condition. I was able to mill, drill and assemble them all myself without any prior gunsmithing knowledge other than what I saw on YouTube. And guess what they all go bang when I pull their trigger."[235]

256.     Ghost Gun Defendants take further steps to eliminate the need for any technical skill on their customers' part by shipping the products in a "jig," a plastic setting for the frame or receiver that

---

[234] For example, Defendant Brownells says that unfinished frames (and specifically the kind marketed by Polymer80, Inc.) "ha[ve] revolutionized the custom gun world. If you have some basic mechanical aptitude and a few simple tools found in many home workshops, you are good to go to build your own custom pistol on a Polymer80 frame." See https://www.brownells.com/guntech/how-to-build-a-polymer80-for-a-glock-174-pistol/detail.htm?lid=17513 (last visited June 17, 2022).

[235] See https://www.brownells.com/handgun-parts/frame-parts/frames/pf940cv1-80-frame-aggressive-texture-for-glock-19-23-32-prod105856.aspx (last visited June 28, 2022).

makes it easy for even an amateur to see and follow the steps necessary to convert the unfinished frame into finished form.

257.    Here is a picture of an unfinished Glock-compatible handgun frame purchased from Defendant Indie Guns by investigators from the Office of the Attorney General, as it was packaged inside the box in which it arrived:



258.    The unfinished handgun frame is shipped already inside the jig, and the jig itself is clearly labeled with the simple steps the consumer needs to take to finish the frame. The notches on the top are clearly labelled "REMOVE" – the small pieces of plastic sticking up above them are the "rails" that the consumer is to mill off, along with another small piece of plastic inside the frame where the recoil spring will go.

259.    The jig makes sure that an untrained consumer will easily be able to remove the small plastic rails — and only the small plastic rails. As Defendant Brownells explains in its how-to video, "this is pretty simple to do because, once you put this in the included jig . . . only the portions that stick up here are what you remove."

117

260.    Once that's done, all that's left to do is to drill the three simple holes, which are helpfully labeled as "M2" or "M3" on the jig. These correspond to two drill bits that are included in the same box:



261.    All the consumer needs to do is drill the three holes using a hand drill or a drill press, following the instructions on the jig.

262.    The result is a finished frame that would have required serialization and a background check if Ghost Gun Defendants had sold it to a consumer. The finished frame can accept a few commercially available parts (sometimes sold as a kit along with the unfinished frame) in order to become a working ghost gun.

263.    Defendant Brownells goes a step further, providing an online page with step-by-step video instructions on how to convert a nominally "unfinished" Polymer80 frame into a finished frame. In the key section, entitled "How to Mill a Polymer80 Frame," Brownells writes that "'Milling' sounds way more complex than this step really is. All it takes is a drill press and an electric hand drill to complete the last '20%' of your Polymer80 pistol frame (you can also use a milling machine, if you have one). There's no complicated setup because the jig that came with your slide keeps everything properly aligned

118

as you make simple cuts with the included drill bits. Wait, it can't be that simple? Yes, it is. Watch this video."[236]

264.    The viewer can watch along as a uniformed Brownells employee goes through all the steps of converting an "unfinished" Polymer80 Glock-compatible handgun frame into a finished version, reassuring the viewer that it is "pretty simple to do" and "usually takes about 45 minutes to an hour to complete." If the viewer has questions or would like assistance finishing the frame, Brownells offers a telephone "tech line" where "we'll be glad to help you out."

265.    Each Ghost Gun Defendant knows that the only purpose of the "unfinished" frames and receivers they sell is to become a finished frame or receiver that would have required serialization or a background check, and then to be further converted into a working ghost gun. Each Ghost Gun Defendant knows that these products are in demand from consumers who could not legally purchase firearms. If any Ghost Gun Defendant claims ignorance of these facts, it is being willfully blind to the illicit nature of its business.

**B.    Ghost Gun Defendants Violate and Circumvent, and Assist Their Customers in Violating and Evading, State and Federal Gun Laws Designed to Protect Public Safety.**

266.    The purpose and the result of the ghost gun business model is the easy acquisition of untraceable, operable firearms without compliance with federal and state laws regulating firearms. Ghost Gun Defendants intentionally assist their customers in violating those laws, and themselves violate state laws prohibiting the sale of "unfinished" frames and receivers into the City of Buffalo and the State of New York.

**i.    The Federal Gun Control Act.**

---

[236]    *Id.*

267.    The 1968 federal Gun Control Act regulates the manufacture, sale, and possession of firearms, including frames and receivers. 18 U.S.C. § 921(a)(3). The Gun Control Act requires all commerce in firearms to proceed through federally licensed manufacturers, importers, and dealers, known as federal firearms licensees ("FFLs"), 18 U.S.C. §§ 922(a)(1)(A); 923(a), who in turn must operate in strict conformity with federal and state laws pertaining to firearms.

268.    To ensure that all firearms can be traced to the first purchaser, federal law requires licensed manufacturers and importers to inscribe a serial number on the frame or receiver of each firearm they manufacture or import. 18 U.S.C. § 923(i).

269.    To prevent the acquisition of firearms by people deemed unfit to possess them, licensed dealers may not sell or transfer a firearm to specified prohibited persons, as determined through a mandatory background check. 18 U.S.C. § 922(d), (t). Prohibited persons include, among others, individuals who: i) have been convicted of a felony; ii) have been convicted of any crime of domestic violence or are subject to a domestic violence restraining order; iii) have been involuntarily committed to a mental health facility or adjudged "mentally defective"; iv) have been dishonorably discharged from the military; or v) are unlawful users of controlled substances. 18 U.S.C. § 922(d), (g). FFLs may not sell or transfer rifles or shotguns to anyone under the age of 18, or other types of firearms to anyone under 21. 18 U.S.C. § 922(b)(1).

270.    To curb gun trafficking or transfers of guns to prohibited persons, federal law prohibits FFLs from shipping firearms to purchasers, and requires that all firearm sales be conducted in person except in very limited circumstances requiring, among other things, notice to law enforcement. 18 U.S.C. §§ 922(a)(2), (c). FFLs may not sell or deliver a firearm to any person where the purchase or possession violates any applicable state or local law, 18 U.S.C. § 922(b)(2), or to persons that do not reside in the state of the dealer's place of business, except for in-person sales of rifles or shotguns that fully comply with both states' laws. 18 U.S.C. § 922(b)(3).

120

271.    Licensed manufacturers and dealers must keep records of all firearm sales, noting the make, model, and serial number of the firearm, as well as the "name, age, and place of residence" of the purchaser. 18 U.S.C. §§ 922(b)(5), 923(g)(1)(A). FFLs may not sell a firearm without providing the recipient with a secure gun storage or safety device. 18 U.S.C. § 922(z).

272.    On April 26, 2022, ATF published a final rule, effective August 24, 2022, stating that the "unfinished" frame and receiver kits Defendants sell are firearms under the Gun Control Act. ATF, Final Rule, "Definition of 'Frame or Receiver' and Identification of Firearms," 87 FR 24652 (April 26, 2022) ("Final Rule").[237]  The Final Rule explains that a "frame or receiver parts kit containing a partially complete … blank of a frame or receiver that is sold, distributed, or possessed with a compatible jig or template is a frame or receiver, as a person with online instructions and common hand tools may readily complete or assemble the frame or receiver parts to function as a frame or receiver." *Id.* at 24739; *see also id.* ("The terms 'frame' and 'receiver' shall include a partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver.")

273.    The Final Rule nullifies prior informal ATF guidance, set forth in determination letters to a ghost gun manufacturer, finding that certain examples of "unfinished" "80%" frames or receivers, when considered in isolation, did not constitute firearms under federal law. ATF's Final Rule is consistent with, and correctly interprets, the federal Gun Control Act.[238]

---

[237]  Available here: https://www.federalregister.gov/documents/2022/04/26/2022-08026/definition-of-frame-or-receiver-and-identification-of-firearms. (Corrections available here: https://www.govinfo.gov/content/pkg/FR-2022-08-22/pdf/2022-17741.pdf).

[238]  In addition, in a May 9, 2022, letter to a ghost gun components retailer, ATF explained that, "notwithstanding the recently announced regulations and definitions" in the final rule, it has "always been" ATF's position that the sale and transfer to a single customer of "all the components necessary to produce a fully functional firearm," whether sold in "one or multiple transactions," constitutes the sale of a "firearm" under the Gun Control Act and is unlawful unless made according to the requirements of the Gun Control Act, including serialization and a background check. *See* May 9, 2022

121

## ii.  New York State Law

274.   Since April 26, 2022, the New York criminal code has expressly prohibited the possession, sale, or offering for sale of ghost guns and "unfinished" or unserialized frames or receivers by or to persons in New York State. *See* N.Y. Penal Law §§ 265.00(6) (defining "dispose of"), (8-a) (defining "serialized"), (32) (defining "unfinished frame or receiver" and "ghost gun"), 265.01(9) (prohibiting possession of ghost guns), (10) (prohibiting possession of unserialized or "unfinished" frame or receiver), 265.07 (registration and serialization of firearms, rifles, shotguns, finished frames or receivers, and "unfinished" frames or receivers), 265.60 (criminal sale of a ghost gun in the second degree), 265.61 (criminal sale of a ghost gun in the first degree), 265.63 (criminal sale of a frame or receiver in the first degree).

### C.  Ghost Guns Endanger the Public and Undermine Law Enforcement

275.   Despite — and in a direct affront to — New York's adoption of a ghost gun ban, ghost guns are flooding the City of Buffalo, and their prevalence is increasing at an alarming rate. The Buffalo Police Department recovered 62 ghost guns in connection with arrests in 2021 and 44 so far in 2022.

276.   In the first six months of 2022, the Buffalo Police Department took in 42 ghost guns compared to 20 at the same time through June 30.[239]

277.   These numbers are limited to ghost guns recovered by the Buffalo Police Department. The actual number of ghost guns on Buffalo's streets and in homes is undoubtedly far higher, but impossible to know — as ghost gun sellers do not report sales.

---

letter from Matthew Varisco, Special Agent in Charge, ATF Philadelphia Field Division to JSD Supply, available at https://perma.cc/YU47-TGPL (captured May 13, 2022).

[239] "Buffalo Police Seizing Twice as Many Ghost Guns So Far This Year," *Buffalo News*, July 15, 2022, available at https://buffalonews.com/news/local/buffalo-police-seizing-twice-as-many-ghost-guns-so-far-this-year/article_50f4d27c-02de-11ed-b24f-87b17f1fc325.html.

122

278.    Ghost guns make Buffalo's streets, schools, public spaces, and homes — and the job of patrol officers in the Buffalo Police Department — significantly more dangerous

279.    Ghost guns have also been used to perpetrate violent crimes on city streets, including multiple murders, as well as non-fatal shootings.

280.    As these arrests, arsenals, and shootings vividly and tragically illustrate, there is a thriving illicit market for the sale and delivery of illegal ghost guns into Buffalo which arm underage persons, and individuals with violent criminal histories who would not be able to obtain a firearm through regular channels.

281.    The City of Buffalo has taken steps to combat the growing ghost gun scourge, incurring significant costs.

282.    As ghost guns have increasingly become a major component of gun crime in the City, they have imposed significant costs and burdens on many other City institutions, including the public hospitals, which must care for people suffering serious injuries after violent incidents involving ghost guns; district attorneys' offices, which must build and prosecute criminal ghost gun cases; and courts, which must adjudicate the cases.

283.    Buffalo's experience reflects a national trend. According to the ATF, 45,240 ghost guns were recovered by law enforcement across the country from 2016 through 2021, including 692 in connection with homicides or attempted homicides.[240]  Ghost gun recoveries increase each year, from 1,758 in 2016 to 19,344 in 2021.[241]  Cities nationwide have seen similar dramatic increases in ghost gun recoveries. The 1,921 ghost guns recovered by the Los Angeles Police Department in 2021 were more

---

[240]  ATF, Final Rule, "Definition of 'Frame or Receiver' and Identification of Firearms," 87 FR 24652, 24656 (April 26, 2022).

[241]  *Id.* at 27723.

123

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 136 of 208

than double the amount it recovered in 2020.[242] San Francisco has reportedly experienced a 27-fold

increase in ghost gun recoveries by police over the past five years, with more than 200 ghost guns

recovered in 2021.[243] Other municipalities have seen comparable rises, including Philadelphia (17 in

2018, 95 in 2019, 250 in 2020), Washington, D.C. (25 in 2018, 116 in 2019, 306 in 2020), San Diego (53

in 2018, 77 in 2019, 210 in 2020), Prince George's County, Maryland (17 in 2018, 50 in 2019, 176 in

2020), and Chicago (21 in 2018, 72 in 2019, 139 in 2020).[244]

284.    Tragically, ghost guns are increasingly being put to violent or deadly use across the

country. In Los Angeles, ghost guns were linked to 24 murders, eight attempted murders, 20 robberies

and 60 assaults with a deadly weapon as of November 2021.[245] And ghost guns accounted for nearly

half of the guns recovered in homicides in San Francisco in 2020.[246]

285.    Often, violent crimes using ghost guns are committed by people who would not have

been able lawfully to acquire firearms and presumptively would have failed background checks because,

for example, of their criminal history or age. In 2013, a man who failed a background check at a licensed

---

[242] *See* "Los Angeles County DA attempts to battle 'ghost gun' sales by appealing to credit card companies for help," *CNN* (Feb. 10, 2022), available at https://www.cnn.com/2022/02/09/us/ghost-guns-credit-cards-la-county/index.html (https://perma.cc/LMN5-TPP2 (captured May 10, 2022)).

[243] *See id.*; Complaint, *The People of the State of California v. Blackhawk Mfg. Grp., Inc., et al.*, CGC-21-594577, at ¶¶ 77-78 (Aug. 18, 2021).

[244] National Police Foundation, *The Proliferation of Ghost Guns: Regulation Gaps and Challenges for Law Enforcement*, at 15 (2021), available at https://www.policefoundation.org/wp-content/uploads/2021/08/NPF_The-Proliferation-of-Ghost-Guns_Final_2021.pdf (https://perma.cc/6NSJ-NHVG).

[245] *See* "Los Angeles County DA attempts to battle 'ghost gun' sales by appealing to credit card companies for help," *CNN* (Feb. 10, 2022), available at https://www.cnn.com/2022/02/09/us/ghost-guns-credit-cards-la-county/index.html (https://perma.cc/LMN5-TPP2 (captured May 10, 2022).

[246] *Id.*

124

gun dealer used an AR-15 ghost gun to kill five people in Santa Monica, California.[247] In 2017, a man with a criminal record prohibiting his possession of a firearm used an AR-15 ghost gun in a California mass shooting that killed five people and injured 18.[248] In 2019, a 16-year-old brought a ghost gun to school in Santa Clarita, California, and shot five students, killing two, before killing himself;[249] and a convicted felon in Syracuse, New York, used a ghost gun to shoot his own nephew, a young child, in the back.[250] In 2020, a convicted felon used a ghost gun to shoot and injure two Los Angeles sheriff's deputies.[251] And in April 2021, a man with a criminal record for unlawfully carrying a concealed weapon used a ghost gun to shoot five people, killing one, in a nighttime shooting spree in San Diego.[252]

### D. Ghost Gun Defendants' Online Marketing and Sales of Ghost Guns

286.    Each of the Ghost Gun Defendants markets, and makes available for sale over the internet, ghost gun components, including unserialized, "unfinished" frames or receivers, to residents of

---

[247] Alain Stephens, "Ghost Guns are Everywhere in California," *The Trace* (May 17, 2019), available at https://www.thetrace.org/2019/05/ghost-gun-california-crime.

[248] *Id.*

[249] *Id.*

[250] "DA: Syracuse man shot 6-year-old nephew with untraceable 'ghost gun,'" *Syracuse.com* (Jan. 6, 2020), available at https://www.syracuse.com/crime/2020/01/da-syracuse-man-shot-6-year-old-nephew-with-untraceable-ghost-gun.html).

[251] "'Ghost Gun' Kit Maker Sued Over Ambush Shooting of Two Deputies at Compton Transit Station," *NBC Los Angeles* (Aug, 10, 2021), available at https://www.nbclosangeles.com/news/local/la-county-deputies-ghost-gun-kit-maker-lawsuit-compton-metro-rail-station/2668483; Complaint, *Apolinar v. Polymer80, Inc.*, Case No. 21STCV29196 (Sup. Ct. Los Angeles Cty.) (filed Aug. 9, 2021), at ¶ 9, available at https://everytownlaw.org/wp-content/uploads/sites/5/2021/08/Complaint.pdf.

[252] "Untraceable 'ghost gun' allegedly used in fatal Gaslamp shooting spree," *CBS8.com* (Apr. 23, 2021), Allegedly Used in Fatal Gaslamp Shooting Spree, (Apr. 23, 2021), available at https://www.cbs8.com/article/news/local/untraceable-ghost-gun-allegedly-used-in-fatalgaslamp-shooting-spree/509-cc352272-85d9-4e4b-bc1b-7446dcb96660.

125

the City of Buffalo and nearby communities. Each Ghost Gun Defendant sells parts and accessories through their websites that are compatible with conventional, serialized firearms and ghost guns. With the click of a mouse, and with no background check, residents of the City of Buffalo and nearby communities can purchase, and have purchased, from Ghost Gun Defendants unserialized, "unfinished" frames or receivers from which to construct operable ghost guns. Ghost Gun Defendants ship ghost gun components straight to these customers, with no intermediary.

287.    Defendant Rainier Arms markets the Freedom Wolf 80% Pistol Frame by telling consumers that it "is not at the stage of manufacturing to meet the ATF definition on a firearm frame. This means that this item can ship straight to your door, with no Federal Firearms License Required. Simply follow the instructions provided, and 48 hours later, you will be ready to assemble and shoot your home built Freedom Wolf!"[253]

288.    The "Q&A" Section of Brownells' webpage for a Polymer80 Frame Kit includes an exchange where a customer asks, "Is this unit serialized (does it have a [*sic*] engraved serial number on it)? I want it and will buy it if it DOES NOT. I have asked this question before but never got an answer!" Brownells' staff expert answered: "Not serialized it's a 80% receiver."[254]

289.    The same Q&A page includes a Brownells customer care "staff expert" assuring the customer that although the ATF was issuing a new regulation (clarifying that unfinished frames and receivers are firearms, as discussed below), 80% frames "are still legal" and "will still be legal after the change but there will be new restrictions and hoops to jump through."[255]

---

[253]    *See* https://www.rainierarms.com/rifle-parts/receiver-parts/lone-wolf-arms-freedom-wolf-80-glock-19-compatible-pistol-frame (last visited June 16, 2022).

[254]    *See* https://www.brownells.com/handgun-parts/frame-parts/frames/pf940cv1-80-frame-textured-for-glock-19-23-32-prod97837.aspx (last visited June 28, 2022).

[255]    *Id.*

126

290.    Similarly, in touting the Polymer80 frame kits it sells, Defendant KM Tactical points to the "Blank Serialization Plate" as a significant feature.[256]

291.    In 2022, the Buffalo Police Department recovered approximately 43 Polymer80 guns. In 2021, Buffalo Police Department recovered approximately 62 Polymer80 guns.

292.    Defendants know, or should know, that they are selling their ghost gun products to buyers who are trying to evade federal and state gun laws.

### i.  Arm or Ally

293.    Arm or Ally is a distributor of firearms and firearms parts located in Indian Trail, NC.

294.    Its business focuses on parts for AR-10 and AR-15-style rifles, including "unfinished" receivers that can be used to build ghost gun versions of those rifles. It also sells "unfinished" handgun frames, including into New York.

295.    Its webpages selling AR-15-compatible receiver kits proclaim, in large bold green letters, "No FFL Required!"[257]

296.    Meanwhile in tiny, mostly illegible text, Arm or Ally attempts to extricate itself from any responsibility for whether its sales are legal, throwing it onto the consumer instead. Its boilerplate text reads, "It is your responsibility to know and understand your state and local laws regarding the ownership

---

[256] *See* https://kmtactical.net/product/polymer-80-standard-pistol-frame-kit-pf940v2-black (last visited June 17, 2022), also available at https://web.archive.org/web/20220629152258/https://kmtactical.net/product/polymer-80-standard-pistol-frame-kit-pf940v2-black (https://perma.cc/64GX-VHWG?type=image).

[257] See https://www.armorally.com/shop/polymer80-ar15-80-lower-receiver-kit-rl556v3 (last visited June 23, 2022), also available at https://web.archive.org/web/20220520113005/https://www.armorally.com/shop/polymer80-ar15-80-lower-receiver-kit-rl556v3.

and possession of this product. We do not provide legal advice; if you are uncertain, consult with an attorney prior to purchasing."[258]

297.  Although its AR-15-compatible "unfinished" lower receiver page says in similarly tiny text that "[w]e do not provide advice or assistance with the manufacturing process," the page in fact links to a set of "milling instructions," providing a step-by-step guide to convert the "unfinished" receiver into the core of an AR-15 rifle.[259]

298.  Arm or Ally's sales pages discuss "State Restrictions" in New Jersey, Connecticut, Washington State, and Washington, DC, but not New York.[260]

299.  In fact, Arm or Ally has sold and continues to illegally sell "unfinished" frames and receivers directly to consumers in New York State, including the City of Buffalo.

300.  Arm or Ally is a Federal Firearms License holder that operates an interactive website (armorally.com) through which consumers can purchase unserialized, "unfinished" frames and receivers and ghost gun components, as well as serialized frames, among other products.[261]  Arm or Ally sells, has sold, and will continue to sell, unserialized, "unfinished" frames directly to individual customers in the City of Buffalo.

301.  Arm or Ally sells various Glock-compatible ghost gun kits, such as:

---

[258] *Id.*

[259] *Id.* (linking to: https://web.archive.org/web/20220602181003/https://www.polymer80.com/CMS-Images/Polymer80_Lower_AR15-G150_Build_Instructions-Phoenix_Version2_1.pdf) (https://perma.cc/H7LG-VJQR).

[260] *Id.*

[261] *See* https://www.armorally.com (also available at https://perma.cc/QPN5-WQZQ (captured May 20, 2022)).

128

INDEX NO. 815602/2022
RECEIVED NYSCEF: 12/20/2022

- Polymer80 frame kits for the PF45, PF940C, PF940V2, PF9SS, PF940SC and PF9SS models, which include the unserialized, "unfinished" frame, rails, and a finishing jig, with drill bits;[262] and

- The P80 Compact Frame & Slide Kit, that bundles into one package a Polymer80 PF940C frame kit, a slide from American Tactical Arms, and a slide completion kit from Arm or Ally.[263]

302.    For those buying in bulk, Arm or Ally offers the Polymer80 — PF45 Pistol Frame Kit — 25 Pack, which includes 25 sets of unserialized, "unfinished" frames, rails, and the jig and drill bits.[264]

303.    The remaining components needed to assemble these Glock-compatible ghost guns can be purchased on Arm or Ally's website or from other dealers.

304.    Significantly, before making an online sale of unserialized, "unfinished" frames, Arm or Ally does not conduct background checks, and does not require customers to have a valid state or city license or permit.

305.    According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), on or around April 28, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Glock-compatible Polymer80 PF940C unfinished frame kit from Arm or Ally. Arm or Ally's website acknowledged that the company was shipping directly to consumers, and in fact

---

[262] https://www.armorally.com/product-category/glock/frame-parts/glock-frames (also available at https://perma.cc/3NQY-LXTA (captured May 20, 2022)).

[263] https://www.armorally.com/shop/p80-compact-frame-and-slide-kit (also available at https://perma.cc/B96L-6E6B (captured May 20, 2022)).

[264] https://www.armorally.com/shop/polymer80-pf45-pistol-frame-kit-25-pack (also available at https://perma.cc/7YF7-UJGP (captured May 20, 2022)).

129

stated that the order of an unfinished frame was "required to ship to your credit card's billing address." Arm or Ally accepted the order and shipped the frame into New York County.

306.     On or around May 12, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of parts sufficient to convert the unfinished frame into a ghost gun, including a G19-compatible slide parts kit, a G19-compatible threaded barrel, and a G19-compatible slide, all manufactured by Arm or Ally. The City also purchased a Polymer80 9mm frame parts kit. Arm or Ally accepted the order and shipped the parts into New York County.

307.     The webpage viewed by the investigator demonstrated that the company understood that its products would be converted into working weapons, stating that "[i]n the comfort and privacy of your own home you can assemble your own firearm for personal-use with nothing more than simple hand-tools."

308.     Arm or Ally accepted the order and shipped the parts into New York County.

309.     On or around May 27, 2022, investigators from the Office of the Attorney General conducted an undercover purchase of a Polymer80 PF940C Glock-compatible unfinished frame from Arm or Ally's website, as part of a pistol frame kit.

310.     The Arm or Ally website said of the product that "[t]his system is a complete kit. There are no additional jigs and parts to purchase. Polymer80 Spectre system is a complete, all-inclusive package including the jig and drill bits required to finish your Glock project."[265]

---

[265]  https://www.armorally.com/shop/polymer80-pf940c-pistol-frame-kit (last visited June 6, 2022), also available at https://web.archive.org/web/20220120133501/https://www.armorally.com/shop/polymer80-pf940c-pistol-frame-kit (https://perma.cc/V2PD-PGMZ?type=image).

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 143 of 208

311.   Although the Arm or Ally website said that "NY residents must send copy of valid state-issued Driver's License,"[266]  Arm or Ally did not actually require investigators to do so.

312.   Arm or Ally accepted the order and shipped the frame into Kings County.

### ii. Rainier Arms

313.   Rainier Arms is a Washington State-based online retailer that describes itself as "the ultimate stop for AR-15 rifles and AR-15 parts."

314.   When Rainier Arms markets its "unfinished" frames or receivers, the company portrays them as exempt from public safety laws. For instance, Rainier Arms explains that "80% receivers are almost-completed pieces of machined metal or plastics that are not classified as firearms by the ATF. As such, they can be bought, sold, and transported without restriction, as the government jut considers them pieces of metal and/or plastic and not guns."[267]

315.   Rainier Arms also sells "unfinished" handgun frames, including the Glock-compatible Lone Wolf Arms Freedom Wolf 80% Pistol Frame. Rainier Arms' product description for the "unfinished" frame claims the product "is not at the stage of manufacturing to meet the ATF definition on a firearm frame. This means that this item can ship straight to your door, with no Federal Firearms License required."[268]

---

[266]  *Id.*

[267]  https://www.rainierarms.com/manufacturers/polymer80 (last visited June 28, 2022) (also available at https://perma.cc/HZ64-UMTZ). *See also* https://www.rainierarms.com/lower/filter/category2:stripped-lower-receivers (stating that "80% Lower Receivers are components that require the completion of the last 20% of milling. Due to this fact, 80% Lowers are not treated as firearms") (last visited June 28, 2022) (also available at https://perma.cc/E8DU-L3YX).

[268]  https://www.rainierarms.com/lone-wolf-arms-freedom-wolf-80-glock-19-compatible-pistol-frame (last visited June 28, 2022) (also available at https://perma.cc/7HRU-9FAU).

316.    Rainier Arms is aware of state-law restrictions on the sale of "unfinished" frames or receivers to consumers, declaring that it will not ship them to New Jersey or sell them in-store within Washington State. However, the company acknowledges no restrictions on shipping to New York consumers.

317.    Rainier Arms has sold and continues to sell "unfinished" frames and receivers into New York State.

318.    Rainier Arms is a Federal Firearms License holder that operates an interactive website (rainierarms.com) through which consumers can purchase unserialized, "unfinished" frames and receivers and ghost gun components, as well conventional, serialized firearms, serialized frames, and ammunition, among other products.[269]  Rainier Arms sells, has sold and will continue to sell unserialized, "unfinished" frames directly to individual customers in the City of Buffalo.

319.    Rainier Arms sells various Glock-compatible ghost gun kits such as:

- Polymer 80 frame kits for the PF940SC, PF940V2, and PF9SS models, which include the unserialized, "unfinished" frame, rails, and a finishing jig with drill bits.[270]

320.    The remaining components needed to assemble these Glock-compatible ghost guns, can be purchased on Rainier Arms' website or from other dealers.

321.    According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022),

---

[269]  *See* www.rainierarms.com (also available at https://perma.cc/HKV6-UGS4).

[270]  https://www.rainierarms.com/manufacturers/polymer80 (also available at https://perma.cc/VM7R-4AMY and https://perma.cc/NY8F-SPW6).

132

on or around May 12, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a 24-round magazine[271] and two parts kits for the Polymer80 ghost gun.

322.    Ranier Arms accepted the order and shipped the parts into New York County.

323.    On or around May 18, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940v2 Glock-compatible unfinished pistol frame from Ranier Arms, along with a Glock 17-compatible slide and barrel.

324.    Ranier Arms accepted the order and shipped the frame and parts into New York County.

325.    Shipping data obtained by the Office of the Attorney General indicates that from March 2020 to the present, Rainier Arms sent approximately 131 packages to non-FFL addresses in New York State each month, with approximately 106 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

326.    Significantly, before making an online sale of unserialized, "unfinished" frames, Rainier Arms does not conduct background checks and does not require customers to have a valid state or city license or permit.

### iii.  80P Builder

327.    80P Builder, a division of Salvo Technologies, Inc. also known as 80P Freedom Co., is a Florida corporation that claims to "specialize in aftermarket parts while also offering Polymer80 frames." See https://80pbuilder.com (last visited June 23, 2022) (also available at https://web.archive.org/web/20220601181928/https://80pbuilder.com).

---

[271] The large-capacity magazine Rainier Arms sold was separately illegal under New York State law. See Penal Law § 265.00(23).

328.  Despite the fact that selling "unfinished" frames and receivers is a core part of its business model, its website touts a claim that "**80P Freedom Co. does NOT sell firearms**" in bold, oversize letters. *Id.*

329.  80P Builder sells "unfinished" receivers in tandem with the "lower parts kit" containing the parts necessary to make it the fully functional lower part of a handgun.[272]

330.  80P Builder knows that these products are illegal, and in fact it informs consumers that it will not ship to New Jersey. As to other states, it simply says, "[a]t 80P Builder, we by no means provide legal advice or legal counsel. Every builder needs to research their respective State laws and Federal laws."[273]

331.  Despite New York State law, 80P Builder has shipped, and continues to ship "unfinished" frames and receivers into New York State, including the City of Buffalo.

332.  80P Builder, through its owner Salvo Technologies, Inc., is a Federal Firearms License holder that operates an interactive website (http://80pbuilder.com) through which consumers can purchase unserialized, "unfinished" frames, ghost gun components, and knives, among other products.[274] 80P Builder sells, has sold, and will continue to sell, unserialized, "unfinished" frames directly to individual customers in the State of New York, including in the City of Buffalo and nearby communities.

333.  80P Builder sells three Glock-compatible ghost gun kits and thirteen different "custom builds" such as:

---

[272]  *See, e.g.,* https://web.archive.org/web/20220527204526/https://80pbuilder.com/pf940sc-frame.

[273]  *Id.*

[274]  *See* http://80pbuilder.com (also available at https://perma.cc/9RSG-BTWV (captured May 27, 2022)).

- Polymer 80 frame kits for the PF940SC and PF940SS models.[275]

- Polymer 80 frame kits for the PF940SC that can be bundled with lower parts kits that include the Polymer 80 ejector and housing, Ghost bullet slide release, Ghost slide stop, 80P Builder machined pins and springs, 80P Builder mag catch, and OEM Glock trigger bar.[276]

- "Custom builds" that bundle together into one purchase the items needed for a ghost gun build, and include one of the Polymer 80 frame kits for the PF940SC, PF940SS, and PF940V2, plus a customized slide, barrel, guide rod assembly, upper parts kit and lower parts kit.[277]

334. Additional components needed to assemble these Glock-compatible ghost guns, if any, can be purchased on 80P Builder's website or from other dealers.

335. According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), although the Office of the Attorney General has not yet obtained records of the shipments sent by 80P Builder, its sale of unfinished frames into the New York market is evidenced by the fact that it sent an unfinished frame to New York City investigators in response to an undercover purchase.

336. On or around May 11, 2022, an employee of the New York City Sheriff's office conducted an undercover purchase of a Polymer80 PF940v2 unfinished frame from 80pbuilder.com,

---

[275] https://80pbuilder.com/products/frames (also available at https://perma.cc/K5D5-B9YH) (captured May 27, 2022)).

[276] https://80pbuilder.com/pf940sc-frame (also available at https://perma.cc/XR7E-SNHL) (captured May 27, 2022)).

[277] https://80pbuilder.com/products/customs/custom-bundles (also available at https://perma.cc/4GXR-QGSJ) (captured May 27, 2022)).

135

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 148 of 208

along with a lower parts kit; a Glock-17-compatible slide, barrel, and guide rod, an upper parts kit, and a set of high-definition sights.

337.    80P Builder accepted the order and shipped the ghost gun into New York County.

338.    According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), on information and belief, this undercover purchase was just one of many instances when 80P Builder sent prohibited unfinished frames into New York, without conducting a background check or implementing any other controls to prevent improper persons from turning its products into working ghost guns.

339.    Significantly, before making an online sale of unserialized, "unfinished" frames, 80P Builders does not conduct background checks, and does not require customers to have a valid state or City license or permit.

### iv.    Rock Slide USA

340.    Defendant Rock Slide USA, LLC is a North Carolina limited liability company with its principal place of business in Broadway, NC.

341.    Rock Slide USA is a ghost gun retailer that operates an interactive website (www.rockslideusa.com) through which consumers can purchase unserialized, "unfinished" frames and ghost gun components, including magazines, among other products.[278] Upon information and belief, Rock Slide USA sells, has sold, and will continue to sell, unserialized, "unfinished" frames directly to individual customers in the City of Buffalo.

---

[278]    *See* www.rockslideusa.com (also available at https://perma.cc/7JTJ-UYMT (captured May 20, 2022)).

342.     Rock Slide USA specializes in manufacturing "uppers," the part of the gun that fits on top of the "lower" part containing the frame. Rock Slide USA also sells Polymer80 brand Glock-compatible "unfinished" frames, and touts their compatibility with its own "upper" products.

343.     Rock Slide USA sells various Glock-compatible ghost gun kits from Polymer80.[279] Additional components needed to assemble these ghost guns can be purchased on Rock Slide USA's website or from other dealers.

344.     Significantly, before making an online sale, Rock Slide USA does not conduct background checks and does not require customers to have a valid state or city license or permit.

345.     Rock Slide USA describes the "unfinished" frames they sell as "com[ing] with everything needed to make your own custom, Glock compatible pistol at home. Various colors available. No license required."[280]

346.     According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), although the Office of the Attorney General has not yet obtained records of the shipments sent by Rock Slide USA, its sale of unfinished frames into the New York market is evidenced by the fact that it sent an unfinished frame to New York City investigators in response to an undercover purchase.

347.     On or around May 11, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940C Glock-compatible "unfinished" frame from Rock Slide USA, along with Rock Slide-brand upper and the remaining parts necessary to convert the "unfinished" frame into a working ghost gun.

---

[279]  https://rockslideusa.com/shop (also available at https://perma.cc/4VMT-BYNQ (captured May 27, 2022)).

[280]  See https://web.archive.org/web/20220626200841/https://rockslideusa.com/shop (last visited June 28, 2022) (also available at https://perma.cc/GP6D-KS63?type=image).

348.     The checkout page included the words "No license required. Ships anywhere in the USA."

349.     Rock Slide USA accepted the order and shipped the frame into New York County.

350.     According to the Amended Complaint, on information and belief, this undercover purchase was just one of many instances when Rock Slide USA sent prohibited unfinished frames into New York, without conducting a background check or implementing any other controls to prevent improper persons from turning its products into working ghost guns.

### v.   Indie Guns

351.     Indie Guns, LLC, is a Florida limited liability company with its principal place of business in Orlando, Florida. It appears to be affiliated with another Florida limited liability company named Indie Group, LLC, also with its principal place of business in Orlando.

352.     Indie Guns is a ghost gun retailer that operates an interactive website (www.indieguns.com) through which consumers can purchase unserialized, "unfinished" frames and ghost gun components, including magazines, among other products.[281]  Indie Guns sells, has sold, and will continue to sell, unserialized, "unfinished" frames directly to individual customers in the City of Buffalo.

353.     Indie Guns focuses its business on ghost guns and the parts for them, particularly "unfinished" frames and receivers. It touts itself as the "[p]remiere distributor of high quality USA made polymer gun frames, 80% lowers, and build kits."

354.     Its website advertises a wide variety of "unfinished" frames, frame kits and full build kits.

---

[281]   *See* www.indieguns.com (also available at https://perma.cc/K4G5-QLGG (captured June 14, 2022)).

355. The company touts a "blank serialization plate" as one of the key features of the "unfinished" frames it sells.

356. Indie Guns also sells "unfinished" frames as part of "LSB Kits" (the acronym standing for "lock, stock, and barrel"), which the company describes as "everything needed to build a complete pistol in a discounted bundle package."[282]

357. The company ships these LSB kits directly to the consumer, without going through an FFL that would follow federal serialization, background check, and recordkeeping requirements. The company knows and intends that these consumers will convert the LSB kits into working firearms — as Indie Guns itself explains, "When done with your build, just grab a box of rounds and you're good to go . . . ."[283]

358. Indie Guns has sold and continues to sell and ship illegal "unfinished" frames and receivers into New York State.

359. Indie Guns is a high-volume seller of various Glock-compatible ghost gun kits, such as:

- Polymer 80 frame kits for the PF940V2, PF940C, PF940SC, PF940SS, and PF45 models.[284]

- A Polymer 80 "Complete Frame Assembly" kit for the PV940V2 model, bundled with a Polymer80 frame parts kit with trigger assembly and a Polymer80 magazine.[285]

---

[282] See https://indieguns.com/kangal-17-urban-camo-lsb-kit-lock-stock-barrel-for-g17-gen3 (last visited June 28, 2022).

[283] *Id.*

[284] https://indieguns.com/frame-kits (also available at https://perma.cc/5YD9-DP6T (captured June 14, 2022)).

[285] https://indieguns.com/complete-frame-assembly-for-g17-g17l-g22-g24-g31-g34-g35 (also available at https://perma.cc/QGA9-F3CC (captured June 14, 2022)).

139

- A Polymer 80 kit for the PF940, bundled with a barrel and two 13-round magazines.[286]

360.     Additional components needed to assemble these Glock-compatible ghost guns can be purchased on Indie Guns' website or from other dealers.

361.     In fact, court filings from a recent lawsuit between Polymer80 and Indie Guns note that in July 2021, Polymer80 sold and shipped more than 13,000 unserialized "80%" Glock-compatible frame kits to Indie Guns. This shipment, for which Indie Guns was charged $700,000 (a 30% discount from the wholesale price), has a retail value of over $2 million, based on the price of $150 per frame kit that Indie Guns charges on its website for most of these kits.

362.     Significantly, before making an online sale, Indie Guns does not conduct background checks and does not require customers to have a valid state or City license or permit.

363.     According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), although the Office of the Attorney General has not yet obtained records of the shipments sent by Indie Guns, its sale of unfinished frames into the New York market is evidenced by the fact that it sent unfinished frames to New York State and City investigators in response to undercover purchases.

364.     According to the Amended Complaint, on or around May 18, 2022, an investigator from the New York City Sheriff's Office conducted an undercover purchase of a Polymer80 PF940V2 Glock-compatible unfinished frame from Indie Guns, as part of a complete frame assembly kit including a

---

[286] https://indieguns.com/bundle-deal-buy-1-pf45-frame-kit-buy-1-g21-oem-45-barrel-get-2-free-g21-oem-45-13-rd-mags (also available at https://perma.cc/7S6B-WKK2 (captured June, 14, 2022)).

140

trigger assembly, a magazine, and a complete slide with barrel. Indie Guns accepted the order and shipped the product into New York County.

365.    On or around May 27, 2022, investigators from the Office of the Attorney General conducted an undercover purchase of a Polymer80 PF940V2 Glock-compatible unfinished frame from Indie Guns' website, as part of a complete frame assembly kit.

366.    The Indie Guns website said that "Indie Guns is pleased to present the CFA-17 (COMPLETE FRAME ASSEMBLY-17) The CFA-17 contains all necessary parts, as detailed below, to build a complete G17 Gen3 lower." Indie Guns also touted the frame's "blank serialization plate."[287]

367.    Indie Guns accepted the order and shipped the unfinished frame into Kings County.

368.    According to the Amended Complaint, on information and belief, these undercover purchases were just two of many instances when Indie Guns sent prohibited unfinished frames and receivers into New York, without conducting a background check or implementing any other controls to prevent improper persons from turning its products into working ghost guns.

### vi.   Brownells

369.    Brownells, Inc., also known as Brownells or Bob Brownell's, is an Iowa corporation with its headquarters in Grinell, IA.

370.    Although Brownells sells a wide variety of different firearms, parts, and paraphernalia, it has taken to selling "unfinished" frames and receivers with particular gusto, marketing them based in large part on the lack of compliance with federal firearms law and the ease with which they can be converted into working ghost guns.

---

[287] *See* https://indieguns.com/complete-frame-assembly-for-g17-g17l-g22-g24-g31-g34-g35 (last visited June 6, 2022).

Case 1:23-cv-00066-FPG Document 1-1 Filed 01/23/23 Page 154 of 208

371.    For instance, in an October 2017 press release announcing that the company would market a set of exclusive Polymer80 "unfinished" frames unique to Brownells, the company said that the "unfinished" frames could be used "to make instant custom handguns at home," and that "[w]ith a drill press or similar tool, an 80% frame can be finished into a firearm in just minutes."[288]

372.    The same press release also advertised the legal conclusion that "[b]ecause they are not complete firearms, [unfinished frames] can be shipped straight to a customer's home without an FFL."[289]

373.    As discussed above, Brownells' online materials go to great lengths to promote "unfinished" frames to consumers, saying that they "ha[ve] revolutionized the custom gun world. If you have some basic mechanical aptitude and a few simple tools found in many home workshops, you are good to go to build your own custom pistol on a Polymer80 frame."[290]

374.    Brownells provides an online page with step-by-step video instructions on how to convert a nominally "unfinished" Polymer80 frame into a finished frame. In the key section, entitled "How to Mill a Polymer80 Frame," Brownells writes that "'Milling' sounds way more complex than this step really is. All it takes is a drill press and an electric hand drill to complete the last "20%" of your Polymer80 pistol frame (you can also use a milling machine, if you have one). There's no complicated setup because the jig that came with your slide keeps everything properly aligned as you make simple cuts with the included drill bits. Wait, it can't be that simple? Yes, it is. Watch this video."[291]

---

[288]  Press Release, "Brownells Announces Exclusive Polymer80 Frames" (Oct 11, 2017), available at https://www.theoutdoorwire.com/story/1507676814jseq2774930.

[289]  *Id.*

[290]  https://www.brownells.com/guntech/how-to-build-a-polymer80-for-a-glock-174-pistol/detail.htm?lid=17513 (last visited June 28, 2022) (also available at https://www.brownells.com/guntech/how-to-build-a-polymer80-for-a-glock-174-pistol/detail.htm?lid=17513).

[291]  *Id.*

142

375.    The viewer can watch along as a uniformed Brownells employee goes through all the steps of converting an "unfinished" Polymer80 Glock-compatible handgun frame into a finished version, reassuring the viewer that it is "pretty simple to do" and "usually takes about 45 minutes to an hour to complete." If the viewer has questions or would like assistance finishing the frame, Brownells offers a telephone "tech line" where "we'll be glad to help you out."

376.    Brownells has sold and continues to illegally sell "unfinished" frames and receivers directly to consumers in New York State, including in the City of Buffalo.

377.    Between approximately August 22, 2018, and May 11, 2020, Brownells sent at least five packages to Matthew Gerwitz at addresses in Tonawanda, NY.

378.    On information and belief, the packages Brownells sent to Gerwitz contained "unfinished" frames or receivers and/or the parts to make them into ghost guns.

379.    According to the Erie County District Attorney's Office, on or around May 26, 2020, Gerwitz carried out a drive-by shooting near his home, wounding a man in the stomach.[292]

380.    When Tonawanda police began to investigate the area, Gerwitz opened fire with a high-powered rifle, shooting a police detective multiple times.

381.    The Erie County District Attorney described the pistol used by Gerwitz as "a homemade, off-the-internet 9 mm," noting that the gun was illegal because it was unserialized and did not have a permit.

382.    Police found three more ghost guns when searching Gerwitz's home, and the Erie County District Attorney stated that Gerwitz had a "little gun shop in his house."

---

[292]  See https://buffalonews.com/news/local/da-suspect-in-police-shooting-accused-of-using-homemade-guns-in-attacks/article_0ccc4699-a340-53b9-a87e-26a278dd7fc8.html (last visited June 28, 2022).

143

383. On June 13, 2022, police arrested Salerna-Sanchez, also known as "Gunsmith," on felony weapons charges following a search of the apartment on Claudette Court that netted guns, including an AR-15, along with thousands of rounds of ammunition and kits to make untraceable guns, the *Buffalo News* reported.[293]

384. Police Commissioner Joseph Gramaglia described Salerna-Sanchez as a high-level gun dealer who has been implicated in selling dozens of guns on the streets of Buffalo and, possibly, surrounding communities, the Buffalo News reported. Gramaglia told the newspaper it takes about 30 minutes to assemble the kits into an operational firearm that can be sold for as much as $2,000 on the street.

385. "This is what feeds the everyday gun violence that we see in our community and in communities across America — not just in Buffalo," Gramaglia said.

386. On or around April 14, 2022, Brownells sent a package to Joshua Gotthart at an address on Wright Avenue in Buffalo, NY.

387. On information and belief, the package Brownells sent to Gotthart contained "unfinished" frames or receivers and/or the parts to make them into ghost guns.

388. On April 28, 2022, police pulled over Gotthart as he drove from his house on Wright Avenue.

389. He had a loaded ghost gun in a holster strapped to his right hip and was wearing a bulletproof vest, according to the Erie County District Attorney's Office.

390. Around the same time, Buffalo Police SWAT, joined by officers from multiple agencies, raided Gotthart's house, the *Buffalo News* reported. Using a search warrant, they said they found three

---

[293] See https://buffalonews.com/news/local/crime-and-courts/police-raid-nets-weapons-and-ghost-gun-kits-this-is-what-feeds-everyday-gun-violence/article_afc1a5da-eb52-11ec-97a7-1bb3d1b8c1dd.html (last visited June 28, 2022).

unregistered handguns in a bedroom and what the DA's office described as an "arsenal" of rifles, shotguns, and magazines. They also found tools used to assemble ghost guns and a large amount of ammunition in the house, the DA's office said in a statement.[294]

391.    Gotthart was arraigned on one count of Criminal Possession of a Weapon in the Second Degree (Class "C" violent felony), three counts of Criminal Possession of a Firearm (Class "E" felonies), and one count of Unlawful Wearing of a Body Vest (Class "E" felony).

392.    According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), shipping data obtained by the Office of the Attorney General indicates that from March 2020 to the present, Brownells sent approximately 1,300 packages to non-FFL addresses in New York State each month, with approximately 328 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

393.    Brownells' sale of unfinished frames into the New York market is evidenced by the fact that it sent an unfinished frame to New York State investigators in response to an undercover purchase.

394.    On or around May 27, 2022, investigators from the Office of the Attorney General conducted an undercover purchase of a Polymer80 PF940Cv1 unfinished frame kit from Brownells' website.

395.    Brownells accepted the order and shipped the unfinished frame kit into Kings County.

396.    Brownells has sold a massive number of unfinished frames and receivers into New York State, many of which have been converted into ghost guns used in crimes or by persons who could not and should not legally possess a firearm.

---

[294]  See https://buffalonews.com/news/local/crime-and-courts/gunning-for-the-guns-police-cracking-down-in-buffalo-to-reduce-shootings/article_376afcfe-cc7a-11ec-ae52-efb7dcf5267c.html (last visited June 28, 2022).

### vii.   Glockstore/GS Performance

397.    GS Performance, LLC, also known as Glockstore and GSPC, is a Tennessee entity with offices in Nashville, TN and San Diego CA. It is the successor or affiliate of a California entity also named GS Performance, LLC.

398.    To look at Glockstore's website and marketing materials now, one would think the company has nothing to do with selling "unfinished" frames or receivers. Its website no longer offers the products, and a consumer visiting today will find no mention of "unfinished" frames, 80% lowers, or Polymer80's main product line.

399.    But in fact, "unfinished" frames and receivers were central to Glockstore's business model for many years, and the company was one of the most significant manufacturers and distributors of these deadly products.

400.    Glockstore was less than fully thorough in erasing the evidence of its prior business model. For instance, one still-online blog post talks about how a new model of "unfinished" pistol frame is "one of the most talked about firearm products ever!" Glockstore goes on to explain that the product "is specifically designed to straddle the line between an ATF firearm classification and a DIY project that's easily accomplished by anyone even moderately handy."[295]

401.    The same blog post explains that one of the main reasons a consumer might like to buy an "unfinished" frame is "the fact that you can build a completely legal handgun without any 'government oversight,' aka interference." Further down, Glockstore sums up its value proposition: "[n]o fuss, no muss, no registration, no records . . . what's not to like?"[296]

---

[295]  See http://community.glockstore.com/i-can-build-my-own-gun-with-this
(last visited June 28, 2022) (also available at https://perma.cc/B3FP-SQGJ).

[296]  *Id.*

146

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 159 of 208

402.    The blog post appears to have embedded a video of Glockstore owner Lenny Magill

walking the consumer through how to "transform this 'not a firearm' into a fully functioning 9mm

handgun."[297]  The video itself has been removed for violating YouTube's terms of service.[298]

403.    Another blog post Glockstore missed in its whitewashing attempt is still available at

http://community.glockstore.com/no-need-to-register-your-handgun-with-the-spectre-polymer80

(last visited June 28, 2022) (also available at https://perma.cc/G4E2-U8Q6).

404.    The post is entitled "[100% Legal] Build a Non-Registered Handgun With a Spectre

Polymer80."

405.    The post describes the "unfinished" frame in question as "[o]ne of the most exciting and

fastest selling items at the GlockStore." The blog post focuses both on the frame's usefulness for evading

registration requirements and on the ease of converting it into a working ghost gun, explaining that

"[o]ne can simply purchase them as a 'non-firearm' part and then 'finish' the frame into a functioning

lower. You then assemble them with readily available parts and legally own a firearm that does not have

to be 'registered.'"

406.    According to Glockstore blog post, "[t]his is completely legal and acceptable based on

Federal laws that have been on the record for many years that state an individual can actually make a

firearm for personal use."[299]  The blog post does not acknowledge the existence of state laws, licensing

requirements, or longstanding prohibitions against firearm possession by felons or other dangerous

persons.

---

[297] See also http://community.glockstore.com/lenny-magill-completes-the-new-polymer-80-full-size-v2-80-lower-using-glock-factory-parts (another blog post describing the contents of Mr. Magill's video) (last visited June 28, 2022) (also available at https://perma.cc/LMY6-KRJS).

[298] *Id.*

[299] *Id.*

407.    Glockstore's illicit sales of "unfinished" frames and receivers stopped only after the State of California filed suit against it based on several consumer protection statutes.[300]

408.    California's pleading details several undercover purchases from Glockstore, as well as how Glockstore's marketing falsely "leads consumers to believe that ATF has approved the sale" of its products and falsely projects "the conclusion the [unfinished frame] is unregulated."[301]

409.    California specifically cited Glockstore's failure to inform consumers of the "unfinished" frame's illegality under California law, and of the legal requirements for the gun to be serialized and for the consumer to pass a background check.[302]

410.    Glockstore shipped large numbers of its illegal products into New York as well, again based on a manifest disregard for state law.

411.    Between approximately November 26, 2018, and December 6, 2019, GS Performance sent at least four packages to Matthew Gerwitz at an address on Morgan Street in Tonawanda, NY.

412.    On information and belief, the packages GS Performance sent to Gerwitz contained unfinished frames or receivers and/or the parts to make them into ghost guns.

413.    As discussed above, Gerwitz conducted a drive-by shooting and shot a police officer multiple times, using weapons the Erie County District Attorney described as "homemade" and "off-the-internet."

    **viii.   KM Tactical**

---

[300]    See Amended Complaint, *People of the State of California v. Blackhawk Mfg. Grp., et al.*, Case No. CGC-21-594577 (Cal. Super. Ct., Oct. 13, 2021), available here: https://oag.ca.gov/system/files/attachments/press-docs/GHOSTGUNS%20-%20Amended%20Complaint.pdf.

[301]    *See id.* ¶¶ 106-112, 133-36.

[302]    *Id.* ¶¶ 138-40.

148

414.     KM Tactical is a Missouri-based online retailer of gun parts and paraphernalia, focusing on AR-15, AR-10, and Glock components.

415.     Categorized under the "Goodies" section of the site, KM Tactical offers an extensive selection of "unfinished" frames and receivers divided between AR and Glock platforms.[303]

416.     According to KM Tactical owner Kyle Murphy in an October 2020 interview, "[n]othing we sell does damage, we don't sell serialized parts."[304]

417.     Mr. Murphy is correct that the "unfinished" frames and receivers his business sells into New York are unserialized, but the damage has been extensive.

418.     Between approximately October 28, 2019, and May 22, 2020, KM Tactical sent 11 packages to Matthew Gerwitz at addresses on Morgan Street and Grove Street in Tonawanda, NY.

419.     On information and belief, the packages KM Tactical sent to Gerwitz contained "unfinished" frames or receivers and/or the parts to make them into ghost guns.

420.     According to the Erie County District Attorney's Office, on or around May 26, 2020, Gerwitz carried out a drive-by shooting near his home, wounding a man in the stomach. When Tonawanda police began to investigate the area, Gerwitz opened fire with a high-powered rifle, shooting a police detective between multiple times.[305]

---

[303] *See* https://web.archive.org/web/20220629152306/https://www.rainierarms.com/lower/filter/category2:stripped-lower-receivers (also available at https://perma.cc/DZ3K-88KN?type=image); https://kmtactical.net/product-category/default-category/accessories/80-lowers/pistol-platform (also available at https://perma.cc/9VB5-AZQP).

[304] "Husband, Wife Duo Move Business, Home to Lee's Summit," *Lee's Summit Economic Development Council* (Oct. 28, 2020), https://www.leessummit.org/husband-wife-duo-move-business-home-to-lees-summit.

[305] See https://buffalonews.com/news/local/tonawanda-man-indicted-in-drive-by-slaying-attempted-murder-of-cop/article_fff58d82-e7b7-11ea-a7fe-7f8ba091a3f4.html (last visited June 28, 2022).

421.    The Erie County District Attorney described the pistol used by Gerwitz as "a homemade, off-the-internet 9 mm," noting that the gun was illegal because it was unserialized and because Gerwitz did not have a permit.

422.    Police found three more ghost guns when searching Gerwitz' home, and the Erie County District Attorney stated that Gerwitz had a "little gun shop in his house."

423.    According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), shipping data obtained by the Office of the Attorney General indicates that from March 2020 to the present, KM Tactical sent approximately 246 packages to non-FFL addresses in New York State each month, with approximately 222 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

### ix.   Primary Arms

424.    Defendant Primary Arms, LLC, is a Houston-based online retailer of firearms, parts, and paraphernalia.

425.    Although Primary Arms now appears to sell their "unfinished" frames and receivers serialized and through a FFL, for many years the company shipped "unfinished" frames and receivers directly to New York consumers, with no serialization and no background check.

426.    According to the Amended Complaint in *The People of the State of New York, by Letitia James, Attorney General of the State of New York v. Arm or Ally, LLC, et al.* (N.Y. Sup. Ct. Index No. 451972/2022), shipping data obtained by the Office of the Attorney General indicates that from March 2020 to the present, Primary Arms sent approximately 790 packages to non-FFL addresses in New York State each month, with approximately 332 of those packages roughly matching the weight and dimensions of the unfinished frames obtained in undercover purchases.

### x.   Polymer 80

150

427.     Defendant Polymer 80, Inc., misleadingly advertises and, on information and belief, sells and provides illegal firearms to consumers in the State of New York, including the City of Buffalo. Through a website and a network of dealers, Polymer80 sells a variety of almost complete firearms, including AR-15 semi-automatic rifles and several handguns, which consumers can easily finish at home. These products, which lack identifying information such as serial numbers, are untraceable.

428.     In 2022, the Buffalo Police Department recovered approximately 43 Polymer80 guns. In 2021, Buffalo Police Department recovered approximately 62 Polymer80 guns.

429.     Polymer80 tells consumers, including those in Buffalo, that they can legally purchase and possess its products because the guns are no more than 80% complete, and thus do not reach the necessary state of manufacturing to constitute a firearm under federal and state law.

430.     However, Polymer80's core products — lower receivers for rifles and handgun frames — are firearms under federal and state law.

431.     On its website, Polymer80 claims that these weapons, which include an AR-15 semi-automatic rifle, a .308 semi-automatic rifle, and at least seven types of handguns, are no more than 80% complete. Consumers can purchase the lower receivers of rifles or handgun frames, along with other materials — generally, the trigger, barrel, and firing pin, all of which are available, if in stock, on Polymer80's website — needed to complete the receivers and handgun frames into fully functional firearms. The consumers then receive those materials via mail.

432.     To further facilitate the ease of completing its firearms, Polymer80 offers, "Buy, Build, Shoot" kits which "contain[] all the necessary components to build [two different] complete pistol[s]." The website states that these kits include an "80% frame kit, complete slide assembly, complete frame part kit, 10 round magazine and a pistol case."

433.    Consumers can then follow Polymer80's written step-by-step instructions online, often accompanied by supplemental videos, to finish both the pistols and the semi-automatic rifles in a matter of hours.

434.    All of Polymer80's lower receivers and handgun frames lack a unique manufacturer's number, serial number, or a unique dealer's identification number, making these guns untraceable "ghost guns."

435.    Polymer80 tells consumers at multiple places on its website that because the lower receivers and handgun frames it sells are supposedly no more than 80% complete, they can be legally sold, distributed, and possessed.

436.    For instance, Polymer80's website homepage, copied below, asks, "is it legal?" and responds unequivocally, "YES!" This statement would lead a reasonable consumer in Buffalo to believe that Polymer80's handguns are legal for them to purchase and possess.

152



437.    To establish the purported legality of all its products, Polymer80 links to a determination letter from the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to Polymer80 regarding just one of its products, the AR-15 lower receiver. The letter states that the AR-15 lower receiver is not a "firearm" under federal law because it has not reached the necessary state of manufacturing under the federal Gun Control Act of 1968. Polymer80's website provides no similar letter establishing the legality, under federal law or elsewhere, of the other firearms it sells. Polymer80 also provides no information regarding the legality of its products under New York law.

438.    Polymer80 products are also available through its "Dealers," at least 48 in total, which consumers can access through Polymer80's website.

439.    Polymer80 advertises, and, on information and belief, sells, both directly and through its Dealers, lower receivers and handgun frames to New York State and City of Buffalo consumers.

440.     On information and belief, Polymer80 engages in the business of selling firearms to New York and Buffalo consumers without a dealer's license.

441.     On information and belief, Polymer80 does not adhere to the mandatory waiting period on firearm purchases.

442.     On August 10, 2022, the Superior Court of the District of Columbia, Civil Division issued an order granting in part and denying in party the District of Columbia's motion for summary judgment for violations of the Consumer Protection Procedures Act. *See District of Columbia v. Polymer80, Inc.*, Case No. 2020 CA 002878 B (available here: https://oag.dc.gov/sites/default/files/2022-08/OGIPSJPoly-20CA2878-.pdf

443.     The Court held: "As a preliminary matter, the Court finds that Polymer80's handgun frames, semi-automatic receivers, and Buy, Build, Shoot kits are firearms." *Id.* at 5.

444.     Additionally, the Court held, "In the instant case, Polymer80 sold unfinished handgun frames, unfinished semi-automatic receivers, and Buy, Build, Shoot kits to District consumers, and these products are (and were) readily converted into firearms." *Id.*

445.     The Court held "that Polymer80 violated the CPPA with respect to D.C. Code § 28-3904 (a),(b),(e-1), and that the District is entitled to summary judgment as to these claims as a matter of law." *Id.* at 9.

446.     Also, the Court held, "the Court finds that the District has satisfied its burden in establishing that there is no genuine issue of material fact that Polymer80 violated the District's gun laws, which in turn, served as a violation of the CPPA. Polymer80 violated District law by selling firearms to District consumers without the requisite licenses, and failing to comply with the series of restrictions and requirements the District imposes on licensees. Additionally, Polymer80's firearms violated District law because the firearms were not registered and failed to have an identification number or serial number. Accordingly, the District is entitled to summary judgment as to Count II as a matter of law." *Id.* at 13.

447.    The Court also held: "Given the Court's ruling that Polymer80 violated the CPPA and the District's gun laws, and Polymer80's alarming belief that the sale of its firearms is now legal in the District, to prohibit future sales of its firearms to District consumers, the Court shall grant the Plaintiff's request for a permanent injunction." *Id.* at 14.

448.    The Court also imposed a civil penalty of $4,038,000 for Polymer80's violation of the CPPA. *Id.* at 16-17.

### xi.  JSD Supply

449.    Defendant JSD Supply is a Prospect, Pennsylvania online retailer of "do-it-yourself firearms finishing and customization."[306]

450.    JSD Supply's website boasts, "JSD was founded in a love of guns and hate of paperwork. Since 2013, we've helped thousands of people build their own gun from the privacy of their garage. No serialization, no background check, no government fee."[307]

451.    JSD Supply's website states, "Everything we carry has been personally tested by our team. We know that every component and tool will work for you because we've used them all ourselves. Built correctly, your firearm will look, feel, and operate identically to store-bought models. Expect a firearm that works well and reliably performs year after year. Order a complete build kit and all the tools you need here with us online, or follow JSD Supply on Instagram."[308]

452.    On August 20, 2021, the U.S. Attorney's Office for the Western District of New York issued a press release announcing that, "Lamborghini Lucas, 33, of Buffalo, NY, was arrested and

---

[306] https://web.archive.org/web/20220517213953/https://jsdsupply.com/about-us (also available at https://perma.cc/7Q35-HZC7?type=image).

[307] *Id.*

[308] *Id.*

charged by criminal complaint with unlawfully manufacturing firearms."[309] The press release stated: "Assistant U.S. Attorney Seth T. Molisani, who is handling the case, stated that according to the complaint, on August 6, 2021, investigators executed a New York State search warrant at the defendant's Woodlawn Avenue residence. During the search, a loaded Polymer 80 PF940SC 9mm PMF firearm, also known as a ghost gun, was recovered under a mattress in a bedroom. An additional three Polymer 80 PF940SC 9mm PMF firearms were discovered in a laundry basket full of clothing. A box sent from 'JSD Supply,' which sells gun parts kits, was located in the living room. A receipt in the box showed three 'PF940SC Full build kit-Minus Frame,' Two 'Polymer 80 PF940SC Black,' One 'Polymer 80 PF940SC Gray' for a total of $1,259.94. Throughout the residence, investigators also located three Polymer 80 boxes, three polymer 80 jigs, rotary bits, and a power drill. A records check determined that Lucas does not have a license to manufacture or deal in firearms."[310]

453.    According to the Complaint, "Law enforcement located a Polymer 80 PF940SC 9mm PFM loaded with 9 rounds of 9mm ammunition under the mattress of the front bedroom. Directly next to this firearm was mail addressed to LUCAS. Within a laundry basket full of clothing, three Polymer 80 PF940SC 9rhm PFMs were recovered. A United States Postal Box sent from 'JSD Supply' was located in the living area of the apartment. A Web search shows a JSD Supply website featuring 'JSD 80% Lower Receivers, Jigs, and Gun Parts Kits . . . 80% lower build kits are used to create fully functional firearms with no registration or serial numbers.' Within this box was a receipt addressed to Mike Tate 495 Woodlawn, 'User' mrlambolights@gamil.com, this receipt shows three 'PF940SC Full

---

[309] https://www.justice.gov/usao-wdny/pr/buffalo-man-arrested-charged-manufacturing-ghost-guns

[310] *Id.*

build kit-Minus Frame', Two 'Polymer 80 PF940SC Black', One 'Polymer 80 PF940SC Gray' for a total of $1,259.94."[311]

454.    On July 23, 2020 the Department of Justice issued a press release titled, "Armed Trafficker Sentenced."[312]   The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Billy B. Sanders, 37, of Rochester, NY, who was convicted of being a felon in possession of ammunition, was sentenced to serve 71 months in prison by U.S. District Judge Charles J. Siragusa."[313] Additionally, the press release indicated, "Assistant U.S. Attorney Charles Moynihan, who handled the case, stated that the defendant was arrested on May 2, 2019, after New York State Parole officers went to Sander's residence on Saratoga Avenue in Rochester, for a compliance check. During that check, parole officers found a Polymer 80 semiautomatic pistol loaded with eight rounds of ammunition inside a backpack. The handgun did not have a serial number on it. During his plea, Sanders stated that he had the handgun and ammunition because he had been shot and needed the handgun for protection. The defendant admitted he also possessed a small amount of cocaine."[314]

455.    On August 18, 2021, the Department of Justice issued a press release titled, "Rochester Man Arrested At The Peace Bridge With Cocaine And A Ghost Gun."[315]   The press release stated: "U.S. Attorney James P. Kennedy, Jr. announced today that Luis Amed Colon Molina, 42, of Rochester, NY, was arrested and charged by criminal complaint with possession with intent to

---

[311]   *United States of America v. Lucas*, 1:22-cr-00013-JLS.

[312]   https://www.justice.gov/usao-wdny/pr/armed-drug-trafficker-sentenced-1

[313]   *Id.*

[314]   *Id.*

[315]   https://www.justice.gov/usao-wdny/pr/rochester-man-arrested-peace-bridge-cocaine-and-ghost-gun

157

distribute cocaine and possession of a firearm in furtherance of drug trafficking activity."[316] Additionally, the press release indicated, " During a search of the defendant's vehicle, the gray fanny pack was removed from the trunk. In addition to the baggies containing a white powder substance, officers also found a digital scale with white powder residue inside the fanny pack. The substance was field tested resulting in a positive presence of cocaine. Officers also recovered a loaded 9mm, Polymer 80 handgun in the vehicle's glove box. The gun did not have a serial number and is considered a 'Ghost Gun.'"[317]

### E. Ghost Gun Defendants' Guns Have Harmed the City of Buffalo and Will Continue to Do So If Unabated.

456.    The influx of ghost guns into the State of New York, including the City of Buffalo, is a significant threat to public health and safety. New York's legislature has passed laws designed to ameliorate this threat, but by the conduct described in detail above, Ghost Gun Defendants not only undermine these laws, they affirmatively harm New Yorkers, including residents of the City of Buffalo, by (i) increasing the number of firearms likely to be used in the commission of a crime, (ii) diminishing or unwinding the effect of on-point legal protections, including those relating to intimate partner violence, (iii) increasing the number of murders and suicides, and (iv) creating a new primary and secondary market for illicit guns in New York, including the City of Buffalo.

457.    As a result, to date, the City of Buffalo has had to (i) invest in ghost gun-specific law enforcement initiatives, technology, and resources, (ii) expend increasing amounts of resources on law enforcement investigative efforts to solve specific crimes involving assembled ghost guns, and (iii)

---

[316] *Id.*

[317] *Id.*

research and implement other measures to quell the crisis, including expanding relevant community

support and services and equipping more public hospitals with resources to treat gun-related injuries.

458.    On July 20, 2021, Erie County issued an Executive Order declaring gun violence as a

public health crisis in Erie County.[318]

### i. The Rise of Ghost Guns and the Damage Done

459.    The available data indicate that ghost guns are proliferating — and are being used in

crimes — exponentially. According to the Bureau of Alcohol, Tobacco, Firearms and Explosives, the

number of ghost guns recovered at crime scenes nationwide has increased more than elevenfold in just

six years, from 1,758 in 2016 to 19,344 in 2021.[319]  Notably, according to the ATF, "[t]hese numbers . . .

are likely far lower than the actual number of [ghost guns] recovered from crime scenes" because some

law enforcement agencies trace ghost guns incorrectly, while others do not attempt to trace guns that

have no serial numbers or identifiable markings.[320]

460.    The number of ghost guns recovered at crime scenes in New York likely follows this

disturbing upward national trend.

461.    Specifically, New York law enforcement is recovering an increasing number of crime

guns each year. In 2018, law enforcement made 6,559 crime gun recoveries, but in 2021, that number

rose to 10,132 crime guns — an increase of 54.5%.[321]

---

[318]  https://www2.erie.gov/exec/index.php?q=press/poloncarz-declares-gun-violence-erie-county-public-health-crisis.

[319]  *See* ATF, Final Rule, "Definition of 'Frame or Receiver' and Identification of Firearms," 87 FR 24652, 24656 & n.18 (April 26, 2022) (citing internal figures from the ATF Office of Strategic Intelligence and Information).

[320]  *See id.* at 24656 n.18.

[321]  These figures include all firearms identified as "defaced," whether they are in fact defaced with potentially recoverable serial numbers or in actuality ghost guns, which never had a serial number.

462.     Ghost guns are an increasingly concerning part of this mushrooming phenomenon. Throughout New York State, including the City of Buffalo. The Buffalo Police Department recovered 62 ghost guns in connection with arrests in 2021 and 44 so far in 2022. The City of Buffalo believes that the number of ghost guns being recovered only scratches the surface of the problem.

463.     In the first six months of 2022, the Buffalo Police Department has taken in 42 ghost guns compared to 20 at the same time through June 30.[322]

464.     Moreover, as of June 17, 2022, there have been 373 recoveries of assembled ghost guns, putting New York on pace to recover over 800 ghost guns over the full year.[323]

465.     When considering the rate of ghost gun recovery in the context of all gun recoveries across the State, the trend is deeply disturbing. In 2018, assembled ghost guns constituted only 0.67% of all guns recovered by law enforcement. That rate increased to 1.5% in 2019, then 3.6% in 2020, then further to 6.32% in 2021. Upon information and belief, from January 1 through June 20, 2022, law enforcement has recovered an assembled ghost gun 8.7% of the time that a gun was recovered. Senior law enforcement officials expect the prevalence of ghost guns to continue to increase unless steps are taken to restrain illicit trafficking.

466.     The number of assembled ghost guns in New York — including those created from Ghost Gun Defendants' illegal products — has reached crisis levels and continues to climb.

467.     The pandemic has exacerbated the issue. Gun manufacturers have generally reported massive sales of ghost gun kits since March 2020. Upon information and belief, Ghost Gun Defendants'

---

[322] "Buffalo Police Seizing Twice as Many Ghost Guns So Far This Year," available at https://buffalonews.com/news/local/buffalo-police-seizing-twice-as-many-ghost-guns-so-far-this-year/article_50f4d27c-02de-11ed-b24f-87b17f1fc325.html.

[323] Notably, these numbers do not count recovered unfinished frames and receivers, nor do they count completed "major components" of a firearm, which are also illegal and harmful to New Yorkers.

sales of "unfinished" frames and receivers have likewise increased significantly over that same time period, with a significant number of those products being shipped directly into New York State or otherwise easily finding their way into New York State — leading to significant profits from this illicit market for Ghost Gun Defendants.

468.    Upon information and belief, that increase in sales has coincided with a massive uptick in gun murders, as approximately 79% of U.S. murders committed in 2020 involved a firearm, which represents a 34% increase from 2019, a 49% increase from 2015, and a 75% increase from 2010.[324]

469.    While New York was among the states with the lowest rates of gun fatalities in 2020, Ghost Gun Defendants' products and practices are rapidly altering the picture. Indeed, Ghost Gun Defendants' business practices and conduct are significant contributors to New York's increasing rates of gun-related fatalities, including in the City of Buffalo.

    ii.    **Ghost Gun Defendants' Firearm Products Are Manufactured to Be Easily Converted Into Working Untraceable Firearms and Are Sold Without Background Checks or Other Public Safety Concerns.**

470.    Defendants market and sell firearm components from which purchasers quickly and easily build fully functional weapons. Ghost guns have the same deadly force as a conventional firearm and are designed to resemble, and be compatible with, the current popular firearms offered by traditional firearms manufacturers, such as semi-automatic Glock handguns, and the AR-10 and AR-15.

471.    On December 2, 2022, the Erie County District Attorney's Office issued a press release titled, "Juvenile Offender Sentenced for Killing Teenage Girl in Double Shooting on Koons Avenue."[325]

---

[324] https://www.pewresearch.org/fact-tank/2022/02/03/what-the-data-says-about-gun-deaths-in-the-u-s/

[325] "Juvenile Offender Sentenced for Killing Teenage Girl in Double Shooting on Koons Avenue," available at https://www2.erie.gov/da/index.php?q=press/juvenile-offender-sentenced-killing-teenage-girl-double-shooting-koons-avenue

161

The press release provided, "Erie County District Attorney John J. Flynn announces that a 16-year-old male from Buffalo was sentenced this morning before Erie County Court Judge Kenneth Case to 12 years to life in prison. On Tuesday, January 25, 2022, at approximately 2:38 p.m., the juvenile offender, while acting in concert with a co-defendant, unlawfully entered a home on the 200 block of Koons Avenue in the City of Buffalo through a window. Once inside of the home, the juvenile offender, who was 15-years-old at the time of the crime, intentionally shot two teenagers with an illegal 'ghost gun.' One victim, a 17-year-old female, died at the scene. Due to the age of the deceased, her name will not be released by our office. The second victim, a 19-year-old male, was taken to ECMC where he was treated for an injury to his arm. The juvenile offender pleaded guilty to one count of Murder in the Second Degree (Class "A-I" felony), the highest charge in the indictment, on October 11, 2022."[326]

## X.   Defendants' Conduct Is Dangerous and Directly Harms the City of Buffalo

472.    The evidence that all Defendants have caused and continue to cause great harm to New York's public health and safety by their conduct and business practices is not anecdotal or limited to instances of sales where their products were ultimately used in crimes or found in the possession of convicted felons.

473.    Rather, guns recovered at crime scenes are statistically related to gun manufacturer practices in the aggregate. Available public health research indicates that manufacturers can lessen the use of their guns in crime by implementing certain reasonable policies and practices. For example, a manufacturer may have an authorized dealer program, maintain records of sales to individual dealers or visit dealers frequently, maintain distributor agreements, or impose location-related controls over where their advertising appears. The more of these practices that a manufacturer implements and adheres to, the less frequently its products will be recovered from crime scenes. By these practices, a manufacturer

---

[326] *Id.*

can align its business practices with its responsibilities under the law and incentivize its dealer and distributor customers to do the same.

474.     Defendants' conduct, as described in more detail above, is entirely at odds with such reasonable policies and practices. Defendants named here do nothing to geographically restrain the marketing of their products so as to stem the flow of these products to criminals through the illegal secondary market, and they follow policies and practices that directly result in sales of these illegal products directly to unknown and unchecked individuals in New York, including the City of Buffalo.

475.     Moreover, Defendants are aware that criminals are an important segment of the gun industry market. To that end, a significant percentage of handguns that have been used in crimes in New York have historically originated in states that have weaker gun laws. Indeed, according to the ATF, 74% of firearms used by individuals in the commission of a crime in New York have been purchased outside of New York. By the conduct described above, Defendants exacerbate the challenges New York has in preventing illegal firearms from entering our communities by providing criminals and other individuals who either know, or suspect, they are ineligible to legally purchase a firearm with a direct avenue to illicitly purchase one.

476.     Moreover, ATF trace data have also long established that certain dealer characteristics indicate serious problems. For example, guns purchased by individuals who bypassed a geographically closer dealer constitute the vast majority of traced firearms. That risky characteristic is exponentially amplified by individuals who can not only bypass geographically closer dealers, but can bypass any and all dealers entirely.

477.     In the context of domestic violence, an intimate partner is five times more likely to be murdered when the violent partner has access to a firearm.[327]  New York law addresses this very real and

---

[327]  Zeoli AM, McCourt A, Buggs S, Frattaroli S, Lilley D, Webster DW. Analysis of the Strength of Legal Firearms Restrictions for Perpetrators of Domestic Violence and Their Associations

substantial risk by, among other things, suspending a violent partner's firearms license, rendering the individual ineligible for such a license, and requiring the immediate surrender of any firearms he or she owns or possesses when certain conditions are present. See N.Y. Fam. Ct. Act § 842-a (McKinney). These laws are effective. Limitations, like those imposed by N.Y. Fam. Ct. Act § 842-a, have been studied and are linked to significant reductions in intimate partner homicide rates. Ghost Gun Defendants' sale of ghost gun products, and their refusal to conduct background checks, undermine these important protections, increasing the already significant risk that a protected person or persons will be murdered.

478.    On October 21, 2022 (last updated December 4, 2022), The Buffalo News published an article titled, "'Stuff of nightmares': Man indicted on charges he killed estranged wife in front of children."[328] The story provided, "When Adam R. Bennefield allegedly fatally shot his estranged wife on Oct. 5, Keaira Bennefield's 9- and 5-year-old daughters were nearby, according to Erie County prosecutors. Also in the back seat of her SUV was the couple's 6-month-old-son. On Friday, Adam Bennefield-in handcuffs and shackles-pleaded not guilty to murder and other charges in connection with the slaying…An Erie County grand jury indicted Adam Bennefield on charges of second-degree murder, aggravated criminal contempt and three counts of child endangerment. "The allegations contained in this indictment are horrifying," Assistant District Attorney Ryan Haggerty said in court during the roughly two-minute proceeding. "They are the stuff of nightmares."…The day before Keaira Bennefield was killed, Adam Bennefield appeared in Cheektowaga Town Court on misdemeanor charges to an alleged domestic violence incident from Sept. 28 in which he allegedly hit and kicked her inside her

---

With Intimate Partner Homicide. Am J Epidemiol. 2018 Nov 1;187(11):2365-2371. Doi: 10.1093/aje/kwy174. PubMed PMID: 30383263.

[328] "'Stuff of nightmares': Man indicted on charges he killed estranged wife in front of children," available at https://buffalonews.com/news/local/crime-and-courts/stuff-of-nightmares-man-indicted-on-charges-he-killed-estranged-wife-in-front-of-children/article_1ffaa620-508f-11ed-998b-cfa9a45f4a21.html

164

home. A judge released him because state law prevented him from setting bail…Investigators have not recovered the shotgun allegedly used in the killing, District Attorney John Flynn said during a news conference following the arraignment…The district attorney said there was "zero evidence" that would have allowed police to charge Adam Bennefield with anything more serious than the misdemeanors he faced for the alleged beating on Sept. 28. "The injuries and the evidence did not sustain higher charges," he said…Bennefield was paroled from state prison in 2015 after being convicted in 2000 of kidnapping his estranged girlfriend and another woman, as well as escaping from the Erie County Correctional Facility…Morning, Oct 5 – Keaira Bennefield, who was staying at her mother's home, dons a bulletproof vest as she gets ready to take her children to school. Adam Bennefield rammed his car into her vehicle, got out, pulled out a shotgun and fatally shot her, according to police."[329]

479.    Ghost Gun Defendants' sale of "unfinished" frames and receivers directly to consumers also undermines New York's licensing laws, which play a major role in protecting the public. Research indicates that comprehensive background checks are most effective in lowering firearm homicide and suicide rates when they are implemented in conjunction with handgun purchaser licensing laws.[330] Notably, when Missouri repealed its handgun purchaser licensing law, there was an "estimated [] 47.3% overall increase in firearm homicides and a 23.5% increase in firearm suicides."[331]  Consistent with that

---

[329] *Id.*

[330] McCourt AD, Crifasi CK, Stuart EA, Vernick JS, Kagawa RMC, Wintemute GJ, Webster DW. Purchaser Licensing, Point-of-Sale Background Check Laws, and Firearm Homicide and Suicide in 4 US States, 1985-2017. Am J Public Health. 2020 Oct;110(10):1546-1552. Doi: 10.2105/AJPH.2020.305822. Epub 2020 Aug 20. PubMed PMID: 32816544; PubMed Central PMCID: PMC7483089.

[331] *Id.*

165

result, permit-to-purchase laws like New York's have been studied and demonstrated to meaningfully decrease firearm homicides.[332]

480. But by their conduct, Ghost Gun Defendants are nullifying those benefits. Defendants are negating the impact of New York's effective licensing and permit laws, and as a consequence the number and rate of homicides and suicides will continue to rise.

481. Given the nature of the business practices and products of all of Defendants, together with the known nature of the gun industry market and the statistical relationship between a gun manufacturer's conduct and crime gun outcomes, Defendants are knowingly and/or recklessly causing harm to the City of Buffalo's public health and safety.

482. With every sale Defendants have made and continue to make, they circumvent and undermine the City of Buffalo's firearms public safety measures for their own profit.

483. Using CDC data from 2015-2019, Brady United Against Gun Violence established five-year averages of firearm fatalities:

---

[332] Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. Association between Firearm Laws and Homicide in Urban Counties. J Urban Health. 2018 Jun;95(3):383-390. Doi: 10.1007/s11524-018-0273-3. PubMed PMID: 29785569; PubMed Central PMCID: PMC5993701; Crifasi CK, Merrill-Francis M, McCourt A, Vernick JS, Wintemute GJ, Webster DW. Correction to: Association between Firearm Laws and Homicide in Urban Counties. J Urban Health. 2018 Oct;95(5):773-776. Doi: 10.1007/s11524-018-0306-y. PubMed PMID: 30117057; PubMed Central PMCID: PMC6181823.

166

The Centers for Disease Control (CDC) provides annual gun fatality data. Using data from the most recent years available (2015-2019), Brady established five-year averages of firearm fatalities.

## EVERY YEAR ON AVERAGE

### 115,551
People are shot

### 7,957
Children and teens (age 1-17) are shot

**FATALITIES**

**38,826**
People die from gun violence

**14,062**
murdered

**23,437**
die from suicide

**483**
killed unintentionally

**521**
killed by legal intervention

**324**
died but intent was unknown

**547***
women killed by husband or male dating partner*

**GUN INJURIES**

**76,725**
People survive gun injuries

**34,566**
intentionally shot by someone else

**3,554**
survive an attempted gun suicide

**32,759**
shot unintentionally

**1,376**
shot by legal intervention

**4,471**
shot but intent was unknown

**FATALITIES**

**1,663**
Kids & teens die from gun violence

**864**
murdered

**662**
die from gun suicide

**89**
killed unintentionally

**10**
killed by legal intervention

**38**
die but intent was unknown

**GUN INJURIES**

**6,294**
Children & teens survive gunshot injuries

**2,788**
intentionally shot by someone else

**166**
survive an attempted gun suicide

**2,893**
shot unintentionally

**101**
shot by legal intervention

**380**
shot but intent was unknown

*This number is a five-year average derived from Violence Policy Center's "When Men Murder Women" analysis of FBI homicide data, 2014-18 (the five most recent years available for this).



**BRADY**
UNITED AGAINST GUN VIOLENCE

167

## EVERY DAY ON AVERAGE

### 316
People are shot

### 22
Children and teens (age 1-17) are shot

#### FATALITIES

**106**
People die from gun violence

**39**
murdered

**64**
die from suicide

**1**
killed unintentionally

**1**
killed by legal intervention

**1**
died but intent was unknown

#### GUN INJURIES

**210**
People survive gun injuries

**95**
intentionally shot by someone else

**10**
survive an attempted gun suicide

**90**
shot unintentionally

**4**
shot by legal intervention

**12**
shot but intent was unknown

#### FATALITIES

**5**
Kids & teens die from gun violence

**2**
murdered

#### GUN INJURIES

**17**
Children & teens survive gunshot injuries

**8**
intentionally shot by someone else

**2**
children and teens either die from suicide or survive a suicide attempt.

**8**
children and teens are unintentionally shot in instances of family fire — a shooting involving an improperly stored or misused gun found in the home, resulting in injury or death.

While Brady historically used CDC data to establish averages for gun injuries as well, recent findings show there are more accurate sources. Due to funding restrictions and other constraints, the sample size utilized by the CDC is so small that its estimate of firearm injuries ranges significantly. Data provided by Healthcare Cost and Utilization Project's HCUPnet, and collected from emergency departments and databases, gives a more comprehensive picture of gun injuries in the U.S. The numbers below represent a three-year average of the **most recent** HCUPnet data available (2013, '14, and '16). It is important to note that data reported for children and teens contains data only for 1-17 year-olds.



484.     On July 20, 2021, Erie County issued Executive Order #022: Declaration of Gun Violence as a Public Health Crisis.[333]  Buffalo is the second-largest city in New York and the seat of Erie County. The executive Order declaring the following facts as the predicate for action:

- WHEREAS, in June 2021, the New York State Division of Criminal Justice Services released a report indicating Erie County was the county that had the highest rate of violent crimes involving a firearm in 2020, per capita, across New York State (130.7 crimes involving a firearm per 100,000 residents), which was more than double the state average (57.4 per 100,000 residents), and even much greater than New York City's rate (77.6 per 100,000 residents); and

- WHEREAS, the Erie County Crime Analysis Center data shows that homicides have increased in Erie County for the past four years, from 46 in 2017, to 58 in 2018, 59 in 2019 and 69 in 2020, the vast majority of these having been through the use of a firearm against the decedent; and

- WHEREAS, as of July 14, 2021, 44 of the 49 homicides committed in Erie County used a firearm; and

- WHEREAS, the effects of gun violence extend far beyond these casualties because gun violence shapes and reshapes the lives of those who witness it by either knowing someone who was shot or living in fear of the next shooting; and

- WHEREAS, according to research compiled by the Everytown for Gun Safety Research Division, these injuries, whether direct or indirect, costs the United States nearly $280 billion in three different categories: (1) immediate costs

---

[333] https://www2.erie.gov/exec/sites/www2.erie.gov.exec/files/uploads/pdfs/Executive-Order-22-Gun-Violence-as-a-PHC-002.pdf

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 182 of 208

starting at the time of an incident; (2) subsequent costs such as treatment, long-term physical and mental health care, forgone earnings, criminal justice costs; and (3) cost estimates of quality-of life lost over a victim's lifespan; and for the enormous costs associated with this violence, whether they own a gun or not; and

- WHEREAS, gun violence is not limited to person-on-person acts, nor certain geographic areas of Erie County, but all areas of Erie County when suicides are included; and

- WHEREAS, the Erie County Medical Examiner Office has issued reports indicating that a firearm was used in 29 suicides in 2019, 30 in 2020 and, as of July 14, 2021, 8 in 2021; and

- WHEREAS, the Erie County Medical Examiner's Office reports indicate that a firearm was used in thirty-two percent (32%) of suicides in Erie County in 2020 and thirty-one percent (31%) of suicides in Erie County in 2021; and

- WHEREAS, Live Well Erie was established by Executive Order No. 21 in September 2019 to focus on the social determinants of health, including housing stability, job opportunities, and neighborhood crime and safety, which dramatically influence the ability of every resident to achieve his or her full potential; and

- WHEREAS, the impact of gun violence on public health deserves action from all levels of government, especially counties.

485.    On this basis, the Erie County Executive, Marc C. Poloncarz, ordered:

- I declare gun violence to be a public health crisis in Erie County.

- I direct the Commissioner of Central Police Services, Commissioner of Probation, Commissioner of Health, Commissioner of the Department of Mental Health, and Commissioner of the Department of Social Services to form a task force to work in concert with local law enforcement, including the Erie County Sheriff's Office and Buffalo Police Department, the Erie County District Attorney's Office, members of the Erie County Legislature, local anti-violence organizations and leaders, and the Live Well Erie Task Force to prepare programs and initiatives that (a) decrease gun violence among youth; (b) increase funding to programs specifically designed to reduce gun-violence; (c) work with local law enforcement agencies to create strategies to reduce the amount of illegal firearms in Erie County; (d) work with marginalized populations to provide education on gun violence, issues and solutions; (e) advocate for relevant policies that improve health in communities of color; and (f) support local, State, and Federal programs that advance anti-gun violence initiatives.

- I direct and authorize the Commissioner of the Department of Probation to increase the number of monthly home visits, known as Individual Custom Notifications, performed by Department of Probation officers with probationers who are at high-risk of involvement with guns and violence under the Gun Involved Violence Elimination ("GIVE") Initiative.

- I direct and authorize the Commissioner of the Department of Social Services to (a) expedite the investment of the additional $530,727 received by Erie County from New York State for additional summer youth employment opportunities, under the new age and geographic residence restrictions provided by New York State, thereby making more at-risk youth and young adults eligible for the

171

program, and to work with local anti-violence organizations and leaders to identify atrisk youth and young adults for the initiative; and (b) following placement of at-risk young adults into temporary employment opportunities as described above, work to transition said young adults into permanent employment opportunities using the Department of Social Services' Placing Individuals in Vital Opportunity Training ("PIVOT") program.

486.    The Erie County Gun Violence Prevention Task Force was created in July, 2021, by Erie County Executive Order #22, which declared gun violence to be a public health crisis.[334]  The Task Force has been working diligently since then to address the Order's key objectives. The Erie County Commissioners of Central Police Services, Probation, Health, Mental Health, and Social Services collaborate on the Task Force with local law enforcement including the Erie County Sheriff's Office and Buffalo Police Department, the Erie County District Attorney's Office, members of the Erie County Legislature, local antiviolence organizations and leaders, and the Live Well Erie Task Force.[335]

487.    The Task Force is charged with preparing programs and initiatives addressing six areas of concern:[336]

- decrease gun violence among youth;

- increase funding to programs specifically designed to reduce gun-violence;

- work with local law enforcement agencies to create strategies to reduce the number of illegal firearms in Erie County;

---

[334] https://www2.erie.gov/exec/sites/www2.erie.gov.exec/files/uploads/pdfs/7-18-22-gun-violence-prevention-task-force-report.pdf

[335] *Id.*

[336] *Id.*

- work with marginalized populations to provide education on gun violence, issues and solutions;

- advocate for relevant policies that improve health in communities of color; and

- support local, State, and Federal programs that advance anti-gun violence initiatives.

488. On June 20, 2022, the Task Force issued a report. The report noted that the Task Force increased funding to the GIVE program;[337] expedited an additional $530,727 in funding received by Erie County from NYS to expand the 2021 Summer Youth Employment Program ("SYEP") to have a focus on gun violence prevention in targeted zip codes throughout the City of Buffalo;[338] is working on its own initiatives and has secured three hundred gunlocks to distribute to Erie County residents;[339] and is now partnering with the University of Buffalo School of Social Work to create an environmental scan which will integrate mapping of gun violence "hot spots" in the community with mapping of assets and resources associated with gun violence prevention and recovery.[340]

489. The report also contained the following chart:

---

[337] The Gun Involved Violence Elimination (GIVE) Initiative provides state funding to local law enforcement agencies for equipment, overtime, personnel, as well as focused training and technical assistance. GIVE is a key component of New York State's shooting and homicide reduction strategy. GIVE supports 20 police departments, district attorneys' offices, probation departments and sheriffs' offices in 17 counties: Albany, Broome, Chautauqua, Dutchess, Erie, Monroe, Nassau, Niagara, Oneida, Onondaga, Orange, Rensselaer, Rockland, Schenectady, Suffolk, Ulster and Westchester. These counties historically account for more than 80 percent of the violent crime that occurs in New York State outside of New York City. *See* https://www.criminaljustice.ny.gov/ops/gunviolencereduction/index.htm#:~:text=The%20Gun%20Involved%20Violence%20Elimination,shooting%20and%20homicide%20reduction%20strategy.

[338] https://www2.erie.gov/exec/sites/www2.erie.gov.exec/files/uploads/pdfs/7-18-22-gun-violence-prevention-task-force-report.pdf

[339] *Id.*

[340] *Id.*

173



490.    Despite these proactive approaches, gun violence continues to be an urgent matter in the City of Buffalo. For example, on March 30, 2022, the Erie County Sheriff reported the arrest of two

individuals on March 29 for weapon charges.[341] Both individuals were arrested in the Bailey and Broadway area of Buffalo.[342] The arrests follow an investigation into illegal gun trafficking activity in the area.[343]

491.    On July 8, 2021 (last updated July 11, 2021), 7 Eyewitness News (7abc, WKBW-Buffalo) published an article titled, "Three-year-old boy shot in Buffalo on Monday dies; grandfather remembers 'cheerful,' 'funny' child."[344] The story provided, "The family of three-year-old Shaquelle Walker Jr. who was among four people shot on Donovan Drive in Buffalo on Monday says the boy has died. "I really don't know what to say right now," said Maurice Walker, the boy's grandfather. "I'm just at a loss for words, that it can happen to a little kid when he's in front of his house, his grandmother's house with his father, looking, enjoying fireworks, everyone else was doing on the 4th and the 5th." The boy, who went by the nickname Quelle, was shot along with three men just after 11p.m. Monday on Donovan Drive…Two of those men were listed on stable condition following the shooting, while another man was grazed, treated, and released…Two people, 22-year-old Dequan Richardson and 25-year-old Jonay Robinson of Cheektowaga, were arraigned Thursday morning on separate drug and gun charges but are considered "person of interest" in connection with the shooting, according to Erie County District Attorney John Flynn. The investigation into the shooting led Buffalo police to obtain a search warrant

---

[341] https://www2.erie.gov/sheriff/index.php?q=press/2-arrested-following-gun-trafficking-investigation

[342] *Id.*

[343] *Id.*

[344] "Three-year-old boy shot in Buffalo on Monday dies; grandfather remembers 'cheerful,' 'funny' child," available at https://www.wkbw.com/news/local-news/three-year-old-boy-shot-in-buffalo-on-monday-dies-grandfather-remembers-cheerful-funny-child

for the apartment where the drugs and guns were found. However, Flynn could not say whether the guns taken from the apartment were used in the shooting."[345]

492.    On September 21, 2021, the Erie County District Attorney's Office issued a press released titled, "Cheektowaga Couple Indicted on Murder, Assault and Gun Charges for Shooting That Killed Toddler, Injured Three Adults on Donovan Drive."[346]  The press release provided, "Erie County District Attorney John J. Flynn announces that 22-year-old Dequan I. Richardson and 25-year-old Jonay B. Robinson of Cheektowaga were arraigned this morning before Erie County Court judge Susan Eagan on an indictment charging them each with the following offenses…It is alleged that on July 5, 2021, at approximately 10:58p.m., the defendants drove to Donovan Drive in the City of Buffalo. The defendants, while acting in concert with one another, are accused of firing numerous shots into a crowd of people, who were gathered in the courtyard of the Ferry Grider Homes housing complex to watch fireworks, before driving form the area. Three adult males were hit by gunfire, but survived their injuries…The fourth victim, 3-year-old Shaquelle Walker, Jr., was hit in the head by a bullet. He was taken to Oishei Children's Hospital where he died from his injuries on July 9, 2021. It is further alleged that on the afternoon of July 6, 2021, a search warrant was executed at the defendants' residence on Slate Creek Drive in the Town of Cheektowaga as part of the investigation into the shooting on Donovan Drive. Investigators allegedly found an illegal pistol and a rifle inside the shared apartment."[347]

## XI.    This Avoidable Crisis Needs to Be Fixed

---

[345]  *Id.*

[346]  "Cheektowaga Couple Indicted on Murder, Assault and Gun Charges for Shooting That Killed Toddler, Injured Three Adults on Donovan Drive," available at https://www2.erie.gov/da/index.php?q=press/cheektowaga-couple-indicted-murder-assault-and-gun-charges-shooting-killed-toddler-injured-thr

[347]  *Id.*

493.     The rise of gun violence in the State of New York is a public health crisis, as declared both by the 2021-2022 legislative session and by the Governor's recent Executive Order.[348]

494.     As herein described, Defendants have created, maintained, or contributed to a substantial interference with the public's right to health and safety, exacerbating the ongoing public health crisis.

495.     New York's Penal Law establishes that the unlawful possession, sale, or use of an "unfinished" frame or receiver constitutes a nuisance. N.Y. Penal Law §§ 265.07, 400.05.

496.     New York law permits civil enforcement actions based on such a nuisance. Specifically, in New York, and as described in more detail above, "given the specific harm illegal firearm violence causes certain New Yorkers, those responsible for the sale, manufacture, importing, or marketing of firearms should be held liable for the public nuisance caused by such activities."[349]

497.     Further, "[n]o gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product." N.Y. Gen. Bus. Law § 898-b(1).

498.     Moreover, "[a]ll gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state." Id. § 898-b(2). A "qualified product" is a firearm or a component part of a firearm that has been shipped in interstate commerce. Id. § 898-a(6) (incorporating the federal definition from 15 U.S.C. § 7903(4)).

---

[348] See N.Y. Executive Order 3.9 (declaring a disaster emergency across the State due to gun violence) (available at https://www.governor.ny.gov/sites/default/files/2022-06/EO_3.9.pdf).

[349] New York Sponsors Memorandum, 2021 S.B. 7196 (available at https://www.nysenate.gov/legislation/bills/2021/S7196); see also N.Y. Gen. Bus. Law § 898-d.

177

499.  Here, and as described more fully above, each Defendant has engaged in conduct prohibited by General Business Law § 898-b.

500.  For example, as detailed above, several Ghost Gun Defendants sent several shipments to individual consumers in a short period of time, making no effort to determine whether those consumers were engaged in firearms trafficking; shipped "unfinished" frames and receivers to individuals who were not eligible to legally own a firearm; and, as to those Ghost Gun Defendants who sold "unfinished" frames or receivers to undercover employees of New York City or the Office of the Attorney General, they made no attempt to conduct a background check or otherwise verify that the purchaser was legally permitted to purchase a gun in this State. Upon information and belief, each sale of Ghost Gun Defendants' prohibited ghost gun products to a New York customer or to a customer who could foreseeably bring that product into New York likewise lacked any background check or meaningful verification process.

501.  The misconduct of each Defendant is ongoing and continuous.

502.  Each Defendant's misconduct has resulted in significant ongoing harm and costs to the City of Buffalo.

503.  The City of Buffalo believes that abating the public health and safety crisis caused by Defendants' products will require extensive additional resources, including those necessary to (i) develop and execute policies and procedures to locate, recover, and destroy "unfinished" frames and receivers and/or the ghost guns made from them, (ii) research and implement processes sufficient to identify, trace, and link unserialized firearms used in the commission of multiple crimes, and (iii) support communities hard hit by gun violence and crimes.

504.  Despite enacting evidence-based gun control laws and effective enforcement strategies, the City of Buffalo finds itself in a gun violence crisis. All Defendants herein named caused, maintained, and/or contributed to this crisis for their own profit, and must be held accountable.

178

## FIRST CAUSE OF ACTION
### (Violation of GBL § 898 (a-e))

505.     The City of Buffalo incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

506.     Defendants, through their sales, importing, assembling, marketing, and/or distribution practices, have knowingly created, supplied, maintained, and contributed to an illegal market for firearms through which criminals, juveniles, and other prohibited users obtain firearms that are thereafter used in criminal activity in the City of Buffalo.

507.     By acting to create, supply, maintain, and contribute to an illegitimate market for firearms, Defendants have created, contributed to, and maintained a public nuisance that unreasonably interferes with rights common to the general public; deprives City of Buffalo residents of the peaceful use of public streets, sidewalks and parks; interferes with commerce, travel and the quality of daily life; and endangers the property, health, and safety of large numbers of residents of the City of Buffalo.

508.     Defendants have endangered and harmed the public, undermined law enforcement efforts to prevent gun violence and other gun-related crime, and diverted scarce law enforcement resources.

509.     Upon information and belief, at all relevant times herein mentioned, Defendants, who are sued individually and jointly and severally, are the manufacturers, sellers, assemblers, importers, marketers, distributors, and/or dealers of firearms used in the commission of crimes in the State of New York and the City of Buffalo.

510.     Upon information and belief, Defendants, through their manufacturing, importing, design, marketing, and/or distribution practices, have unlawfully and unreasonably knowingly created, supplied, maintained, and contributed to an illegitimate market for guns through which criminals,

juveniles and other prohibited users obtain guns that are thereafter used in criminal activity in the State of New York and the City of Buffalo.

511.    Upon information and belief, at all relevant times herein mentioned, Defendants unlawfully and unreasonably produce, market, import, distribute and/or sell substantially more firearms than they reasonably expect to be bought by law-abiding purchasers, and they knowingly participate in and facilitate the secondary market where persons who have injurious intent obtain their firearms.

512.    Upon information and belief, at all relevant times herein mentioned, it was foreseeable to Defendants that such an unlawful and unreasonable business and marketing practices would lead to easy access for criminal purposes, including easy access by persons intent on murder, mayhem, or other crimes.

513.    Upon information and belief, Defendants' conduct has thereby created and contributed to a public nuisance in the City of Buffalo and in the State of New York by unlawfully and unreasonably interfering with public safety and health and undermining New York's General Business Law § 898 (a-e), and it has resulted in the specific and particularized injuries suffered by the City of Buffalo.

514.    Upon information and belief, although Defendants knew about precautions they could have taken to decrease access by persons prohibited from possessing their products, they knowingly established, supplied, and maintained an oversaturated firearms market that facilitates easy access for criminal purposes, including easy access by persons intent on murder, mayhem, and other crimes.

515.    Upon information and belief, Defendants could have taken, but have failed to take, reasonably available steps to restrict or impede the unlawful flow and use of firearms into the City of Buffalo and State of New York.

516.    Upon information and belief, Defendants' actions make the City of Buffalo and the public vulnerable to crime and assault, and their conduct creates a public nuisance within the meaning of New York's General Business Law § 898 (a-e).

517.    Upon information and belief, Defendants' conduct in the design, manufacturing, importing, selling, marketing and/or distribution of their firearms has created, contributed to, and maintained the public nuisance of unlawful possession, transportation and disposition of firearms and the utilization of guns in the commission of an offense by a) marketing that emphasizes firearm characteristics such as their high capacity and ease of concealment, which appeals to prospective purchasers who have criminal intent, including but not limited to through advertisement, and product placement in movies and social media; b) purposely supplying more firearms than the legitimate market can bear, in order to induce sales in the secondary market; c) not training dealers to avoid straw sales and other illegal transactions; and d) refusing to terminate contracts with distributors who sold to dealers with disproportionately high volumes of guns traced to crime scenes.

518.    Upon information and belief, as a result, Defendants' conduct unreasonably exposes the City of Buffalo and the public to a risk of harm.

519.    Upon information and belief, Defendants market, distribute, promote, manufacture, import and/or sell their products with reckless disregard for human life and for the peace, tranquility, and economic well-being of the public.

520.    Upon information and belief, Defendants' acts are the cause of the Plaintiff's past, present and future injury.

521.    Defendants' conduct violates § 898-b of the New York General Business Law ("GBL"), which declares such conduct to be a public nuisance under GBL § 898-c. The statute expressly provides that a city corporation counsel may bring a lawsuit on behalf of the municipality to enjoin and restrain violations of §§ 898-b(1) or (2). GBL § 898-d.

522.    GBL § 898-b provides a statutory cause of action against "gun industry members" who endanger the public through unlawful or unreasonable business practices involving firearms or firearm

components or who fail to use reasonable controls to prevent those products from being possessed, used, sold, or marketed unlawfully in New York State.

523.    Specifically, GBL § 898-b provides:

1. No gun industry member, by conduct either unlawful in itself or unreasonable under all the circumstances shall knowingly or recklessly create, maintain or contribute to a condition in New York state that endangers the safety or health of the public through the sale, manufacturing, importing or marketing of a qualified product.

2. All gun industry members who manufacture, market, import or offer for wholesale or retail sale any qualified product in New York state shall establish and utilize reasonable controls and procedures to prevent its qualified products from being possessed, used, marketed or sold unlawfully in New York state.

524.    The statute defines "gun industry member" as any person or entity "engaged in the sale, manufacturing, distribution, importing or marketing of firearms, ammunition, ammunition magazines, and firearms accessories." GBL § 898-a(4). Each Defendant is a gun industry member because it engages in one or more of the above.

525.    "Qualified product" is defined under GBL § 898-b by reference to 15 U.S.C. § 7903(4), which in turn defines "qualified product" to include "a firearm" as defined in the federal Gun Control Act, or "a component part of a firearm or ammunition," that "has been shipped or transported in interstate or foreign commerce." See GBL § 898-a(6). Each Defendant sells, manufactures, assembles, imports, distributes and/or markets Qualified Products.

526.    Under the federal Gun Control Act, a "firearm" is defined, in relevant part, as "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; [or] (B) the frame or receiver of any such weapon." 18 U.S.C. § 921(a)(3).

527.    Each Defendant has sold, and continues to sell, manufacture, assemble, import, distribute and/or market "Qualified Products" in the City of Buffalo and New York State.

182

528.     Each Defendant, through the sale, manufacturing, assembling, importing, distributing, and/or marketing of Qualified Products, has engaged in conduct that is unlawful and/or unreasonable under the circumstances and has knowingly or recklessly created, maintained, or contributed to a condition in the City of Buffalo and New York State that endangers the health and safety of the public.

529.     Each Defendant has failed to establish and/or utilize reasonable controls and procedures to prevent its Qualified Products from being possessed, used, marketed or sold unlawfully in New York and the City of Buffalo.

530.     Accordingly, each Defendant has violated, and continues to violate GBL § 898-b.

## SECOND CAUSE OF ACTION
### (Common Law Public Nuisance)

531.     The City of Buffalo incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

532.     Defendants, through their past and present business practices, create, contribute to, and maintain a public nuisance under the common law.

533.     A public nuisance "consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons." *Copart Indus., Inc. v. Consol. Edison Co.*, 41 N.Y.2d 564, 568 (1977) (internal citations omitted).

534.     Defendants, through their sales, importing, assembling, marketing, and/or distribution practices, have knowingly created, supplied, maintained and contributed to an illegal market for firearms through which criminals, juveniles, and other prohibited users obtain firearms that are thereafter used in criminal activity in the City of Buffalo.

535.   By acting to create, supply, maintain, and contribute to an illegitimate market for firearms, Defendants have created, contributed to, and maintained a public nuisance that unreasonably interferes with rights common to the general public; deprives City of Buffalo residents of the peaceful use of public streets, sidewalks and parks; interferes with commerce, travel and the quality of daily life; and endangers the property, health, and safety of large numbers of residents of the City of Buffalo.

536.   Defendants have endangered and harmed the public, undermined law enforcement efforts to prevent gun violence and other gun-related crime, and caused the diversion of scarce law enforcement resources.

537.   Upon information and belief, at all relevant times herein mentioned, Defendants, who are sued individually and jointly and severally, are the manufacturers, sellers, assemblers, importers, marketers, distributors, and/or dealers of firearms used in the commission of crimes in the State of New York and the City of Buffalo.

538.   Upon information and belief, Defendants, through their manufacturing, importing, design, marketing, and/or distribution practices, have unlawfully and unreasonably knowingly created, supplied, maintained, and contributed to an illegitimate market for guns through which criminals, juveniles and other prohibited users obtain guns that are thereafter used in criminal activity in New York and Buffalo.

539.   Upon information and belief, at all relevant times herein mentioned, Defendants unlawfully and unreasonably produce, market, import, distribute and/or sell substantially more firearms than they reasonably expect to be bought by law-abiding purchasers, and they knowingly participate in and facilitate the secondary market where persons who have injurious intent obtain their firearms.

540.   Upon information and belief, at all relevant times herein mentioned, it was foreseeable to Defendants that such an unlawful and unreasonable business and marketing practices would lead to

184

easy access for criminal purposes, including easy access by persons intent on murder, mayhem, and other crimes.

541.     Upon information and belief, Defendants' conduct has thereby created and contributed to a public nuisance in the City of Buffalo and State of New York by unlawfully and unreasonably interfering with public safety and health.

542.     Upon information and belief, although Defendants knew about precautions they could have taken to decrease access by persons prohibited from possessing their products, they knowingly established, supplied, and maintained an oversaturated firearms market that facilitates easy access for criminal purposes, including easy access by persons intent on murder, mayhem, or other crimes.

543.     Upon information and belief, Defendants could have taken, but have failed to take, reasonably available steps to restrict or impede the unlawful flow and use of firearms into the City of Buffalo and State of New York.

544.     Upon information and belief, Defendants' actions make the Plaintiff and public vulnerable to crime and assault and their conduct creates a public nuisance.

545.     Upon information and belief, Defendants' conduct in the design, manufacturing, importing, selling, marketing and/or distribution of their firearms has created, contributed to, and maintained the public nuisance of unlawful possession, transportation and disposition of firearms and the utilization of guns in the commission of an offense by a) marketing that emphasizes firearm characteristics such as their high capacity and ease of concealment, that appeals to prospective purchasers with criminal intent, including but not limited to through advertisement, and product placement in movies and social media; b) purposely supplying more firearms than the legitimate market can bear in order to induce sales in the secondary market; c) not training dealers to avoid straw sales and other illegal transactions; and d) refusing to terminate contracts with distributors who sold to dealers with disproportionately high volumes of guns traced to crime scenes.

185

546. Upon information and belief, as a result, Defendants' conduct unreasonably exposed Plaintiff to a risk of harm.

547. Upon information and belief, Defendants market, distribute, promote, manufacture, import and/or sell their products with reckless disregard for human life and for the peace, tranquility, and economic well-being of the public.

548. Furthermore, upon information and belief, Defendants have created a firearms market that is oversaturated and their conduct has unreasonably interfered with public safety and health.

549. Upon information and belief, Defendants' acts are the cause of Plaintiff's past, present, and future injury.

550. Upon information and belief, each Defendant has sold, and continues to sell, manufacture, assemble, import, distribute and/or market firearms in the City of Buffalo and New York State.

551. Each Defendant, through the sale, manufacturing, assembling, importing, distributing, and/or marketing of firearms, has engaged in conduct that is unlawful and/or unreasonable under the circumstances and has knowingly or recklessly created, maintained, or contributed to a condition in the City of Buffalo and New York State that endangers the health and safety of the public.

552. Each Defendant has failed to establish and/or utilize reasonable controls and procedures to prevent its firearms from being possessed, used, marketed or sold unlawfully in New York and the City of Buffalo.

553. Accordingly, Defendants each substantially interfere with rights common to all and cause, contribute to, and/or maintain a public nuisance in the City of Buffalo.

### THIRD CAUSE OF ACTION
### (Deceptive Business Practices in Violation of GBL 349)

554.     The City of Buffalo incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

555.     GBL Article 22-A, § 349 prohibits deceptive acts and practices in the conduct of any business, trade, or commerce in the State of New York.

556.     Upon information and belief, all Defendants have repeatedly violated GBL § 349 by engaging in a wide array of deceptive acts and practices, as set forth above.

557.     In particular, the Ghost Gun Defendants have repeatedly violated GBL § 349 by selling "unfinished" frames, "unfinished" receivers, and/or ghost guns in the State of New York and/or the City of Buffalo, and also by misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal for consumers to buy and possess these products, that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Ghost Gun Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded.

558.     In particular, the AR-15-Style Assault Weapon Defendants have repeatedly violated GBL § 349 by knowingly marketing, advertising, and promoting AR-15-style assault weapons for civilians to use to carry out offensive, military-style combat missions against their perceived enemies. Such use of such weapons, or any weapon for that matter, would be illegal, and New York law does not permit advertisements and other marketing techniques that promote or encourage violent, criminal behavior.

559.     Upon information and belief, Defendants directed their marketing and advertising to the illegal secondary criminal market, as well as to the public at large.

560.     Upon information and belief, the promotion of an association between Defendants' products and military and law enforcement personnel is false, unfair, deceptive, and unlawful.

561.     Upon information and belief, Defendants' targeting of their marketing campaign to youths is unfair and unlawful.

562. Upon information and belief, Defendants marketed their firearms in a way that attracted and enabled persons who posed a danger to others.

563. As a direct and proximate cause of Defendants' violations, Plaintiff has sustained damages.

## FOURTH CAUSE OF ACTION
### (Deceptive Business Practices in Violation of GBL 350)

564. The City of Buffalo incorporates the allegations within all prior paragraphs within this Complaint as if they were fully set forth herein.

565. GBL Article 22-A, § 350 prohibits false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York.

566. Upon information and belief, all Defendants have repeatedly violated GBL § 350 by engaging in a wide array of deceptive acts and practices, as set forth above.

567. In particular, the Ghost Gun Defendants have repeatedly violated GBL § 350 by misrepresenting, directly or by implication, in their advertising and elsewhere, that it is legal for consumers to buy and possess "unfinished" frames, "unfinished" receivers, and/or ghost guns in the State of New York and/or the City of Buffalo, that only completed guns need to be sold by a dealer with an FFL, that purchasers of the guns sold by Ghost Gun Defendants are not subject to background checks or waiting periods, and that the guns sold need not be serialized or recorded.

568. In particular, the AR-15-Style Assault Weapon Defendants have repeatedly violated GBL § 350 by knowingly marketing, advertising, and promoting AR-15-style assault weapons for civilians to use to carry out offensive, military-style combat missions against their perceived enemies. Such use of such weapons, or any weapon for that matter, would be illegal, and New York law does not permit advertisements and other marketing techniques that promote or encourage violent, criminal behavior.

188

Case 1:23-cv-00066-FPG   Document 1-1   Filed 01/23/23   Page 201 of 208

569.     Upon information and belief, Defendants directed their marketing and advertising to the illegal secondary criminal market, as well as to the public at large.

570.     Upon information and belief, the promotion of an association between Defendants' products and military and law enforcement personnel is false, unfair, deceptive, and unlawful.

571.     Upon information and belief, Defendants' targeting of their marketing campaign to youths is unfair and unlawful.

572.     Upon information and belief, Defendants marketed their firearms in a way that attracted and enabled persons who posed a danger to others.

573.     As a direct and proximate cause of Defendants' violations, Plaintiff has sustained damages.

189

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants, jointly and severally, as to the FIRST, SECOND, THIRD, and FOURTH Causes of Action, awarding Plaintiff amounts that exceed the jurisdiction of all lower Courts:

i.    compensatory damages in an amount sufficient to fairly and completely compensate Plaintiff for all damages;

ii.   direct Defendants, jointly and severally, to endow an abatement fund with sufficient capital to eliminate the public nuisance they are responsible for creating, exacerbating, and/or perpetuating, pursuant to New York General Business Law § 898-b;

iii.  treble damages, penalties and costs pursuant to General Business Law §§349(h) and 350-3(3);

iv.   punitive damages;

v.    attorneys' fees;

vi.   interest, costs and disbursements; and

vii.  such and further relief as this Court may deem just and proper.


Dated:    December 20, 2022
          Melville, New York

_____
Salvatore C. Badala
Shayna E. Sacks
NAPOLI SHKOLNIK PLLC
400 Broadhollow Road, Suite 305
Melville, New York 11747

190

Paul J. Napoli
Hunter J. Shkolnik
NAPOLI SHKOLNIK
1302 Avenida Ponce de León,
Santurce, Puerto Rico 00907
Phone: (347) 379-1688
pnapoli@NSPRlaw.com
hunter@NSPRlaw.com

*Attorneys for Plaintiff*

191

## VERIFICATION

STATE OF NEW YORK    )
                            )  ss.:
COUNTY OF SUFFOLK    )

       Salvatore Badala, being first duly sworn, deposes and says: That he represents the Plaintiff in the above entitled action, that he has read the foregoing Verified Complaint and knows the contents thereof; that the same is true of her own knowledge except as to matters and things therein stated upon information and belief, and as to those matters and things she believes it to be true.

                                             SALVATORE BADALA

Sworn before me this
20th day of December, 2022

Harold May
Notary Public, State of New York
No. 01MA5069176
Qualifies in Suffolk County
Commission Expires: November 18, 2026

192

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ERIE

-------------------------------------------------------------------X

THE CITY OF BUFFALO,                                   Index No.:

*Plaintiff,*

    -*against*-

SMITH & WESSON BRANDS, INC.; BERETTA U.S.A.
CORP.; BUSHMASTER FIREARMS INDUSTRIES, INC.;
COLT'S MANUFACTURING COMPANY, LLC;
GLOCK, INC.; HI-POINT FIREARMS, A/K/A
STRASSEL'S MACHINE, INC.; JA INDUSTRIES, LLC,
F/K/A JENNINGS FIREARMS, F/K/A BRYCO ARMS,
F/K/A JIMENEZ ARMS; KEL-TEC CNC INDUSTRIES,
INC.; O.F. MOSSBERG & SONS, INCORPORATED;
REMARMS, LLC, A/K/A REMINGTON FIREARMS;
SAVAGE ARMS, INC.; SIG SAUER, INC.;
SPRINGFIELD ARMORY, INC.; STURM, RUGER &
CO., INC.; SCCY INDUSTRIES, LLC; TAURUS
HOLDINGS, INC., A/K/A TAURUS INTERNATIONAL
MANUFACTURING, INC.; ARM OR ALLY, LLC;
BROWNELLS, INC., A/K/A BROWNELLS OR BOB
BROWNELL'S; GS PERFORMANCE, LLC, A/K/A
GLOCKSTORE, A/K/A GSPC A/K/A DOUBLE
DIAMOND; INDIE GUNS, LLC; JSD SUPPLY; KM
TACTICAL; POLYMER80, INC.; PRIMARY ARMS,
LLC; RANIER ARMS, LLC; SALVO TECHNOLOGIES,
INC., A/K/A 80P BUILDER OR 80P FREEDOM CO.;
ROCK SLIDE USA, LLC; BANGERS, L.P. N/K/A IRON
VALLEY™ SUPPLY CO.; GUN CENTER INC., A/K/A
GC WHOLESALE; RSR GROUP, INC.; VINTAGE
FIREARMS, LLC; AND WOLCOTT GUNS INC.,

*Defendants.*

-------------------------------------------------------------------X

=================================================================

## VERIFIED COMPLAINT

=================================================================

**NAPOLI SHKOLNIK PLLC**

400 Broadhollow Road, Ste. 305.Melville, New York 11747, Tel: (212) 397-1000
*Attorneys for Plaintiff*

=================================================================

The undersigned attorney hereby certifies, pursuant to 22 NYCRR 130-1.1a that he has read the
within papers and that same are not frivolous as that term is defined in 22 NYCRR 130-1.1(c).

/s/ Salvatore C. Badala
Salvatore C. Badala

193

========================================================================
Service of a copy of the within                                        is hereby
admitted.

Dated,          _____

        Attorney(s) for
========================================================================

PLEASE TAKE NOTICE:

☐   NOTICE OF ENTRY
        that the within is a (certified) true copy of an                    duly entered in the
        office of the clerk of the within named court on _____200__.

☐   NOTICE OF SETTLEMENT
        that an order                    of which the within is a true copy
        will be presented for settlement to the HON.              one of the judges of the
        within named Court, at
        on                    200___   at_____ O'clock ___.M.

Dated,   _____

                                Yours, etc.


                        **NAPOLI SHKOLNIK PLLC**

194

# EXHIBIT C



Salvatore C. Badala
Partner
*SBadala@napolilaw.com*

December 20, 2022

Erie County Clerk's Office
92 Franklin Street
Buffalo, NY 14202

Dear Honorable Clerk:

Attached with this filing, you will find a Complaint on behalf of the City of Buffalo.

Pursuant to NY CPLR §8018 (b)(5), it is our understanding that the City of Buffalo is not

responsible for paying a filing fee.

Thank you,

Salvatore C. Badala
NAPOLI SHKOLNIK PLLC
400 Broadhollow Rd., Ste. 305
Melville, New York 11747

*Attorneys for the City of Buffalo, Plaintiff*